FILED FOR RECORD 08/28/2023 15:02:01
Mandy Plaisance, DY CLERK
JEFFERSON PARISH, LA

## 24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON
## STATE OF LOUISIANA

SUIT NO. 846-304                          DIVISION _____

### MAI TL, INC. d/b/a BAYMONT INN & SUITES – MARRERO

#### vs.

### VELOCITY RISK UNDERWRITERS, LLC;
### INDEPENDENT SPECIALTY INSURANCE COMPANY;
### CERTAIN UNDERWRITERS AT LLOYD'S AND OTHER
### INSURERS SUBSCRIBING TO BINDING AUTHORITY B604510568622021; and
### ACCESS RESTORATION SERVICES US, INC.

FILED: _____        _____
                                         DEPUTY CLERK

### PETITION FOR DECLARATORY JUDGMENTS AND FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes the plaintiff property owner, MAI TL, INC. d/b/a BAYMONT INN & SUITES - MARRERO ("Plaintiff" and/or "Baymont"), which respectfully files this *Petition for Declaratory Judgment and for Damages* against VELOCITY RISK UNDERWRITERS, LLC ("Velocity Risk"), INDEPENDENT SPECIALTY INSURANCE COMPANY ("ISIC"), and CERTAIN UNDERWRITERS AT LLOYD'S AND OTHER INSURERS SUBSCRIBING TO BINDING AUTHORITY B604510568622021 ("Lloyd's London") (collectively, the "Defendant Insurers"), as well as against ACCESS RESTORATION SERVICES US, INC. ("ARS"), a disaster mitigation and property restoration company, for all of the reasons and on the grounds set forth below, to wit:

#### PARTIES

#### 1.

Plaintiff, MAI TL, INC. d/b/a BAYMONT INN & SUITES - MARRERO ("Plaintiff" and/or "Baymont"), is a domestic corporation incorporated under the laws of the State of Louisiana with its principal (and only) place of business located in Jefferson Parish, specifically at 6589 Westbank Expressway, Marrero, Louisiana 70072.

#### 2.

Defendant VELOCITY RISK UNDERWRITERS, LLC ("Velocity Risk") is a foreign limited liability company organized under the laws of the State of Delaware with a principal place of business located in Nashville, Tennessee and with a registered principal business office in

EXHIBIT
3

Louisiana located in Baton Rouge, LA. Velocity Risk may be served through its registered agent for service of process in this State, CORPORATION SERVICE COMPANY, located at 501 Louisiana Avenue, Baton Rouge, Baton Rouge, LA 70802.

**3.**

Defendant INDEPENDENT SPECIALTY INSURANCE COMPANY ("ISIC"), upon information and belief, is (or was) a foreign insurance company incorporated under the laws of the State of Delaware with its principal place of business located in the State of Texas. Upon information and belief, ISIC was recently acquired in May 2023, by VELOCITY HOLDCO, LLC (a Delaware limited liability company with corporate offices located in Tennessee), and pursuant to the agreement(s) effectuating said acquisition, the surviving entity which has agreed to guarantee ISIC's obligations is STATE NATIONAL INSURANCE COMPANY, INC., which is a Texas corporation that may be served through its agent for service of process in this State, the Louisiana Secretary of State, located at 8585 Archives Avenue, Baton Rouge, LA 70809.[1]

**4.**

Defendant CERTAIN UNDERWRITERS AT LLOYD'S AND OTHER INSURERS SUBSCRIBING TO BINDING AUTHORITY B604510568622021 ("Lloyd's London"), upon information and belief, is a foreign underwriting syndicate of Victor Insurance Holdings and Lloyd's of London which is authorized to do and doing business in the State of Louisiana, and which may be served through its agent for service of process in this State, the Louisiana Secretary of State, located at 8585 Archives Avenue, Baton Rouge, LA 70809.

**5.**

Defendant ACCESS RESTORATION SERVICES US, INC. ("ARS") is a foreign corporation incorporated under the laws of the State of Delaware with a principal place of business in the State of Texas, but which is authorized to do and doing business in the State of Louisiana, including through its registered, principal business office in the State of Louisiana, located in Lafayette, LA.

---

[1] Prior to its acquisition by VELOCITY HOLDCO, LLC in May 2023, ISIC could be served through its registered agent for service of process in this State, NATIONAL REGISTERED AGENTS, INC., which is located at 3867 Plaza Tower Drive, Baton Rouge, LA 70816-4378.

ARS may be served through its agent for service of process in this State, NORTHWEST REGISTERED AGENT, LLC, located at 201 Rue Beauregard, Suite 202, Lafayette, LA 70508.

## JURISDICTION AND VENUE

### 6.

This Court has subject matter jurisdiction to hear the actions presented in this suit.

### 7.

This Court has personal jurisdiction over all named defendants (altogether and collectively, the "Defendants") because all Defendants do and are authorized to do business in the State of Louisiana, and because the policy of property insurance at issue in this case provides coverage for property that is situated in this Parish.

### 8.

Venue is proper herein pursuant to La. C.C.P. art. 76 because the insured property loss at issue occurred in Jefferson Parish, and because Plaintiff is domiciled in Jefferson Parish.

## RELEVANT FACTUAL BACKGROUND

### 9.

Plaintiff owns and operates a hotel in Marrero, Louisiana located at 6589 Westbank Expressway, Marrero, Louisiana 70072 (the subject "Property"), which is the insured commercial property now at issue in this matter.

### 10.

In or around April 2021, Baymont purchased and was issued a policy of commercial property insurance from the Defendant Insurers, Policy No. 2021-800969-01 (the subject "Policy"), effective April 14, 2021 through April 14, 2022. Among other things, the Policy included policy limits of $4,200,000 for Building coverage (Coverage "A"), $75,000 for Other Structures (Coverage "B"), $350,000 for Contents (Coverage "C"), and $300,000 for loss of Business Income (Coverage "D").

### 11.

Among other provisions, the Policy contains an "Appraisal" provision which specifically provides that, in the event of a covered loss, if the insured and the insurer cannot agree "on the

value of the property or the amount of loss," either party may demand that the matter be submitted to the "appraisal" process, which requires that each of the parties then select, within 20 days, their own "competent and impartial appraiser," and that these appraisers designate an umpire for purposes of resolving any disagreement between them.[2]

### 12.

The Policy also expressly prohibits the post-loss assignment of rights, benefits or claims arising under the Policy.[3] That is, pursuant to one of its overriding endorsements, namely, Endorsement SMB 421 2010 LA ALL Restrictive AOB, the subject Policy specifically provides, at Section G.1 (relating to "Assignment"), that the "[p]ost-loss assignment of rights, benefits or claims arising under this policy are prohibited." Policy, at § G.1(b).

### 13.

Plaintiff fully performed at all times under the subject Policy, including by paying all premiums when due and satisfying all other Policy requirements.

### 14.

Upon information and belief, the Defendant Insurers determined the amount of the Policy premium based upon factors related to the age and condition of the Property, the cost of replacing the Property and/or its individual elements, and the assumption that the Defendant Insurers would pay Plaintiff's claims based upon the terms and conditions of the Policy.

### 15.

On or about August 29, 2021, during the effective period of the Policy, Hurricane Ida (the subject "Hurricane") struck Southeast Louisiana as one of the most powerful and destructive hurricanes to ever make landfall in this State,[4] ultimately causing evacuations, business closures, and widespread property destruction all throughout the region, including in the greater New Orleans area and, in particular, at the location of the subject Property.

---

[2] The Policy's "Appraisal" provision, found at Section H.3, is quoted hereinbelow in full, at ¶ 38, *infra*.

[3] *See* Policy Endorsement SMB 421 2010 LA ALL Restrictive AOB (which states, *inter alia*, and in all-caps, that "THIS POLICY DOES NOT ALLOW THE ASSIGNMENT OF POST-LOSS INSURANCE BENEFITS.").

[4] Hurricane Ida was the second most damaging hurricane to ever hit Louisiana, behind only Hurricane Katrina. *See* https://www.kplctv.com/2022/04/05/final-report-ida-ties-it-strongest-winds-ever-hit-louisiana.

**16.**

At the time of the Hurricane, Plaintiff's Policy was in full force and effect and provided coverage for the specific type of damage to the Property caused by the Hurricane, as well as, among other things, for loss of business income.

**17.**

The Hurricane caused extensive and catastrophic physical damage to the subject Property.

**18.**

As a consequence of the extensive and catastrophic physical damage to the subject Property caused by the Hurricane, Plaintiff not only lost a substantial amount of business income, but also incurred and/or will incur significant expenses to restore the Property to its pre-storm condition.

**19.**

Shortly following the Hurricane, Plaintiff timely gave notice of and reported its covered damages and losses to the Defendant Insurers and properly submitted to the Defendant Insurers a claim for insurance proceeds owed under its Policy, Claim No. SDA21017210 (the subject "Claim").

**20.**

After being notified of the damages and losses to the Property caused by Hurricane Ida, the Defendant Insurers, through their assigned estimator and adjuster, Choice Claims Solutions, scheduled and conducted a full and unimpeded inspection of the subject Property on or about October 13, 2023, giving the Defendant Insurers, at that time, both actual and satisfactory proof of the covered loss and damages to the Property.

**21.**

In addition to the initial inspection conducted by their assigned adjuster on or about October 13, 2021, the Defendant Insurers thereafter also conducted multiple additional, follow-up inspections of the subject Property, including, but not limited to, through an engineer and a separate building consultant, on or about December 13, 2021 and December 15, 2021, respectively, thus giving the Defendant Insurers, at all of those times, even further unequivocal proof of the covered loss and damages to the subject Property.

**22.**

The Defendant Insurers' multiple inspections of the Plaintiff's Property and corresponding adjustments of the total covered losses were wholly deficient, resulting in an estimate of damages which grossly misrepresented, miscalculated and/or undervalued the true nature, scope, and extent of the covered damages to the Property caused by Hurricane Ida.

**23.**

Specifically, the Defendant Insurers' estimate of the covered damages to the Property was only $1,012,352.59 (or $766,102.59 after application of the deductible), which grossly misrepresents the true nature, scope, and extent of the total covered damages caused by Hurricane Ida.

**24.**

Upon information and belief, at the Defendant Insurers' direction and consistent with the Defendant Insurers' standard adjusting practices, each of the adjusters, building consultants, engineers, and/or other estimators hired and/or retained by the Defendant Insurers willfully or carelessly violated industry standards in adjusting and/or estimating the covered loss.

**25.**

In or around October 2022, the Defendant Insurers—without the participation, authority or knowledge of Plaintiff—negotiated and entered into a confidential settlement agreement exclusively with defendant ARS, whereby the Defendant Insurers ultimately made a direct payment to ARS alone in the amount of roughly $2.1 million strictly for the *mitigation* work (*e.g.*, the water extraction and demolition work) that had purportedly been performed by ARS in connection with the damages at the Property caused by Hurricane Ida.

**26.**

At or around the time of this so-called confidential settlement agreement between ARS and the Defendant Insurers (which Plaintiff still has never seen, despite multiple requests), the Defendant Insurers (or their counsel) assured Plaintiff that this direct payment to ARS alone (in the amount of roughly $2.1 million) would not affect the amount of available coverage under Plaintiff's Policy.

**27.**

The Defendant Insurers, however, have now since taken the contrary position that their payment made directly to ARS strictly for ARS's *mitigation* work (in the amount of roughly $2.1

million) now *does* in fact diminish the remaining amount of available coverage under Plaintiff's Policy for the actual building repairs needed under Coverage "A" (Building Coverage).

## 28.

Despite having now since made payment directly to ARS in the amount of roughly $2.1 million strictly for *mitigation work* alone, the Defendant Insurers have, to date, paid to Plaintiff less than $1 million for all the building damages that still remain unrepaired.

## 29.

Despite having proof of the true nature, scope, and extent of the damages to the Property caused by Hurricane Ida, the Defendant Insurers arbitrarily and capriciously refused to honor their obligations under the subject Policy, including, among other ways, by underpaying Plaintiff's insurance Claim and by failing to pay the full amounts due and owing to Plaintiff under the Policy within the time period(s) prescribed by law.

## 30.

Due to the Defendant Insurers' continuing, vexatious refusal to pay the full amount(s) due and owing to Plaintiff under the Policy, the only repairs that have been made to the subject Property to date—in addition to the mitigation work (including, *e.g.*, the water extraction and demolition work) provided or performed by ARS—consist of a new roof being installed on or around June 2022. Other than that, the Property remains in a state of total disrepair and thus, to date, still has not been open for business since before Hurricane Ida.

## 31.

The Defendant Insurers have since continued unfairly and improperly in delaying action and denying payment of the full amount owed to Plaintiff under the Policy, all of which still remains due and owing to Plaintiff under the subject Policy.

## 32.

As a result of the Defendant Insurers' vexatious refusal to pay Plaintiff's Claim fairly and promptly and to otherwise perform under the Policy, including, but not limited to, their failures to timely pay all amounts owed to Plaintiff under the Policy, Plaintiff has suffered and continues to suffer considerable damages for which the Defendant Insurers are now liable.

**33.**

Given the actions or omissions of <u>all</u> named Defendants, including, but not limited to, the Defendant Insurers' failure to timely pay all amounts owed under the Policy, Plaintiff is and continues to be faced with potential financial ruin.

**<u>CAUSES OF ACTION</u>**

**I.     Petition for Declaratory Judgment as to Appraisal**

**34.**

Plaintiff repeats and re-alleges each and every allegation set forth above as if copied and restated herein *in extenso*.

**35.**

On or about April 19, 2023, counsel for the Defendant Insurers advised undersigned counsel for Plaintiff during a scheduled telephone discussion that a fundamental disagreement existed between Plaintiff and the Defendant Insurers specifically as to the value of the damaged Property and the amount of the covered loss, and that, therefore, for this reason, the Defendant Insurers was unwilling to remit any further supplemental payments owed under the Policy.

**36.**

Accordingly, on or about May 12, 2023, and in accordance with the Policy's contractual provisions, Plaintiff, through undersigned counsel, delivered a letter to counsel for the Defendant Insurers specifically invoking the "Appraisal" process under the Policy and identifying therein as its designated appraiser, Josh Passons of PASSONS CLAIMS AND Consulting, and thus, further requesting therein that the Defendant Insurers reciprocally designate their own "competent and impartial appraiser" within 20 days of that letter, all as required by the Policy's "Appraisal" provision which is quoted below in ¶ 38, *infra*.

**37.**

On or about May 30, 2023, however, the Defendant Insurers, through their counsel, rejected Plaintiff's invocation of the appraisal process, arguing, for the very first time, and rather remarkably, that the Policy's appraisal provision somehow now does not apply to this dispute because the "claimed loss" is somehow now "not covered" by the Policy; this was despite all of

the previous (albeit woefully insufficient) partial payments that had already previously been paid up to that point by the Defendant Insurers under the Policy for the very same claimed loss.

**38.**

As noted *supra*, the Policy specifically requires that the Defendant Insurers shall submit to the "Appraisal" process as outlined in the Policy's "Appraisal" provision whenever requested by the Plaintiff and where, as here, the parties disagree as to the amount of the loss. Specifically, the Appraisal" provision (found in Section H.3) provides in full as follows:

**3. Appraisal**

Appraisal applies after we confirm that the damage due to a loss is covered. If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser within 20 days. The two appraisers will select an umpire. If they cannot agree within 20 days, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

Appraisers and umpires are not authorized to determine if coverage, exclusions, conditions and any other contractual issues exist between us. If there is an appraisal, we will still retain our right to deny the claim. The appraisal award cannot be used by either party in any proceedings concerning coverage, exclusions, conditions or any other contractual issues.

**39.**

Accordingly, Plaintiff now respectfully seeks a declaratory judgment and an order from this Honorable Court pursuant to La. C.C.P. art. 1871, *et al.*, declaring that the Policy's "Appraisal" provision is valid, enforceable, and applicable to this dispute, and thus ordering that the Defendant Insurers shall fully and completely participate in the appraisal process as contemplated by the Policy's "Appraisal" provision.

**40.**

Plaintiff further prays that this Honorable Court establish reasonable deadlines in which the appraisal process must be concluded so that Plaintiff does not incur further losses and deprivation of the use of its Property as a result of unwarranted delays in the appraisal process.

## II.  Petition for Declaratory Judgment as to ARS's purported Assignment of Benefits

### 41.

Plaintiff repeats and re-alleges each and every allegation set forth above as if copied and restated herein *in extenso*.

### 42.

Shortly following the passing of Hurricane Ida, Plaintiff was approached by ARS, a disaster mitigation and property restoration company, and soon thereafter decided to hire ARS to perform the necessary mitigation and repair work at the Property.

### 43.

Specifically, to that end, on or about August 31, 2021, Plaintiff signed what was ostensibly a written contract with ARS whereby Plaintiff purportedly "assigned" to ARS all of its insurance benefits or proceeds payable under its Policy that were related to any mitigation or repair work to be performed by ARS. In particular, this "Assignment of Benefits" document (hereinafter, the "AOB") provided, in pertinent part, as follows:

> The OWNER irrevocably assigns to ARS that portion of proceeds of any insurance coverage which relates to the WORK performed by ARS and agrees to promptly authorize and/or endorse all payments to ARS.

### 44.

The August 31, 2021 AOB document, on its face, is and was directly violative of the terms and conditions of the subject Policy, insofar as the Policy expressly prohibits the post-loss assignment of rights, benefits or claims arising under the Policy.[5] As such, the AOB document, as executed, is and was null, void and unenforceable and should thus be deemed never to have existed under applicable law. *See* La. C.C. art. 2033.

### 45.

Upon information and belief, and in spite of the prohibition against the post-loss assignment of benefits under the Policy and the consequent invalidity of the AOB document, in or

---

[5] *See* Policy Endorsement SMB 421 2010 LA ALL Restrictive AOB (which states, *inter alia*, and in all-caps, that "THIS POLICY DOES NOT ALLOW THE ASSIGNMENT OF POST-LOSS INSURANCE BENEFITS."). That is, the Policy specifically provides, at Section G.1 (relating to "Assignment"), that the "[p]ost-loss assignment of rights, benefits or claims arising under this policy are prohibited." Policy, at § G.1(b).

around October 2022, the Defendant Insurers—without the participation, authority or knowledge of Plaintiff—negotiated and entered into a confidential settlement agreement with ARS alone whereby the Defendant Insurers ultimately made a direct payment to ARS alone in the amount of roughly $2.1 million strictly for the mitigation work (*e.g.*, the water extraction and demolition work) purportedly performed by ARS in connection with the damages caused by Hurricane Ida.

**46.**

To date, and despite multiple requests made to counsel for ARS and counsel for the Defendants Insurers, Plaintiff still has never seen the confidential settlement document between ARS and the Defendant Insurers and, to date, still does not know the exact dollar-and-cents amount that was paid to ARS by the Defendant Insurers pursuant to this settlement.

**47.**

Both the purported settlement agreement between ARS and the Defendant Insurers and the resulting settlement payment to ARS alone, as the purported assignee of Policy benefits, are and were directly violative of the terms and conditions of the subject Policy, insofar as the Policy expressly prohibits the post-loss assignment of rights, benefits or claims arising under the Policy. As such, the purported settlement agreement between ARS and the Defendant Insurers is and was null, void and unenforceable, and thus, the resulting settlement payment to ARS alone (in the amount of roughly $2.1 million) should be reimbursed and/or repaid directly to Plaintiff (and its mortgagee) as the insured and proper payee under the subject Policy.

**48.**

Accordingly, Plaintiff now respectfully seeks a declaratory judgment and an order from this Honorable Court pursuant to La. C.C.P. art. 1871, *et al.*, declaring that both the AOB document and the purported settlement agreement between the Defendant Insurers and ARS (as the purported *assignee* of Policy benefits) are and were directly violative of the terms and conditions of the subject Policy and, as such, are/were null, void, and unenforceable as written, and thus further ordering that the resulting settlement payment to ARS alone (in the amount of roughly $2.1 million) shall be reimbursed by ARS and/or repaid by the Defendant Insurers directly to Plaintiff (and its mortgagee) as the named insured and proper payee under the subject Policy.

**49.**

Alternatively, Plaintiff respectfully requests that ARS be ordered and directed by this Honorable Court to deposit into the registry of this Court the full amount of the settlement payment it received from the Defendant Insurers (in the amount of roughly $2.1 million), such that the parties to this lawsuit can thereafter be allowed to assert their competing or conflicting claims or rights to said funds, similar to the process contemplated under La. C.C.P. art. 4651.

### III. Breach of Contract

**50.**

Plaintiff repeats and re-alleges each and every allegation set forth above as if copied and restated herein *in extenso*.

**51.**

Plaintiff's Policy, at all times relevant and material to the case, constituted a contract between Plaintiff and the Defendant Insurers.

**52.**

The Defendant Insurers have plainly breached by their Policy's "Appraisal" provision, noted *supra*, which is clearly applicable and enforceable in this case, by refusing in bad faith to comply with the appraisal process once it was invoked by Plaintiff.

**53.**

Further, by paying roughly $2.1 million in insurance proceeds payable under the Policy directly to ARS, which is not a named insured under the Policy, the Defendant Insurers have plainly the breached the terms and conditions of the subject Policy, including those which expressly prohibit the post-loss assignment of rights, benefits or claims arising under the Policy.[6]

**54.**

The Defendant Insurers are thus liable to Plaintiff, *in solido*, for all of the damages that Plaintiff has sustained, foreseeable or not, that are direct consequence of these breaches of the

---

[6] *See* Policy Endorsement SMB 421 2010 LA ALL Restrictive AOB (which states, *inter alia*, and in all-caps, that "THIS POLICY DOES NOT ALLOW THE ASSIGNMENT OF POST-LOSS INSURANCE BENEFITS."). That is, the Policy specifically provides, at Section G.1 (relating to "Assignment"), that the "[p]ost-loss assignment of rights, benefits or claims arising under this policy are prohibited." Policy, at § G.1(b).

Policy, including, but not limited to, Plaintiff's continuing loss of business income, as well as general damages for delay, mental anguish, and emotional distress. La. C.C. art. 1997.

**55.**

Moreover, where, as here, the solidary obligors (the Defendant Insurers) have failed to perform a contractual obligation, "the court shall grant specific performance plus damages for delay if the obligee so demands," and in this context, such damages "are owed from the time the obligor has failed to perform." La. C.C. arts. 1986 and 1989.

**56.**

Accordingly, pursuant to La. C.C. arts. 1986 and other applicable law, in light of the Defendant Insurers' contractual breaches of the Policy noted above, Plaintiff seeks, in addition to damages, an award of *specific performance* ordering the Defendant Insurers as follows:

a) To participate fully and completely in the appraisal process as contemplated by the Policy's "Appraisal" provision, and to do so within a reasonable time determined by this Court so as preclude any further unwarranted delays in the appraisal process; and

b) To make payment to Plaintiff directly, as the named insured and proper payee under the subject Policy, in the amount of all the insurance proceeds that it previously paid in error directly to ARS, in the amount of roughly $2.1 million.

**57.**

Plaintiff fully performed at all times under the Policy, including by paying all premiums when due and satisfying all other Policy requirements, and the Policy was in full force and effect on the date of loss, August 29, 2021.

**58.**

Despite having received satisfactory proof of the loss and covered damages to the Property caused by Hurricane Ida, the Defendant Insurers wrongfully denied and/or grossly underpaid Plaintiff's insurance Claim and, in so doing, also breached their contractual obligations to timely pay all amounts owed under the Policy.

**59.**

Further, the Defendant Insurers' conduct in the handling and adjustment of the Plaintiff's Claim, including, but not limited to, its refusal and failure to timely pay all sums clearly owed under the Policy, has been arbitrary, capricious, and without probable cause.

**60.**

In sum, the Defendant Insurers materially breached and failed to perform under the Plaintiff's Policy by, among other ways:

a)  not thoroughly investigating the Plaintiff's Claim;

b)  providing and relying upon unrealistic and arbitrary estimates of the value of the covered damages;

c)  arbitrarily dismissing obvious damage caused by the subject Hurricane;

d)  denying all or part of, and/or grossly underpaying Plaintiff's Claim despite obvious covered damages;

e)  not tendering the reasonable and necessary proceeds due under the Policy in a timely fashion as necessary to repair the covered damages to the Property;

f)  failing to timely and unconditionally tender the undisputed amounts owed under the Policy for the losses and damages covered;

g)  failing or refusing to comply with the Policy's "Appraisal" provision once the appraisal process was invoked by Plaintiff;

h)  paying over $2,000,000 in insurance proceeds payable under the Policy, which were properly due and payable to Plaintiff (and its mortgagee) under the Policy, directly to a third party (ARS) which was neither a named insured nor a valid assignee of post-loss benefits under the Policy; and

i)  not acting reasonable under the circumstances.

**61.**

As a result of the Defendant Insurers' breaches of their contractual duties under the Policy, Plaintiff has suffered and continues to suffer both general and special damages for which the Defendant Insurers are now liable; this includes, but is not limited to, all amounts owed under the Policy that remain unpaid, all costs associated with recovering, repairing and/or replacing the covered Property, plus the increased repair and replacement costs due to market inflation, as well

as all unpaid mitigation costs, its continuing loss of business income, and all other amounts owed under all applicable coverages, plus general damages for delay, mental anguish, emotional distress and inconvenience, plus statutory penalties on all amounts owed but not timely paid under La. R.S. 22:1892 and La. R.S. 22:1973, discussed *infra*, plus reasonable attorneys' fees and costs, together with interest and all other damages that Plaintiff may prove as allowed by law.

## IV.  Statutory Violations and Penalties under La. R.S. 22:1892 and La. R.S. 22:1973

### 62.

Plaintiff repeats and re-alleges each and every allegation set forth above as if copied and restated herein *in extenso*.

### 63.

La. R.S. 22:1892 expressly obligates a property insurer issuing policies in the State of Louisiana, such as the Defendant Insurers here, to "pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured," La. R.S. 22:1892(A)(1), and further, to "make a written offer to settle any property damage claim ... within thirty days after receipt of satisfactory proofs of loss of that claim." La. R.S. 22:1892(A)(4). The same statute further provides that an insurer's failure to do so shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent (50%) damages on the amount found to be due, "as well as reasonable attorney fees and costs." La. R.S. 22:1892(B)(1).

### 64.

The Defendant Insurers failed to pay all of the amounts owed to the Plaintiff under the Policy within thirty (30) days of receiving satisfactory proof of the covered loss in direct violation of La. R.S. 22:1892, including all of the amounts paid directly to ARS, and Plaintiff remains entitled to all such amounts owed under its Policy that remain unpaid.

### 65.

Specifically, the Defendant Insurers breached their statutory obligations owed to Plaintiff herein under La. R.S. 22:1892 by, among other ways, **a)** failing to pay to Plaintiff the full amount owed under the Policy within thirty (30) days of receiving satisfactory proof of the covered loss,

and further, by **b)** failing to make a written offer to settle Plaintiff's Claim within 30 days after receiving satisfactory proof of the loss.

**66.**

Consequently, pursuant to La. R.S. 22:1892, the Defendant Insurers are now liable unto Plaintiff, *in solido*, for all amounts owed the Policy that remain unpaid, plus an additional statutory penalty of 50% of said amount, plus "reasonable attorney fees and costs." La. R.S. 22:1892(B)(1).

**67.**

Additionally, La. R.S. 22:1973 further imposes on property insurers issuing policies in Louisiana, such as the Defendant Insurers here, a general duty of "good faith and fair dealing," specifically including "an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured." La. R.S. 22:1973(A). This general duty further specifically includes, among other things, a duty to refrain from: a) "misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue," La. R.S. 22:1973(B)(1); and/or b) arbitrarily and capriciously, and without probable cause, failing to pay the full amount of the Claim owed to Plaintiff within 60 days after receiving satisfactory proof of loss. La. R.S. 22:1973(B)(5). Any insurer who breaches these obligations is liable for damages sustained as a result of the breach, as well as a penalty of up to "two times the damages sustained or five thousand dollars, whichever is greater." La. R.S. 22:1973(C).

**68.**

The Defendant Insurers plainly breached their statutory duties of good faith and fair dealing set forth under La. R.S. 22:1973 by, among other ways: a) failing to adjust Plaintiff's Claim fairly and promptly; b) failing to make a reasonable effort to settle Plaintiff's Claim; c) arbitrarily and capriciously, and without probable cause, failing to pay the full amount of the Claim owed to Plaintiff under the Policy within sixty (60) days of having received satisfactory proof of the loss; and d) making misrepresentations of pertinent facts, including misrepresentations concerning the payments made by the Defendant Insurers directly to ARS. *See* La. R.S. 22:1973(A)-(B).

**69.**

As a consequence of the Defendant Insurers' breaches of their statutory duties of good faith and dealing set forth under La. R.S. 22:1973, the Defendant Insurers are now additionally liable

unto Plaintiff, *in solido*, for all of the general and special damages sustained by Plaintiff as a result of said breaches, including, but not limited to, all amounts owed under the Policy that remain unpaid, plus an additional statutory penalty of "two times the damages sustained or five thousand dollars, whichever is greater." La. R.S. 22:1973(C).

<center>70.</center>

The Defendant Insurers were, are, and continue to be in violation of both La. R.S. 22:1892 and La. R.S. 22:1973 and, thus are liable unto Plaintiff, *in solido*, for general and special damages, statutory penalties, attorneys' fees, interest and costs, all as is specifically intended and allowed for under said statutes and applicable Louisiana law.

<center>71.</center>

Indeed, as a result of Defendant's continuing breaches of both its legal and contractual duties, Plaintiff has suffered and continues to suffer both general and special damages for which Defendant is now liable; this includes, but not limited to, all amounts owed under the Policy that remain unpaid, all costs associated with recovering, repairing and/or replacing the covered Property, plus the increased repair and replacement costs due to market inflation, as well as all mitigations costs, additional living expenses, and all other amounts owed under all applicable coverages, plus general damages for delay, mental anguish, emotional distress and inconvenience, plus statutory penalties on all amounts owed but not timely paid under La. R.S. 22:1892 and La. R.S. 22:1973, including reasonable attorneys' fees and costs, together with interest and all other damages that Plaintiff may prove as allowed by law.

### V.  Unjust Enrichment by ARS and Demand for Reimbursement

<center>72.</center>

Plaintiff repeats and re-alleges each and every allegation set forth above, as if copied and restated herein *in extenso*.

<center>73.</center>

Pursuant to the doctrine of "unjust enrichment" set forth under La. C.C. art. 2298, Plaintiff avers that ARS has been unjustly enriched at Plaintiff's expense, and that ARS is therefore bound

to compensate Plaintiff in whatever amount ARS has been enriched or Plaintiff has been impoverished, whichever is less. La. C.C. art. 2298.

**74.**

As explained *supra*, in or around October 2022, the Defendant Insurers, without the participation, authority or knowledge of Plaintiff, paid out roughly $2.1 million in insurance proceeds under the Policy—proceeds that were properly due and payable to Plaintiff (and its mortgagee)—directly to ARS alone, strictly for the mitigation work (*e.g.*, the water extraction and demolition work) that ARS purportedly performed at the Property in connection with the damages caused by Hurricane Ida.

**75.**

Given the express prohibition in the Policy against the post-loss assignment of benefits and the consequent invalidity of the AOB document between ARS and Plaintiff, noted *supra*, ARS, which was neither a named insured nor a valid assignee of post-loss benefits under the Policy, was not legally or contractually entitled to receive the $2.1 million in Policy benefits directly from the Defendant Insurers.

**76.**

ARS thus received benefits directly from the Insurance Defendants that it was not entitled to receive, and its receipt of those benefits constituted an unfair or unjust enrichment, all of which was directly at the expense of Plaintiff and Plaintiff's limits of coverage under the Policy; that is, the benefit received by ARS under the Policy (namely, the *direct* payment from Defendant Insurers in the amount of roughly $2.1 million) came at the expense of Plaintiff, as the rightful beneficiary, and Plaintiff's limits of coverage under the Policy, all within the meaning of La. C.C. art. 2298.

**77.**

Given the invalidity of the AOB document between ARS and Plaintiff and the lack of any other valid or enforceable contract between Plaintiff and ARS, Plaintiff has no other known remedy at law against ARS to recover the insurance proceeds that were paid in error directly to ARS.

**78.**

Accordingly, pursuant to La. C.C. art. 2298, Plaintiff avers that ARS has been unjustly enriched, directly at its expense, without any legal justification, and that because it has no other

known remedy at law against ARS,[7] it is now entitled to recover from ARS, at the very least, the amount of roughly $2.1 million in insurance proceeds that were paid in error directly to ARS.

**79.**

Further, and in addition to the foregoing, Plaintiff is now also entitled to recover and be reimbursed directly from ARS the additional amount of $625,313.79, which represents the exact amount of the payment that Plaintiff, through counsel, paid directly to ARS in or around January 2022 specifically as a partial payment for much of the same mitigation work (*e.g.*, the water extraction and demolition work) that ARS purportedly performed at the Property—work for which ARS was ultimately paid *in full* directly by the Defendant Insurers.

**80.**

To this end, ARS has already expressly acknowledged and admitted its obligation to reimburse Plaintiff for roughly this amount, and it even went so far as to issue and mail a check to Plaintiff for roughly this amount, but that check was lost in transit, and ARS has since neglected to reissue another check to Plaintiff, despite multiple repeated requests.

**81.**

Given ARS's receipt of this now-superfluous payment from Plaintiff's counsel for the mitigation work that has since been paid for in full, ARS has undoubtedly been unjustly enriched, directly at Plaintiff's expense, and as such, Plaintiff is now entitled to reimbursed by ARS, in addition to the forgoing, in the amount of $625,313.79, which Plaintiff paid to ARS in or around January 2022 as partial payment for ARS's mitigation work prior to ARS being paid in full for that same mitigation work directly by the Defendant Insurers.

**WHEREFORE**, on the basis of the foregoing, Plaintiff MAI TL, INC. d/b/a BAYMONT INN & SUITES - MARRERO ("Plaintiff" and/or "Baymont") respectfully prays as follows:

1) That the named defendants herein, VELOCITY RISK UNDERWRITERS, LLC ("Velocity Risk"), INDEPENDENT SPECIALTY INSURANCE COMPANY ("ISIC"), and CERTAIN UNDERWRITERS AT LLOYD'S AND OTHER INSURERS SUBSCRIBING TO BINDING AUTHORITY B604510568622021 ("Lloyd's London") (collectively, the "Defendant Insurers"), and ACCESS RESTORATION SERVICES US, INC. ("ARS"), be served with

---

[7] Plaintiff expressly reserves the right to supplement and/or amend this Petition in the event that additional causes of action against ARS are later discovered or determined to be available.

a copy of this *Petition for Declaratory Judgment and for Damages* and be duly cited to appear herein and answer the same;

**2)**   That after all due proceedings are had, a *Declaratory Judgment* be entered herein pursuant to La. C.C.P. art. 1871, *et al.*, declaring that the "Appraisal" provision of the insurance policy at issue in this case (the subject "Policy") is valid, enforceable, and applicable to this dispute, and thus ordering that the Defendant Insurers shall fully and completely participate in the Appraisal Process as contemplated by the Policy's "Appraisal" provision;

**3)**   That after all due proceedings are had, a *Declaratory Judgment* be entered herein pursuant to La. C.C.P. art. 1871, *et al.*, declaring or otherwise ordering as follows:

   **a)**   declaring that the written "assignment of benefits" contract purportedly entered into between Plaintiff and ARS on or about August 31, 2021 is/was directly violative of the terms and conditions of the subject Policy, and thus, is/was null, void, and unenforceable as written; and thus,

   **b)**   declaring that the purported settlement agreement between the Defendant Insurers and ARS (as the purported assignee of Policy benefits) in around October 2022, whereby the Defendant Insurers ultimately made a direct payment to ARS alone in the amount of roughly $2.1 million, is/was directly violative of the terms and conditions of the subject Policy, and thus, is/was null, void, and unenforceable as written; and thus,

   **c)**   ordering that the settlement payment paid by the Defendant Insurers directly to ARS alone, which consisted of insurance proceeds payable under the Policy in the amount of roughly $2.1 million, now be paid by the Defendant Insurers directly to Plaintiff (and its mortgagee) as the named insured and proper payee(s) under the Policy;

**4)**   That after all due proceedings are had, judgment be entered herein in favor of Plaintiff, and against the Defendant Insurers, *in solido*, finding the Defendant Insurers in breach of the subject Policy and in violation of applicable law, and thus awarding to Plaintiff all damages that are reasonable in the premises, including, but not limited to, all benefits and amounts owed under the Policy that remain unpaid, all costs associated with recovering, repairing and/or replacing the covered Property, plus the increased repair and replacement costs due to market inflation, plus all other amounts owed under all applicable coverages, including for Plaintiff's continuing losses of business income, plus general damages for delay, mental anguish, emotional distress and inconvenience, plus all statutory penalties, attorneys' fees, interest and costs owed under La. R.S. 22:1892 and La. R.S. 22:1973, together with legal interest thereon from the date of judicial demand until fully paid, all as afforded under applicable law;

**5)**   That after all due proceedings are had, judgment be entered herein against defendant ARS, and in favor of Plaintiff, finding that ARS received benefits directly from the Insurance Defendants that it was not entitled to receive, and thus, pursuant to La. C.C.P. art. 2298 and/or other applicable law, ordering that ARS

repay to Plaintiff the full amount of the roughly $2.1 million that was paid in error by the Defendant Insurers directly to ARS;

6)     That after all due proceedings are had, judgment be entered herein against defendant ARS, and in favor of Plaintiff, ordering that ARS reimburse to Plaintiff payment in the amount of $625,313.79, which represents the amount that Plaintiff paid to ARS as partial payment for ARS's mitigation work prior to ARS being paid in full for that same mitigation work directly by the Defendant Insurers.

7)     For all other general and equitable relief to which Plaintiff may be entitled and which this Court may deem appropriate in the premises.

Dated: August 29, 2023.

Respectfully Submitted:

**REYNAUD AROMI LAW, LLC**

Claude F. Reynaud III, LA Bar No. 31534
Kathleen Megan Aromi, LA Bar No. 28508
9 Killdeer Street
New Orleans, Louisiana 70124
Phone: (225) 241-1804
Claude@ReynaudAromiLaw.com
Katie@ReynaudAromiLaw.com

*Attorneys for Plaintiff*

**PLEASE SERVE:**

**VELOCITY RISK UNDERWRITERS, LLC,**
*through its registered agent for service of process:*
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

*EBR CK# 2024 $171.32*
*SOS CK # 2025 $100.W*

**INDEPENDENT SPECIALTY INSURANCE COMPANY,**
*though the contractual assignee of its legal obligations,*
STATE NATIONAL INSURANCE COMPANY, INC.,
*through its registered agent for service of process:*
Louisiana Secretary of State
8585 Archives Avenue
Baton Rouge, LA 70809

**CERTAIN UNDERWRITERS AT LLOYD'S AND**
**OTHER INSURERS SUBSCRIBING TO BINDING AUTHORITY B604510568622021,**
*through its registered agent for service of process:*
Louisiana Secretary of State
8585 Archives Avenue
Baton Rouge, LA 70809

**ACCESS RESTORATION SERVICES US, INC.,**
*through its registered agent for service of process:*
NORTHWEST REGISTERED AGENT, LLC
201 Rue Beauregard, Suite 202
Lafayette, LA 70508

FILED FOR RECORD 08/28/2023 15:02:02
Mandy Plaisance, DY CLERK
JEFFERSON PARISH, LA

24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

STATE OF LOUISIANA

SUIT NO. 846-304                    DIVISION M

MAI TL, INC. d/b/a BAYMONT INN & SUITES – MARRERO

vs.

VELOCITY RISK UNDERWRITERS, LLC;
INDEPENDENT SPECIALTY INSURANCE COMPANY;
CERTAIN UNDERWRITERS AT LLOYD'S AND OTHER
INSURERS SUBSCRIBING TO BINDING AUTHORITY B604510568622021; and
ACCESS RESTORATION SERVICES US, INC.

---

**VERIFICATION**

---

STATE OF LOUISIANA

PARISH OF JEFFERSON

**BEFORE ME,** the undersigned Notary Public, duly commissioned and qualified in and for the above-listed Parish and State, personally came and appeared:

**KATHY NGUYEN,**

the vice-president and duly authorized representative of the Plaintiff in this above-captioned matter, MAI TL, INC. d/b/a BAYMONT INN & SUITES – MARRERO, who, after being first duly sworn, did depose, state, and confirm under oath that all of the factual allegations stated, asserted, and contained in the *Petition for Declaratory Judgments and for Damages* now being filed concurrently herewith are true, correct, and accurate to the very best of her personal knowledge, information, and belief.

**KATHY NGUYEN**

**SWORN TO AND SUBSCRIBED** before me, the undersigned Notary Public, this ___ day of _August_ , 2023.

NOTARY PUBLIC
Printed Name: _CLAUDE F. REYNAUD_
La. Bar Roll No. _31534_
Commission Expires: _At Death_

**12300758**

FILED FOR RECORD 08/29/2023 11:52:34
Monica T. Polkey DY CLERK
JEFFERSON PARISH LA

# 24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

## STATE OF LOUISIANA

### IN RE: HURRICANE IDA CLAIMS

**FILED:**_____

_____
**DEPUTY CLERK**

### STANDING CASE MANAGEMENT ORDER REGARDING
### CERTAIN PROPERTY DAMAGES SUITS ARISING FROM HURRICANE IDA

On August 29, 2020, Hurricane Ida came ashore near Port Fourchon, Louisiana and traveled through Jefferson Parish. As a Category 4 (near 5) hurricane, it was the fifth strongest storm to ever impact the United States. Hurricane Ida tied the Last Island Hurricane in 1856 and Hurricane Laura in 2020 as the strongest to strike Louisiana, based on wind speed. The President of the United States issued a Declaration of a Major Disaster for the State of Louisiana on August 29, 2021. (*See* FEMA-4611-DR.) The Declaration expressly includes Jefferson Parish as an "adversely affected area by this major disaster."[1] Major Hurricane-force winds, with gusts in excess of 155 mph, covered the entirety of Jefferson Parish, and inflicted catastrophic damage throughout this Court's jurisdiction. Hurricane Ida may sometimes hereinafter be referred to as the "Hurricane," and the causes of action arising therefrom may sometimes be referred to as "the Hurricane Cases."

In the aftermath of this catastrophic natural disaster, this Court recognizes that it will soon preside over substantial volumes of insurance coverage-related litigation linked to the Hurricane. Additionally, and like so many other courts across the globe, this Court has faced significant challenges to conducting court business for the better part of a year, as a result of the on-going COVID-19 pandemic. The residents and businesses of Louisiana have similarly struggled to cope with the negative economic impact of COVID-19, even before Hurricane Ida.

---

[1] https://www.fema.gov/disaster-federal-register-notice/4611-dr-la-initial-notice



EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300758 MORTGAGE BOOK 5014 PAGE 102

01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:1 of 14 - Jefferson Parish Clerk of Court: 231839

In the weeks following Hurricane Ida, many related lawsuits will be filed and be pending before this Court. In Act 318 of the 2020 Regular Session the Louisiana Legislature amended the laws expanding judicial authority related to special masters and mandatory mediation in cases stemming from certain major disasters ("Act 318").[2]

Act 318 authorizes this Court to enter this CMO, and after consultation with and upon the recommendation of the Special Master and in consideration of the high volume of cases from Jefferson Parish in state and federal courts, this Court finds it warranted to enter this CMO to best accommodate the adjudication of Hurricane Cases in this Court.

Accordingly, this Court's aim continues to be the just and expedient resolution of these related matters, in spite of the increased strain on the Court's resources, and with the primary goal of enabling the Jefferson Parish community to move forward with crucial recovery efforts, in the aftermath of Hurricane Ida, and the COVID-19 pandemic. In consideration of these aims and the law, after due consideration of the Case Management Orders and discovery protocols implemented by the 14th Judicial District Court and the U.S. District Court for the Western District of Louisiana following Hurricanes Laura and Delta, the 24th Judicial District Court issues the instant Case Management Order, to-wit:

**IT IS HEREBY ORDERED** that this Case Management Order shall be immediately applicable to all Hurricane Cases.

### SECTION 1. DISASTER PROTOCOLS FOR INITIAL DISCOVERY

The Court has reviewed the Disaster Litigation Initial Discovery Disaster Protocols adopted by 14th Judicial District Court and the U.S. District Court for the Western District of Louisiana following Hurricanes Laura and Delta filed in those courts. The Federal Court considered the Disaster Protocols implemented by the U.S. District Court for the Southern District of Texas following Hurricane Harvey. The 14th Judicial District Court considered the Disaster Protocols implemented by the Federal Courts. These Disaster Protocols call for prompt sharing of specific information to promote uniformity, to facilitate prompt evaluation of each case, to foster communication between the parties, and to facilitate an

---

[2] *See* La. R.S. 13:4165(F).



EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300758 MORTGAGE BOOK 5014 PAGE 102

**12300758**

expedited mediation procedure. Accordingly, on _____, 2022, this Court issued a Standing Order for Disaster Discovery Protocols in Certain Property Damage Suits Arising from Hurricane Ida ("Disaster Discovery Protocols") therefore,

IT IS FURTHER ORDERED that the Disaster Discovery Protocols Initial Discovery Protocols are deemed incorporated into this CMO *in extenso* and are applicable to all Hurricane Cases filed in this Court. The disclosures and exchange of information required by the Disaster Discovery Protocols Order issued on _____, 2022 shall be due forty-five (45) days from the date that defendant files responsive pleadings. This deadline may sometimes hereinafter be referred to as the "Disclosure Deadline." No extension or delay in the time to file responsive pleadings shall extend the Disclosure Deadline to more than 75 days from the original deadline to file responsive pleadings unless the extension is by the consent of all parties or pursuant to an express Order of the Court.

IT IS FURTHER ORDERED that each party shall supplement their Initial Disclosures at least fifteen (15) days prior to any scheduled mediation pursuant to the CMO.

Nothing in this Section prevents other discovery in accordance with the provisions of the Code of Civil Procedure, except that requests for subpoenas and subpoenas *duces tecum* shall not be submitted during the SSP without pre-approval of the Special Master or leave of the Court.

### SECTION 2. SPECIAL MASTER AND APPOINTED NEUTRALS

Considering the foregoing reasons supplied by the Court in the introduction, *supra*, the Court finds that exceptional circumstances exist which warrant the appointment of a Special Master to assist with the efficient and fair administration of all Hurricane Cases. Pursuant to the Court's inherent judicial power and its authority under La. R.S. 13:4165, *et seq*,

IT IS FURTHER ORDERED that JONATHAN C. PEDERSEN, BLAIR C. CONSTANT and DONALD MASSEY, are hereby appointed as the Special Masters (hereinafter "Special Master") for Hurricane Cases in the 24th Judicial District Court.

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300758 MORTGAGE BOOK 5014 PAGE 102



**12300758**

As part of this appointment, the Court mandates that the Special Master shall proceed with all reasonable diligence, and shall exercise the respective rights and responsibilities to direct the Streamlined Settlement Process ("SSP") as provided in this Order.

**IT IS HEREBY FURTHER ORDERED** that the Appointed Neutrals, referenced in Section 3(B)(2)(a), *infra*, are hereby appointed and shall proceed with all reasonable diligence and shall exercise their rights and responsibilities under the Streamlined Settlement Process ("SSP") as the Special Master may direct.

A.    **The Special Master.**  The Special Master shall administer, coordinate, and preside over the SSP. This authority includes the power to order parties and/or party representatives with full power of settlement to submit briefings, engage in discovery, and attend settlement conferences. Nothing in this part shall prevent regular formal discovery or motions to compel to be filed with and heard by the assigned District Judge.

B.    **Compensation of Special Master and Appointed Neutrals.**  The Special Master and all other appointed neutrals under the SSP (the "Appointed Neutrals") shall be compensated in the amount of:

    (1)    $400 per hour for the Special Master;

    (2)    $400 per hour for the Appointed Neutrals;

    (3)    $250 per case for the Special Master for administrative expenses in administering, scheduling, organizing, and coordinating the Streamlined Settlement Process for each case amongst the parties as well as with the Appointed Neutrals and shall be paid by the parties at the time their respective initial pleadings are filed; and

    (4)    All actual expenses of the Special Master and Appointed Neutrals, including but not limited to travel, meeting rooms and video conference means.

Unless otherwise directed by mutual agreement of the parties or as otherwise directed by the Special Master, all of the above fees and expenses shall be paid twenty-five percent (25%) by the plaintiff(s) and seventy-five (75%) by the defendant(s).

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300758 MORTGAGE BOOK 5014 PAGE 102



**12300758**

C.  **Role of Special Master and Appointed Neutrals**

(1)  The Special Master and Appointed Neutrals may communicate ex parte with the Court when deemed appropriate by the Court, or the Special Master, without providing notice to the parties, including communication certifying that the parties have complied with the requirements of the SSP.

(2)  The Special Master and Appointed Neutrals may initiate contact and communicate with counsel for any party as he or she deems appropriate with respect to the efficient administration and management of the SSP.

(3)  The Special Master and Appointed Neutrals, the parties, and those assisting the foregoing shall be bound by the confidentiality of the settlement discussions.

(4)  The Special Master may designate any of the Appointed Neutrals to act as his deputy from time to time and to perform any duties of the Special Master.

D.  **Notice of Opt-Out Motion to the Special Master.** Any party to a Hurricane Case may file a motion with the assigned District Judge requesting an opt out from the SSP for good cause shown, which motion must be filed within the time delay contained in Section 3, *infra*.

**IT IS FURTHER ORDERED** that any party filing an opt out motion shall copy the Special Master, and that the parties shall provide notice of the Court's Order on the motion to opt out to the Special Master, regardless whether the motion to opt out is granted or denied.

**IT IS FURTHER ORDERED** that counsel for any party to a Hurricane Case that has been provided a copy of this Order shall be required to provide email notice to the Special Master of the initial pleadings and all subsequent filings in any Hurricane Case (knowledge of this provision is presumed where counsel for the party has been provided a copy of this Order). The Special Master shall send an Initial Informational Package on the SSP to all parties and/or counsel of record for Hurricane Cases subject to the SSP.

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 .::: 12300758 MORTGAGE BOOK 5014 PAGE 102



EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300758 MORTGAGE BOOK 5014 PAGE 102

**SECTION 3. STREAMLINED SETTLEMENT PROCESS ("SSP")**

Within 30 days of the filing of the defendant's responsive pleading (or within 15 days of the transmittal to their counsel of a copy of this Order, including by electronic or other means - whichever is later), either party may file a motion to opt out of this Streamlined Settlement Process ("SSP") for good cause shown. A motion to opt-out of the SSP is not a responsive pleading for any deadline contained in this CMO. Unless the Court authorizes an opt-out, the parties shall participate in the three-stage Streamlined Settlement Process, which is described as follows:

A.   **First Stage: Initial Settlement Conference with Special Master.** Within 30 days of the Disclosure Deadline in all Hurricane Cases, all parties shall participate in an informal settlement conference with the Special Master or his Deputy. In light of the COVID-19 pandemic as well as the desire to resolve the Hurricane Cases as expeditiously as possible, settlement conferences should be conducted, where possible, by phone or audiovisual communication, including but not limited to Zoom, Skype, or similar platforms. Counsel for each plaintiff and for each defendant must have full authority from their clients to resolve the case, who shall be readily available by telephone if circumstances for that particular settlement conference require assistance.

B.   **Second Stage: Mediation.** Cases that do not resolve during the initial settlement conference shall be set for a formal mediation. The Special Master shall assign each Hurricane Case to an Assigned Neutral from the court approved list found in Paragraph B(2) of this Subsection, and it is the goal that Assigned Neutrals complete mediation within 70 days of appointment. The Special Master (or Appointed Neutral for the case) may set a scheduling conference, or communicate with counsel about availability through other means, but shall seek to schedule the mediations in an expeditious manner at mutually convenient times and dates for all parties.

  (1)   **Conduct of Mediation.**

    (a)   After scheduling of an agreed mediation, counsel for each party shall submit confidential statements solely to the appointed neutral. The appointed neutral shall determine, after conferring with the parties, on the length of the



EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300758 MORTGAGE BOOK 5014 PAGE 102

           confidential mediation statements and the permissible number of exhibits attached thereto.

  (b)  Plaintiff(s) shall be present in-person along with counsel (subject to accommodations approved by the case's Appointed Neutral). Defense counsel shall also attend in-person. A representative from defendant(s) is encouraged to attend, but unless otherwise directed by the Special Master the defendant(s) representative shall not be required to attend if counsel for the defendant has full authority to resolve the case. In addition, a representative of the defendant shall be readily available by telephone, if circumstances for that particular mediation require assistance.

  (c)  To the extent agreed by the parties and the case's Appointed Neutral, this mediation conference may be conducted by phone or other means of electronic audio or video communication, including but not limited to Zoom, Skype, or similar platforms.

  (d)  As part of this Streamlined Settlement Process, the attendees may each make opening statements but there shall be no live witness testimony.

(2)  **Approved Neutrals.** The Court hereby initially designates and appoints the following individuals as "neutrals" (mediators) for the SSP:

  (a)  Any person designated by the Special Master after consultation with the Court who is qualified pursuant to R.S. 13:4165(F)(5)(6), including:

| | |
|---|---|
| Hon. Carolyn Gill-Jefferson (ret.) | Hon. "Rusty" Knight (ret.) |
| Hon. Cornelius Regan (ret.) | Hon.Ronald J. Sholes (ret.) |
| Hon. Franz Ziblich (ret.) | Ashley Bass, Esq. |
| Jacques Bezou, Esq. | Robert Raymond, Esq. |
| Blair C. Constant, Esq. | Bobby M. Harges, Esq. |
| Michelle Craig, Esq. | Ross Legarde, Esq. |
| Fred Herman, Esq. | Jonathan Pedersen, Esq. |
| Donald Massey, Esq. | Chadwick J. Mollere, Esq. |
| Roger A. Javier, Esq. | Bryan Reuter, Esq. |
| Ronald L. Faia, Jr., Esq. | Hon. Glenn Ansardi (ret.) |
| Joseph Hassinger, Esq. | Stacy Palowsky, Esq. |
| Brigid Collins, Esq. | |



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:7 of 14 - Jefferson Parish Clerk of Court: 231839

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300758 MORTGAGE BOOK 5014 PAGE 102

        (b)     Any person designated as a neutral pursuant to any Case Management Order that the U.S. District Court for the Eastern District of Louisiana may enter in connection with Hurricane Ida cases.

    (3)    **Neutral Training.** The Special Master may undertake to provide special training to the neutrals, including coordinating participation in training prepared for the Streamlined Settlement Process. The Special Master and his Deputy may jointly form a plaintiffs' liaison committee and a defense liaison committee or may coordinate with any related Federal Court liaison committees for Hurricane Cases. If formed, the Special Master or his Deputy may solicit input and responses concerning commonly occurring legal issues that the liaison committees, from experience, believe may arise in a large number of these cases, along with relevant case law or other authority addressing these issues. While the ultimate determination of any such common issue may well be fact driven, and the outcome of any legal issue will be determined by the Court, the Special Master or his Deputy may seek this information in order to educate and fully prepare the appointed neutrals with the hope of expediting the settlement process. The Special Master or his Deputy may facilitate discussions by and among the appointed neutrals to promote, to the extent possible, consistency in the resolution of cases.

    (4)    **Neutral Reporting.** Within 5 days of the mediation date, the Neutral shall inform the Special Master of the outcome of the mediation.

    (5)    **Stipulation for Mediation.** The Neutral, the Parties and counsel for the parties must execute the Stipulation for Mediation attached hereto as Exhibit A.

**C.**    **Third Stage: Final Settlement Conference with Special Master.** In the event a case does not settle during the Mediation Phase, the parties shall participate in a final settlement conference with the Special Master or his Deputy. The Special Master should aspire to conduct this final settlement conference within 45 days of receiving notice from the Neutral that a particular case did not settle during the mediation phase. To facilitate this final settlement conference, the Special Master or his Deputy may require the parties to submit additional mediation statements and set restrictions upon the number and type of exhibits attached thereto. The Special Master



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:8 of 14 - Jefferson Parish Clerk of Court: 231839

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300758 MORTGAGE BOOK 5014 PAGE 102

or his Deputy may also communicate with the Neutral who conducted the mediation so as to facilitate a productive final settlement conference. A scheduling order will not be entered by the Court unless the Special Master or his Deputy have filed a certificate into the record attesting that all parties have participated in the final settlement conference with the Special Master or his Deputy.

D.  **Extensions of Time.**  Upon a joint request by the parties, for other good cause shown, or for case management purposes, the Special Master or his deputy may extend any deadline specified in this Order by up to 15 days.

## SECTION 4. COURT APPOINTED UMPIRES REQUIRED UNDER POLICIES

If an insurance policy implicated in a Hurricane Case provides for court appointment of a neutral or third appraiser for valuation disputes (hereinafter referred to as an "Umpire"), any request for the appointment by this Court of an Umpire shall only occur if the parties have been unable to agree on their own.

A.  **Where Parties HAVE been allowed to Opt Out of the SSP.**  If any party has been permitted to opt out of the SSP following a timely motion for the same, any party requesting appointment of an Umpire shall file a motion requesting same with the case's assigned District Judge, which motion shall be set for contradictory hearing. Counsel for either or both the Insured and the Insurer may also submit a joint motion requesting appointment of an Umpire to the Civil Duty Judge, who may agree to hear the motion during their respective duty week.

B.  ***Where Parties Have NOT Opted Out of the SSP.***  In all other cases, any request for the appointment by the Court of an Umpire shall be made in writing no later than 14 days following the filing of the defendant's responsive pleading. Any motion or request for this Court's appointment of an Umpire shall be submitted to the Special Master in the same manner as provided for a discovery dispute under the SSP, and the parties shall notify the Special Master and transmit the Umpire request to the Special Master via email at *jcpedersen@specialmasterservices.com.* The deadline may be extended by the Special Master in exceptional circumstances.

C.  ***Umpire-Only Filing.***  If a requesting party is seeking court appointment of an Umpire and no case is otherwise filed or pending before this Court (an "Umpire Only Filing"), then the parties shall follow the same procedures in



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:9 of 14 - Jefferson Parish Clerk of Court: 231839

Subsection 4(1). Any such request shall be made in writing no later than 14 days following the filing of the defendant's responsive pleading, and any such motion or request for this Court's appointment of an Umpire shall be referred to the Special Master under the above captioned general docket created for the Hurricane Cases. The parties shall notify the Special Master and transmit the Umpire request to the Special Master via email at _jcpedersen@specialmasterservices.com._  The deadline may be extended by the Special Master in exceptional circumstances.

(1)    An Insurer is required to provide written notice of the request to any known counsel for the Insured (or directly to an unrepresented Insured). An Insured is required to provide written notice of the request to any known counsel of Insurer (if any) or alternatively to the Insurer's primary point of contact on the claim with Insured. The appraisers previously selected by each party shall also be provided notice, and their contact information (phone and email address) shall be provided in the request for appointment of an Umpire.

(2)    A written report and recommendation following the Umpire's appointment shall be issued to the parties, and shall be deemed applicable to the parties in the same manner as if made by an order of the Court unless the report and recommendation is overturned by the assigned District Judge following a motion filed with the assigned District Judge within seven days of transmittal of the written report.

(3)    In an Umpire Only Filing, the Special Master shall provide the report and recommendation to the parties, who will in turn provide the same to the civil Duty Judge as of the time of the issuance of the report and recommendations. Similarly, the recommendation shall be deemed applicable to the parties in the same manner as if made by an order of the Court unless the report and recommendation is overturned by the civil Duty Judge following a motion filed with the civil Duty Judge within seven days of transmittal of the written report.

## SECTION 5. CLERK OF COURT AND NOTICE

A.    Any Plaintiff filing a Hurricane Case should note on its cover letter to the Clerk, in **all CAPS type** and red font (if possible) that the matter is a **"HURRICANE CASE." Each caption and on each pleading, "HURRICANE CASE" in bold print shall follow the docket number.** If the Special Master learns the Order has not been entered by the Clerk of

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300758 MORTGAGE BOOK 5014 PAGE 102



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:10 of 14 - Jefferson Parish Clerk of Court: 231839

Court, he shall serve it on the parties by email and may file proof of the same into the record at no cost.

B.    In all Hurricane Cases, a copy of this Order shall be served on the defendant(s) along with the Petition and Citation. The Clerk of Court shall include a reference that the Case Management Order is served with the Petition in the Citation issued. The Clerk of Court shall also provide a copy to the plaintiff by any authorized means.

C.    The Clerk of Court shall transmit via email, at least weekly, to the Special Master the docket numbers, case caption, and attorney contact information for any Hurricane Cases filed.

D.    Any party making any filing in a Hurricane Case subject to this Order shall serve a courtesy copy on the Special Master in the same manner as enrolled counsel via email at *jcpedersen@specialmasterservices.com*.

## SECTION 6. COURT SUPERVISION

The Disaster Discovery Protocols and Streamlined Settlement Process shall, at all times, be subject to the ultimate control and supervision of the Court. This Case Management Order for Hurricane Cases is subject to modification pursuant to further orders of this Court. All provisions of this Order shall become effective December 1, 2022 and shall be applicable to all cases whether then pending or thereafter filed.

**DONE AND SIGNED** this _14th_ day of _December_ , 2022, at _Gretna_ , Jefferson Parish, Louisiana.


JUDGE NANCY A. MILLER
CHIEF JUDGE
DIVISION "I"

JUDGE RAYMOND S. STEIB, JR.
DIVISION "A"

JUDGE R. CHRISTOPHER COX III
DIVISION "B"

JUDGE JUNE BERRY DARENSBURG
DIVISION "C"



EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300758 MORTGAGE BOOK 5014 PAGE 102

**12300758**

JUDGE SCOTT U. SCHLEGEL
DIVISION "D"

JUDGE FRANK A. BRINDISI
DIVISION "E"

JUDGE MICHAEL P. MENTZ
DIVISION "F"

JUDGE E. ADRIAN ADAMS
DIVISION "G"

JUDGE DONALD "CHICK" FORET
DIVISION "H"

JUDGE STEPHEN C. GREFER
DIVISION "J"

JUDGE ELLEN SHIRER KOVACH
DIVISION "K"

JUDGE DONALD A. ROWAN, JR.
DIVISION "L"

JUDGE SHAYNA BEEVERS MORVANT
DIVISION "M"

JUDGE STEPHEN D. ENRIGHT, JR.
DIVISION "N"

JUDGE DANYELLE M. TAYLOR
DIVISION "O"

JUDGE LEE V. FAULKNER, JR.
DIVISION "P"

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300758 MORTGAGE BOOK 5014 PAGE 102

Standing Case Management Order
Hurricane Ida Litigation
12



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:12 of 14 - Jefferson Parish Clerk of Court: 231839

**12300758**

# 24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

## STATE OF LOUISIANA

## IN RE: HURRICANE IDA CLAIMS

FILED:_____                _____

                                             **DEPUTY CLERK**

### STIPULATION FOR MEDIATION IN STREAMLINED SETTLEMENT PROGRAM

   **IT IS HEREBY STIPULATED AND AGREED** by and between the undersigned parties:

1.  The parties have agreed to submit their dispute to mediation pursuant to the SSP, as specified in the Standing Case Management Order (and any relevant amendments).

2.  No party shall be bound by anything said or done during the mediation, unless either a written and signed stipulation is executed, or the parties enter into a written and signed agreement. The appointed neutral may meet in private conference with less than all parties. Information obtained by the neutral, either in written or oral form, shall be confidential and, except as provided by Order of the Court, it shall not be revealed by the neutral unless and until the party who provided that information agrees to its disclosure.

3.  The mediation process shall be considered a settlement negotiation for the purpose of all federal and state rules protecting disclosures made during such conferences from later discovery or use in evidence. The entire procedure shall be confidential, and no stenographic or other record shall be made except to memorialize a settlement record. All communications, oral or written, made during the mediation by any party or a party's agent, employee, or attorney are confidential and, where appropriate, are to be considered work product and privileged. Such communications, statements, promises, offers, views and opinions shall not be subject to any discovery or admissible for any purpose, including impeachment, in any litigation or other proceeding involving the parties. Provided, however, that evidence otherwise subject to discovery or admissible is not excluded from discovery or admission in evidence simply as a result of it having been used in connection with this mediation process.

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 :;: 12300758 MORTGAGE BOOK 5014 PAGE 102



**12300758**

4. The appointed neutral and his or her agents shall have the same immunity as judges and court employees have under Louisiana law and jurisprudence from liability for any act or omission in connection with the mediation, and from compulsory process to testify or produce documents in connection with the mediation.

5. The parties (i) shall not call or subpoena the appointed neutral as a witness or expert in any proceeding relating to: the mediation, the subject matter of the mediation, or any thoughts or impressions which the appointed neutral may have about the parties in the mediation, and (ii) shall not subpoena any notes, documents or other material prepared by the appointed neutral in the course of or in connection with the mediation, and (iii) shall not offer into evidence any statements, views or opinions of the appointed neutral.

6. Any party to this Stipulation is required to attend at least one mediation session and as may be directed by the Special Master as many other sessions thereafter as may be helpful in resolving this dispute.

7. An individual with final authority to settle the matter and to bind the party shall attend the mediation on behalf of each party.

Dated:_____

_____
First Plaintiff's Signature

_____
First Defendant's Signature

_____
Second Plaintiff's Signature

_____
Second Defendant's Signature

_____
Counsel for Plaintiff

_____
Counsel for Defendant

_____
Counsel for Plaintiff

_____
Counsel for Defendant

_____
Appointed Neutral

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300758 MORTGAGE BOOK 5014 PAGE 102



**12300759**

FILED FOR RECORD 08/29/2023 11:52:47
Monica T. Polkey DY CLERK
JEFFERSON PARISH LA

# 24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

## STATE OF LOUISIANA

### IN RE: HURRICANE IDA CLAIMS

FILED:_____

　　　　　　　　　　　　　　　　　　　　　**DEPUTY CLERK**

## STANDING ORDER FOR DISASTER DISCOVERY PROTOCOLS
## IN CERTAIN PROPERTY DAMAGE SUITS ARISING FROM HURRICANE IDA

This Court hereby issues the following Standing Order establishing protocols for discovery ("Disaster Discovery Protocols") for all cases involving first-party insurance property damage claims arising from Hurricane Ida ("Hurricane Cases"),

**IT IS ORDERED** that within forty-five (45) days after the defendant's submission of a responsive pleading or motion, the parties must exchange any documents or information listed in these Disaster Discovery Protocols, for any such time periods identified in these Disaster Discovery Protocols.

**IT IS FURTHER ORDERED** that all parties shall remain under an ongoing duty to supplement their responses. No extension or delay in the time to file responsive pleadings shall extend the Disclosure Deadline to more than seventy (75) days from the original deadline to file responsive pleadings unless the extension is by the consent of all parties or pursuant to an express Order of this Court. Nothing in this Section prevents other discovery in accordance with the provisions of the Code of Civil Procedure except the restriction on subpoenas and subpoenas duces tecum articulated in Section 1 of the Standing Case Management Order Regarding Certain Property Damages Suits Arising From Hurricane Ida issued on _December 14_, 2022.

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300759 MORTGAGE BOOK 5014 PAGE 103



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:1 of 10 - Jefferson Parish Clerk of Court: 231840

**IT IS FURTHER ORDERED** that a party may object to disclosure of these Disaster Discovery Materials only if the material is Privileged as that term is defined herein. Any party withholding disclosure of any information or documents, where said disclosure is required pursuant to the Disaster Protocols, shall produce a privilege log to opposing counsel on or before the Disclosure Deadline. This privilege log shall detail all information or documents that it declined to produce on the basis that the material is privileged. The log should include the author of the document, the recipient of the document, the date of the document, and the nature of the privilege asserted.

Any dispute concerning privileged items shall be resolved by contradictory motion before the assigned District Judge. The District Judge may direct that the disputed items be provided to the Court for *in camera* inspection prior to the hearing of the motion.

**IT IS FURTHER ORDERED** that on belief of a party that good cause exists as to why a particular case should be exempted from the Disaster Protocols, in whole or in part, that party must file their objection with the Court prior to the expiration of the 45-day period set forth herein.

## DISASTER DISCOVERY PROTOCOLS

**PART 1: INTRODUCTION AND DEFINITIONS.**

(1)   Statement of purpose.

   a.   These Disaster Discovery Protocols apply to cases involving first-party insurance property damage claims arising from natural disasters ("Disaster Cases"). The Disaster Protocols are designed to be implemented by trial judges, lawyers, and litigants in state and federal courts. The Disaster Protocols make it easier and faster for the parties and their counsel to: (1) exchange important information and documents early in the case; (2) frame the issues to be resolved; (3) value the claims for possible early resolution; and (4) plan for more efficient and targeted subsequent formal discovery, if needed.

   b.   The Disaster Protocols are not intended to preclude or modify any party's rights to formal discovery as provided by law or other

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300759 MORTGAGE BOOK 5014 PAGE 103



applicable rules. Responses to the Disaster Protocols do not waive or foreclose a party's right to seek additional discovery under the applicable rules.

c.    Except as modified by the Court, these Disaster Discovery Protocols were prepared by a balanced group of highly experienced attorneys from across the country with expertise in Disaster Cases. The Disaster Protocols require parties to exchange information and documents routinely requested in every disaster case. The information and documents required to be produced includes favorable as well as unfavorable information and documents, is limited to information and documents that are not subject to objection, and is limited to the information and documents most likely to be important and useful in facilitating early settlement discussion and resolving or narrowing the issues.

(2)    Definitions. The following definitions apply to these Disaster Discovery Protocols:

a.    ***Claimed loss.*** "Claimed Loss" means the loss or damage that the Insured seeks to recover from the Insurer in the litigation.

b.    ***Document.*** "Document" and ‛·documents" are defined to be synonymous in meaning and equal in scope to the phrase "documents or electronically stored information" in FRCP 34(a)(I )(A) or similar state rules. A draft of a document or a nonidentical copy is a separate document.

c.    ***Event.*** "Event" means the disaster alleged to have caused the Insured's Claimed Loss.

d.    ***Identify (Documents).*** When referring to documents, to "identify" means to describe, to the extent known: (i) the type of document; (ii) the general subject matter; (iii) the date; (iv) the author(s), according to the document; and (v) the person(s) to whom, according to the document, the document (or a copy) was to have been sent. Alternatively, to "identify" a document means to produce a copy.

e.    ***Identify (Natural Persons).*** When referring to natural persons, to "identify" means to give the person's: (i) full name; (ii) present or last known address and telephone number; (iii) email address; (iv) present or last known place of employment; (v) present or last known job title; and (vi) relationship, if any, to the parties. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent requests to identify that person.

f.    ***Identify (Non-Natural Persons or Entities).*** When referring to a corporate entity, partnership, or other unincorporated association, to "identify" means to give the: (i) corporate or entity name and, if known, the trade or other names under which it has done business during the relevant time period; (ii) state of incorporation or registration; (iii) address of its principal place of business; (iv) primary phone number; and (v) internet address. Once a corporate or other

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300759 MORTGAGE BOOK 5014 PAGE 103



business entity has been identified in accordance with this subparagraph, only the name of that entity needs to be listed in response to subsequent requests to identify that entity.

g.   **Insurer.** "Insurer" means any person or entity alleged to have insured the Property that is the subject of the operative complaint, unless otherwise specified.

h.   **Insured.** "Insured" means any named individual(s), corporate entity(ies), partnership(s), or other unincorporated association(s) alleging property damage as an Insured in the litigation, or asserting a claim under an assignment.

i.   **Loss.** "Loss" means damage to the Property caused by the Event.

j.   **Other Insurance.** "Other Insurance" means any insurance policy, other than the Policy in force on the date of the Event, that covers or potentially covers the Property or the Claimed Loss.

k.   **Policy.** "Policy" means the insurance policy alleged to cover some or all of Insured's Claimed Loss that is the subject of the Insured's claim in the litigation.

l.   **Privilege.** "Privilege" means information and documents that are protected from disclosure by the attorney-client privilege, or work-product protection, including any joint defense agreement. privilege may properly be asserted include communications that reflect the mental impressions, conclusions, opinions, or theories of an attorney. Documents routinely prepared in the ordinary course of business, including but not limited to adjusters' reports, and other expert analyses, including draft reports, are <u>not</u> privileged and should be produced.

m.   **Property.** "Property" means the property (building or contents) that the Insured claims coverage for under the Policy in the litigation.

n.   **Relating to.** "Relating to" means concerning, referring, describing, evidencing, or constituting.

(3) Instructions.

a.   The relevant time period for this Disaster Discovery begins on the date immediately before the Event and ends on the date the lawsuit is filed for the Claimed Loss, unless a different time period is indicated with respect to a specific production obligation as set out inPart 2 or Part 3 below.

b.   This Disaster Discovery is presumptively not subject to any objections except for attorney-client privilege or work-product protection, including a joint defense agreement. Documents withheld based on a privilege or work-product protection claim are subject to expressly making the claim. A detailed privilege log is required as specified in this Order or any subsequent Orders of the Court, otherwise documents withheld as privileged or work-product protected communications may be described briefly by category or type. Withholding documents on this basis does not alleviate any obligation to produce the withheld documents or additional information about them at a later date, if the Court orders or the applicable rules require production.

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 1230O759 MORTGAGE BOOK 5014 PAGE 103

Standing Order for Disaster Discovery Protocols
Hurricane Ida Litigation
4




01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:4 of 10 - Jefferson Parish Clerk of Court: 231840

**1230Q759**

c.    If a partial or incomplete or "unknown at this time" answer or production is given to any disclosure requirement in these Disaster Discovery Protocols, the responding party must state the reason that the answer or production is partial, incomplete, or unknown and when supplemental information or documents providing a complete response will be produced.

d.    For this Disaster Discovery, a party must disclose information and documents that the disclosing party has in its possession, custody, or control and that are reasonably available. This Disaster Discovery is subject to obligations on supplementation and relevant requirements concerning certification of responses. This Initial Discovery does not preclude either party from seeking additional discovery at a later date.

e.    This Disaster Discovery is subject to the attached Interim Protective Order unless the parties agree or the court orders otherwise. The Interim Protective Order will remain in place until and unless the parties agree on, or the court orders, a different protective order. Absent party agreement or court order, the Interim Protective Order does not apply to subsequent discovery.

f.    Within 14 days after the filing of a responsive pleading by the responding party, the Parties shall meet and confer on the format (e.g., searchable PDF, Excel spreadsheet) for the production of documents under these Disaster Protocols. This will not delay the timeframes for Initial Discovery, absent court order. Nor will production in one format preclude requesting production in another format, if applicable rules of discovery allow.

## PART 2: INFORMATION AND DOCUMENTS TO BE PRODUCED BY THE INSURED

(1)    Timing.

Unless the Court orders otherwise, the Insured's Initial Discovery responses must be provided within 45 days after the Insurer has submitted a responsive pleading or motion (its first filing in this Court.)

(2)    Information to be produced by the Insured:

a.    A description of the Insured's ownership or other interest in the Property.

b.    The address of the Property (or location of movable Property) on the date of the Event.

c.    The name of each Insurer and all policy numbers for each Policy or Other Insurance held by or potentially benefitting the Insured or the Property on the date of the loss, including relevant policy and claim numbers for any claims.

d.    Identify any current mortgagee or other known lien holder.

e.    A computation of each item or type of Claimed Loss, including contents claims if in dispute. When the Policy requires, the computation should reasonably identify or itemize price and quantity of materials.

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300759 MORTGAGE BOOK 5014 PAGE 103



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:5 of 10 - Jefferson Parish Clerk of Court: 231840

123007591230075912300759

f.  Identify any payments received under the Policy relating to the Event. Identify the source and amount of any payments received after the Event from Other Insurance, or any other source, for all or any part of the Loss.

g.  Identify any grant or other similar program that the Insured applied for after the Event, including a Small Business Administration loan, seeking payment for all or any part of the Loss.

h.  Identify the public or other adjusters, estimators, inspectors, contractors, engineers, or other persons engaged by or on behalf of the Insured relating to the Claimed Loss.

i.  With respect to any Other Insurance, all policy numbers, the name of each insurer, and claim and docket numbers for any claims madefor coverage by the Insured on the same Property at issue in this litigation.

j.  Identify the source and amount of any payments received after the Event from Other Insurance, or any other source, for all or any part of the Loss.

k.  A general description, including the court and docket number, of any other lawsuits arising from the Event relating to the Property.

l.  A general description of any known preexisting damage to the Property relating to the Claimed Loss.

m.  A general description of any claims for property damage or lawsuits resulting from property damage in the past ten years relating to the Property.

n.  Identify any sale, transfer, or foreclosure of the Property after the Event.

(3)  Complete and unaltered copies of the following documents to be produced by the Insured:

a.  Documents relating to the Claimed Loss, including: loss estimates; adjuster's reports; engineering reports; contractor's reports; estimates, bids, plans, or specifications regarding repair work (whether planned, in progress, or completed); photographs; videos; or other materials relating to the Claimed Loss, along with any receipts, invoices, and other records of actual costs to repair or replace the Claimed Loss. This shall include all reports or analyses, including draft reports, prepared on behalf of Insured.

b.  Proofs of loss for the Claimed Loss.

c.  Documents relied on by the Insured in generating any proof of loss required or provided under the Policy.

d.  Written communications exchanged between the Insured and Insurer that refer or relate to Insured' s Claimed Loss, the Property, or damages, or otherwise relating to the Insured' s claim.

e.  Photographs and videos of the Property taken for the purpose of documenting the condition of the Property, including photographs and videos of the Loss.

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 1230075 MORTGAGE BOOK 5014 PAGE 103



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:6 of 10 - Jefferson Parish Clerk of Court: 231840

1**2300759**

f.     Written communications, photographs, or estimates of damages sought from or paid by any other insurer related to the Event.

g.     The insurance policy with respect to any Other Insurance, and the claim numbers for claims made to recover Loss to the Property relating to the Event.

h.     Appraisals or surveys of the Property condition within five years before, or any time after, the Event.

i.     If there has been an appraisal under the Policy, documents relating to the appraisal process.

j.     Any other document(s) on which the Insured relies to support the Claimed Loss.

## PART 3: INFORMATION AND DOCUMENTS TO BE PRODUCED BY THE INSURER.

(1)     Timing.

Unless the court orders otherwise, the Insurer's Initial Discovery responses must be provided within 45 days after the Insurer has submitted a responsive pleading or motion (its first filing in this Court in response or answer to the plaintiffs claim). The disclosures related to Insurers and the use of the term "Insurer" under this Part shall extend to anyone acting for or on behalf of the Insurer in relation to the claim of the Insured, including the employees, contractors, and agents of either the Insurer or anyone providing services to the Insurer related to the Insured's claim or Claimed Loss.

(2)     Information to be produced by the Insurer:

a.     **If there is a dispute over coverage**, in whole or in part, an explanation of the Insurer's reason for the denial of coverage, including:
       i.     Any exclusions or exceptions, or other coverage or legal defenses;
       ii.     The factual basis for any exclusion, limitation, exception, or condition-based dispute or defense;
       iii.     Whether there is also a dispute as to the value or amount of the Claimed Loss;
       iv.     Any other basis on which coverage was denied.

b.     **If there is a dispute over all or part of the valuation**, an explanation of the Insurer's basis for disputing the value or amount of the Claimed Loss, including:
       i.     The Insurer's understanding of the nature of the dispute;
       ii.     The amount the Insurer disputes and the basis for that dispute, including any applicable Policy provisions that the Insurer alleges or believes are relevant to the dispute; and
       iii.     The amount the Insurer agrees to pay, if any, with respect to any undisputed part of the Claimed Loss.

c.     Any Policy terms or conditions that the Insurer alleges the Insured failed to comply with, including conditions precedent or other terms.

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300759 MORTGAGE BOOK 5014 PAGE 103



d.    Any payments previously made under the Policy relating to the Event.

e.    A general description of any other basis for nonpayment of the Claimed Loss, in whole or in part.

f.    Any other Event-related lawsuits filed for the Property or the Insured.

g.    Identify the adjuster(s) who handled the claim.

h.    Identify the individual(s) who evaluated, recommended, made, approved, or rejected the claims decision.

i.    Identify the field personnel, estimators, inspectors, contractors, engineers, or other persons who participated in any investigation of the claims or the claims process, had any part relating to Insurer's evaluation process for the claims, or upon who the Insurer relied upon or received information from concerning Insurer's evaluation process or claim decision; and identify anyone who had any role in drafting, editing, reviewing, or approving any report(s), evaluation(s), or inspection(s) on behalf of Insurer involving the Insured's claim.

j.    If preexisting damage is at issue in the litigation, a general description of any prior claims in the past ten years for the Property.

(4)    Complete and unaltered copies of the following documents to be produced by the Insurer:

a.    The entire claim file maintained by the Insurer.

b.    The complete Policy in effect at the time of the Event.

c.    Assessments of the Claimed Loss, including: loss reports, expert reports that contain any description or analysis of the scope of loss or any defenses under the Policy, damage assessments, adjuster's reports, engineering reports, contractor's reports, and estimates of repair or replacement. This shall include all reports or analyses, including all drafts, prepared as part of the evaluation or claims process involving Insured's claim by Insurer, or documents or records reviewed in any way in connection with Insurer's handling of the claim.

d.    Photographs and videos of the Property taken for the purpose of documenting the condition of the Property, including photographs and videos of the Claimed Loss.

e.    Any other evaluations of the Claimed Loss.

f.    Documents containing recordings, transcripts, or notes of statements, conversations, or communications by or between the Insurer and the Insured relating to the Event.

g.    Any claim log, journal, diary, or record maintained by the Insurer relating to the Claimed Loss. This includes all written records, written communications, records of oral communications, reports, audits, or other records, including any documents, envelopes, logs or other documents evidencing when Insurer came into possession of any such records, regarding any aspect of the Insured's claim or that are in any way relating to the Insurer's investigation into the Claimed

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300759 MORTGAGE BOOK 5014 PAGE 103



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:8 of 10 - Jefferson Parish Clerk of Court: 231840

**12300759**

Loss, Insurer's processing of Insured's claim (including adjustment, evaluation, and handling), or Insurer's claim decision.

h.    The complete underwriting file maintained by the Insurer relating to the Property, its conditions, or coverage.

i.    Proofs of loss for the Claimed Loss.

j.    If there has been an appraisal under the Policy, all documents relating to the appraisal process.

k.    Any manuals, policies, directives, guidelines, instructions (whether written, electronic, or otherwise), literature, or similar written materials that would pertain to the Claimed Loss, Hurricane or to similar types of claims, generally such that they would therefore be applicable to the Hurricane Case including the Insured's claim. This includes any document that Insurer relied upon, or intends to rely upon, pertaining to industry guidelines, standard practices, or recommended practices for adjusting first party claims.

l.    For non-NFIP Claims, written communications exchanged between the Insured and Insurer that refer or relate to Insured's Claimed Loss, Property, or damages, or otherwise relating to the Insured's claim.

m.    Any other document(s) on which the Insurer relies to support its defenses.

**DONE AND SIGNED** this _____14th_____ day of ___December___, 2022, at Gretna, Jefferson Parish, Louisiana.

JUDGE NANCY A. MILLER
CHIEF JUDGE
DIVISION "I"

JUDGE RAYMOND S. STEIB, JR.
DIVISION "A"

JUDGE R. CHRISTOPHER COX III
DIVISION "B"

JUDGE JUNE BERRY DARENSBURG
DIVISION "C"

JUDGE SCOTT U. SCHLEGEL
DIVISION "D"

JUDGE FRANK A. BRINDISI
DIVISION "E"

JUDGE MICHAEL P. MENTZ
DIVISION "F"

JUDGE E. ADRIAN ADAMS
DIVISION "G"



EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300759 MORTGAGE BOOK 5014 PAGE 103

**12300759**

JUDGE DONALD "CHICK" FORET
DIVISION "H"

JUDGE STEPHEN C. GREFER
DIVISION "J"

JUDGE ELLEN SHIRER KOVACH
DIVISION "K"

JUDGE DONALD A. ROWAN, JR.
DIVISION "L"

JUDGE SHAYNA BEEVERS MORVANT
DIVISION "M"

JUDGE STEPHEN D. ENRIGHT, JR.
DIVISION "N'

JUDGE DANYELLE M. TAYLOR
DIVISION "O"

JUDGE LEE V. FAULKNER, JR.
DIVISION "P"

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300759 MORTGAGE BOOK 5014 PAGE 103



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:10 of 10 - Jefferson Parish Clerk of Court: 231840

**1.2300760**

FILED FOR RECORD 08/29/2023 11:52:58
Monica T. Polkey DY CLERK
JEFFERSON PARISH LA

# 24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

## STATE OF LOUISIANA

### IN RE: HURRICANE IDA CLAIMS

#### INTERIM PROTECTIVE ORDER REGARDING
#### CERTAIN PROPERTY DAMAGES SUITS ARISING FROM HURRICANE IDA

The Disaster Discovery Protocols for First-Party Insurance Property Damage Cases for all cases involving first-party insurance property damage claims arising from Hurricane Ida ("Hurricane Cases") are designed to achieve more efficient and targeted discovery. Prompt entry of a protective order will allow the parties to begin exchanging documents and information without delay. This Interim Protective Order will remain in place until the parties agree to, or the Court orders, a different protective order, but absent agreement or court order, the Interim Protective Order will not apply to discovery conducted after the parties complete the Streamlined Settlement Program. The parties may agree to use the Interim Protective Order throughout litigation.

**IT IS HEREBY ORDERED** that the following restrictions and procedures apply to certain information, documents, and excerpts from documents and information the parties exchange in response to the Disaster Discovery Protocols:

1.    Any party may designate as "Confidential" any document, or information contained in or revealed in a document, provided in response to these Protocols or, if applicable, in subsequent discovery, if the party determines, in good faith, that the designation is necessary to protect the party. Information and documents a party designates as confidential will be stamped "CONFIDENTIAL." Confidential information or documents are referred to collectively as "Confidential Information."

2.    Unless the court orders otherwise, the Confidential Information disclosed will be held and may be used by any person receiving the information solely in this litigation.

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 1230O760 MORTGAGE BOOK 5014 PAGE 104



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:1 of 5 - Jefferson Parish Clerk of Court: 231841

3. If a party challenges another party's Confidential Information designation, counsel must make a good-faith effort to resolve the dispute. If that is unsuccessful, the challenging party may seek resolution by the Court. Nothing in this Interim Protective Order is an admission by any party that Confidential Information disclosed in this case is relevant or admissible. Each party specifically reserves the right to object to the use or admissibility of all Confidential Information disclosed, in accordance with applicable law and court rules.

4. Information or documents designated as "Confidential" must not be disclosed to any person, except:

    a. the requesting party and counsel, including in-house or agency counsel;

    b. employees of counsel assigned to and necessary to assist in the litigation;

    c. consultants or experts assisting in the prosecution or defense of the litigation, to the extent deemed necessary by counsel;

    d. any person from whom testimony is taken or is to be taken in this litigation, but that person may be shown the Confidential Information only in preparation for, and during, the testimony and may not retain the Confidential Information;

    e. The judge, the court staff, including the clerk, case manager, court reporter, or other person with access to Confidential Information by virtue of his or her position with the court, or the jury; and

    f. The Special Master, Deputy Special Master, and any mediator involved in resolving the case, who shall all be subject to these confidentiality provisions.

5. Before disclosing or displaying Confidential Information to any person, a party must:

    a. inform the person of the confidential nature of the information and documents; and

    b. inform the person that the court has enjoined the use of the information or documents for any purpose other than this litigation and has enjoined the disclosure of that information or documents to any other person.

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 1230760 MORTGAGE BOOK 5014 PAGE 104



6.  The Confidential Information may be displayed to and discussed with the persons identified in Paragraphs 4(c) and (d) only on the condition that before any such display or discussion, each person must be asked to sign an agreement to be bound by this Order in the form detailed in Section 6(a), *infra*.

    6(a).  The Confidentiality Agreement shall read as follows:

> I have been informed by counsel that certain documents or information to be disclosed to me in connection with the matter entitled [CASE CAPTION] have been designated as confidential. I have been informed that any of the documents or information labeled "CONFIDENTIAL" are confidential by Order of the Court.
>
> I hereby agree that I will not disclose any information contained in the documents to any other person. I further agree not to use this information for any purpose other than this litigation.
>
> _____    DATED: _____
> Signature of [NAME]
>
> _____    DATED: _____
> Signature of Counsel

    6(b). If the person refuses to sign an agreement in the form attached, the party seeking to disclose the Confidential Information may seek relief from the court.

7.  The disclosure of a document or information without designating it as "Confidential Information" does not waive the right to designate the document or information as Confidential Information if the document or information is designated under this Order.

8.  Documents or information filed with the court that is subject to confidential treatment under this Order, and any pleadings, motions, or other papers filed with the court disclosing any Confidential Information, must be filed under seal to the extent permitted by the law, rules, or court orders, and must be kept under seal until the court orders otherwise. To the extent the court requires any further act by the parties as a precondition to filing the documents or information under seal, the party filing the document or information is responsible for satisfying the requirements. If possible, only the confidential parts of documents of information filed with the court will be filed under seal.

EFILE: 01/05/2023 12:51 PM JEFF PAR 747832 david $0.00 ::: 1230760 MORTGAGE BOOK 5014 PAGE 104



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:3 of 5 - Jefferson Parish Clerk of Court: 231841

**12300760**

9.  At the conclusion of this litigation, the Confidential Information and any copies must be promptly (and in no event later than 60 days after entry of final judgment no longer subject to appeal) returned to the producing party or certified as destroyed, except that the parties' counsel may retain their working files on the condition that those files will remain confidential. Materials filed in the court will remain in the file unless the court orders their return.

10. Producing documents or information, including Confidential Information, in this litigation does not waive attorney-client privilege or work-product protection for the documents or information.

This Order does not diminish the right of any party to apply to the Court for a different or additional Protective Order relating to Confidential Information, to object to the production of documents or information, to apply to the court for an order compelling production of documents or information, or to modify this Order. Any party may seek enforcement of this Order.

**DONE AND SIGNED** this _14th_ day of _December_ , 2022, at Gretna, Jefferson Parish, Louisiana.

JUDGE NANCY A. MILLER
CHIEF JUDGE
DIVISION "I"

JUDGE RAYMOND S. STEIB, JR.
DIVISION "A"

JUDGE R. CHRISTOPHER COX III
DIVISION "B"

JUDGE JUNE BERRY DARENSBURG
DIVISION "C"

JUDGE SCOTT U. SCHLEGEL
DIVISION "D"

JUDGE FRANK A. BRINDISI
DIVISION "E"

JUDGE MICHAEL P. MENTZ
DIVISION "F"

JUDGE E. ADRIAN ADAMS
DIVISION "G"

Interim Protective Order for Disaster Discovery Protocols
Hurricane Ida Litigation
4

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300760 MORTGAGE BOOK 5014 PAGE 104



**12300760**

JUDGE DONALD "CHICK" FORET
DIVISION "H"

JUDGE STEPHEN C. GREFER
DIVISION "J"

JUDGE ELLEN SHIRER KOVACH
DIVISION "K"

JUDGE DONALD A. ROWAN, JR.
DIVISION "L"

JUDGE SHAYNA BEEVERS MORVANT
DIVISION "M"

JUDGE STEPHEN D. ENRIGHT, JR.
DIVISION "N"

JUDGE DANYELLE M. TAYLOR
DIVISION "O"

JUDGE LEE V. FAULKNER, JR.
DIVISION "P"

EFILE: 01/05/2023 12:51 PM JEFF PAR 7417832 david $0.00 ::: 12300760 MORTGAGE BOOK 5014 PAGE 104

Interim Protective Order for Disaster Discovery Protocols
Hurricane Ida Litigation
5



01/05/2023 12:51:22 CERTIFIED TRUE COPY - Pg:5 of 5 - Jefferson Parish Clerk of Court: 231841

FILED FOR RECORD 08/29/2023 11:53:10
Monica T. Polkey DY CLERK
JEFFERSON PARISH LA

# 24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

## STATE OF LOUISIANA

## IN RE: HURRICANE IDA CLAIMS

FILED:_____

                                        _____
                                        **DEPUTY CLERK**

### STANDING CASE MANAGEMENT ORDER REGARDING CERTAIN PROPERTY DAMAGES SUITS ARISING FROM HURRICANE IDA, EXHIBIT A: LIST OF APPOINTED NEUTRALS

**IT IS HEREBY ORDERED** that the following individuals shall supplement and comprise the Appointed Neutrals referenced in the Standing Case Management Order, Section 3(B)(2)(a), *infra*, and are hereby appointed and shall proceed with all reasonable diligence and shall exercise their rights and responsibilities under the Streamlined Settlement Process ("SSP") as the Special Master may direct.

(2)    **Approved Neutrals.** The Court hereby designates and appoints the following individuals as "neutrals" (mediators) for the SSP:

(a)    Any person designated by the Special Master after consultation with the Court who is qualified pursuant to R.S. 13:4165(F)(5)(6), including:

| | |
|---|---|
| Hon. Carolyn Gill-Jefferson (ret.) | Hon. "Rusty" Knight (ret.) |
| Hon. Cornelius Regan (ret.) | Hon.Ronald J. Sholes (ret.) |
| Hon. Franz Zibilich (ret.) | Ashley Bass, Esq. |
| Jacques Bezou, Esq. | Hon. Glenn Ansardi (ret.) |
| Blair C. Constant, Esq. | Robert Raymond, Esq. |
| Michelle Craig, Esq. | Bobby M. Harges, Esq. |
| Fred Herman, Esq. | Ross Legarde, Esq. |
| Donald Massey, Esq. | Jonathan Pedersen, Esq. |
| Roger A. Javier, Esq. | Chadwick J. Mollere, Esq. |
| Ronald L. Faia, Jr., Esq. | Brian Reuter, Esq. |
| Joseph Hassinger, Esq. | Brigid Collins, Esq. |
| Stacy Palowsky, Esq. | Charles Cusimano, IV, Esq. |
| Christy Remy, Esq. | Harold Adkins, Esq. |
| David Bienvenu, Esq. | Mark Tauzier, Esq. |
| Jack Morris, Esq. | Lacy Smith, Esq. |
| Dustin Carter, Esq. | Eric Nowak, Esq. |

EFILE: 06/13/2023 11:07 AM JEFF PAR 7580166 david $0.00 ::: 12325320 MORTGAGE BOOK 5033 PAGE 85



06/13/2023 11:07:16 CERTIFIED TRUE COPY - Pg:1 of 3 - Jefferson Parish Clerk of Court: 2371148

**12325320**

(b)    Any person designated as a neutral pursuant to any Case Management Order that the U.S. District Court for the Eastern District of Louisiana may enter in connection with Hurricane Ida cases.

DONE AND SIGNED this _26th_ day of _April_____, 2023, at _Gretna_____, Jefferson Parish, Louisiana.


JUDGE NANCY A. MILLER
CHIEF JUDGE
DIVISION "I"

JUDGE RAYMOND S. STEIB, JR.
DIVISION "A"

JUDGE R. CHRISTOPHER COX III
DIVISION "B"

JUDGE JUNE BERRY DARENSBURG
DIVISION "C"

JUDGE SCOTT U. SCHLEGEL
DIVISION "D"

JUDGE FRANK A. BRINDISI
DIVISION "E"

JUDGE MICHAEL P. MENTZ
DIVISION "F"

JUDGE E. ADRIAN ADAMS
DIVISION "G"

JUDGE DONALD "CHICK" FORET
DIVISION "H"

JUDGE STEPHEN C. GREFER
DIVISION "J"

EFILE: 06/13/2023 11:07 AM JEFF PAR 7580166 david $0.00 ::: 12325320 MORTGAGE BOOK 5033 PAGE 85



JUDGE ELLEN SHIRER KOVACH
DIVISION "K"

JUDGE DONALD A. ROWAN, JR.
DIVISION "L"

JUDGE SHAYNA BEEVERS MORVANT
DIVISION "M"

JUDGE STEPHEN D. ENRIGHT, JR.
DIVISION "N'

JUDGE DANYELLE M. TAYLOR
DIVISION "O"

JUDGE LEE V. FAULKNER, JR.
DIVISION "P"

EFILE: 06/13/2023 11:07 AM JEFF PAR 7580166 david $0.00 ::: 12325320 MORTGAGE BOOK 5033 PAGE 85



06/13/2023 11:07:16 CERTIFIED TRUE COPY - Pg:3 of 3 - Jefferson Parish Clerk of Court: 2371148

RECEIVED VIA COUNTER                              PJ 835

FILED FOR RECORD 08/30/2023 12:22:13
Brittany N. Vitrano, DY CLERK
JEFFERSON PARISH, LA

## 24th JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

### STATE OF LOUISIANA

NO. 846,304                                    DIVISION "M"

### MAI TL, INC. d/b/a BAYMONT INN & SUITES – MARRERO

### VS.

### VELOCITY RISK UNDERWRITERS, LLC;<br>INDEPENDENT SPECIALTY INSURANCE COMPANY;<br>CERTAIN UNDERWRITERS AT LLOYD'S AND OTHER<br>INSURERS SUBSCRIBING TO BINDING AUTHORITY B604510568622021; and<br>ACCESS RESTORATION SERVICES US, INC.

FILED:_____        _____
                                              **DEPUTY CLERK**

### PETITION TO INTERVENE

**NOW COMES**, Celtic Bank Corporation ("Celtic" or "Petitioner-in-Intervention") which

pursuant to Louisiana Code of Civil Procedure article 1091, respectfully petitions to intervene in

the above-captioned matter, opposing both plaintiff and defendants, for the following reasons:

1.      Petitioner-in-Intervention is a corporation organized and existing under the laws of the

State of Utah and is authorized to do, and is doing, business in the State of Louisiana.

### FACTUAL BACKGROUND

2.      Plaintiff, Mai TL, Inc. dba Baymont Inn & Suites of Marrero ("Mai TL"), is the owner of

a certain piece of immovable property bearing municipal number 6589 Westbank Expressway,

Marrero, Louisiana 70072 (the "Property"), upon which Mai TL operated a Baymont Inn & Suites

hotel.

3.      In connection with multiple loans and related promissory notes in the original principal

sum exceeding $3,000,000.00, Mai TL (as mortgagor) executed a Multiple Indebtedness Mortgage

(the "Mortgage") in favor of Celtic (as mortgagee) dated May 29, 2015, recorded on June 3, 2015,

as Instrument # 11522925 and MOB 6453, Page 183, in the Parish of Jefferson, State of Louisiana,

granting a mortgage on the Property to secure the amounts owed due to Celtic.  A copy of the

Mortgage is attached hereto and is marked as Exhibit "A."

4.      In addition to other agreements and documents, Celtic respectively filed UCC Financing

Statements on June 2, 2015 with the Clerk of Court for the Parish of Jefferson, State of Louisiana,

Instrument Number 26-346483 and on June 2, 2015 with the Clerk of Court for the Parish of Caddo, State of Louisiana, Instrument Number 09-1268007 to further secure the amounts owed to it by Mai TL that provides Celtic with a security interest in all insurance proceeds payable to Mai TL, among other movable property. A copy of the UCC Financing Statements together with the Continuations is attached hereto and is marked as "Exhibit B in globo."

5.      The Mortgage requires Mai TL to maintain insurance on the Property so long as the Mortgage is in effect, including insurance protecting against property damage, and provides that all insurance proceeds and returned premiums shall be paid directly to Celtic. The Mortgage also provides that no act or omission on the part of Mai TL, or any of its representatives, shall affect the obligations of the insurer(s) to pay the full amount of any loss to Celtic. The Mortgage further states that Celtic shall have the right to directly receive the proceeds of all insurance protecting the Property and that in the event that Mai TL should receive any such proceeds, Mai TL agrees to immediately turn over and to pay such proceeds directly to Celtic.

6.      The Mortgage also affords Celtic the right to apply any and all insurance proceeds, in its sole discretion, to reduce the outstanding balance of the indebtedness and any additional advances that Celtic has made, or may make, on Mai TL's behalf, together with interest thereon.

7.      Pursuant to the obligations set forth in the Mortgage, Mai TL obtained a policy of insurance from Defendant Certain Underwriters at Lloyd's and Other Insurers Subscribing to Binding Authority B604510568622021 a/k/a and/or d/b/a Renaissance Reinsurance Ltd. ("Lloyd's") and Defendant Independent Specialty Insurance Company ("Independent") covering the Property bearing policy number 2021-800969-01 (the "Policy"). The Policy was in full force and effect during all relevant time periods, including April 14, 2021 through April 14, 2022. A copy of the Policy is attached hereto and is marked as Exhibit "C."

8.      The Policy listed Celtic as the sole Mortgage Holder and contained a Standard Mortgage Clause entitling Celtic, as Mortgage Holder, to any and all proceeds paid under the Policy.

9.      On or about August 29, 2021, the Property sustained damages resulting from Hurricane Ida.

10.      At the time the damage was sustained, and at all times material herein and continuing on the date of filing, Mai TL was in default under the Mortgage and related loan and other agreements. *See Celtic Bank Corporation vs. Mai TL, Inc. dba Baymont Inn & Suites of Marrero, et al.*, Case No. 818-848 for the Parish of Jefferson, State of Louisiana.

11.     Upon information and belief, Mai TL provided timely and proper notice of the damage and its claim under the Policy to Lloyd's and Independent pursuant to an Emergency Work Authorization Agreement dated August 31, 2021. A copy of the Emergency Work Authorization Agreement is attached hereto and is marked as Exhibit "D."

12.     Upon information and belief, and shortly after the damage was sustained, Mai TL contracted with ARS to repair and mitigate some of the damage sustained at the Property.

13.     Lloyd's and Independent accepted coverage of the claim made by Mai TL.

14.     Lloyd's and Independent acknowledged Celtic's rights as Mortgage Holder under the Policy and issued two checks each in the amount of $1,000,000.00 made jointly payable to, among others, Celtic and Mai TL.

15.     After one of the checks became stale, and unbeknownst to Celtic, upon information and belief, Lloyd's and Independent re-issued checks totaling approximately $2,100,000.00 directly to ARS.

16.     Upon learning that the proceeds had been paid to a third party in violation of the Policy, Celtic demanded payment of the proceeds that should have been paid to it as Mortgage Holder, to which Lloyd's and Independent refused.

17.     Despite the fact that Celtic had already been acknowledged as the proper payee when the initial two checks were issued, a representative of Lloyd's and Independent advised Celtic that they did not owe a duty to Celtic regarding the work performed by ARS and that ARS "should be paid for their services without restriction." See copy of email transmission dated October 20, 2022 and attached hereto and marked as Exhibit "E."

18.     Contrary to the representative's representation, the Policy does not allow payment of proceeds as suggested by Lloyd's and Independent. Instead, and as was done initially, all payments under the Policy are required to be paid to Celtic as Mortgage Holder.

19.     Unbeknownst to Celtic, and despite its previous objections, and upon information and belief, Lloyd's and Independent issued an additional $1,000,000.00 payment to ARS and/or Mai TL.

20.     Upon information and belief, Lloyd's and Independent has issued approximately $3,100,000.00 in Policy proceeds to ARS and/or Mai TL that instead should have been paid to Celtic as Mortgage Holder.

21.     Eventually, Celtic learned that Mai TL executed an Assignment of Benefits in favor of ARS without seeking and obtaining the permission of Celtic or Lloyd's and Independent. Further, Mai TL's assignment of its rights violated the express terms of the Mortgage and the Policy—the latter containing an enforceable provision prohibiting the assignment of post-loss insurance benefits. See Exhibit "D", Emergency Work Authorization Agreement.

22.     Upon information and belief, ARS knew or should have known that the Policy and related agreements prohibited the assignment by virtue of its communications with Mai TL, ARS' experience with similar work in the same and other areas, its history working with insurance claims, and the involvement of its counsel, among other reasons.

23.     Celtic did not consent to or otherwise authorize Mai TL to assign any rights or proceeds under the Policy to ARS.

24.     Although the Assignment of Benefits is not valid, and it violates the Policy and Mortgage, its validity does not impact Celtic's right to receive proceeds under the Policy as it is well-settled under Louisiana law that an assignor cannot assign rights greater than the rights it possesses. Stated otherwise, Mai TL does not, and did not, have the right to receive payment in preference over Celtic under the Policy and therefore, any rights ARS may have acquired are subject to the terms and limitations of the Policy and are subordinate to Celtic's right to receive and apply insurance proceeds.

25.     The Property, at a minimum, has not been in operation or service since it sustained damage from Hurricane Ida.

26.     To date, Mai TL's indebtedness to Celtic is in excess of $3,000,000.00.

## CAUSES OF ACTION

I.     **Lloyd's and Independent's Breach of the Policy, Breach of the Duty of Good Faith and Fair Dealing under La. R.S. 22:1973, Breach of Statutory Duty and Penalties under La. R.S. 22:1892, and Negligence.**

27.     Louisiana law provides that mortgage clauses such as the Mortgage Holder provision in the Policy establish a contract of insurance between the insurer and the mortgagee and renders the mortgagee an insured under the contract and within the meaning of the Louisiana statutes under which would be entitled to recover penalties and attorney's fees. *May v. Mkt. Ins. Co.*, 387 So. 2d 1081 (La. 1980); *PVCA, Inc. v. Pac. W. TD Fund, LP*, 2023-0342 (La. App. 4 Cir. 6/26/23).[1]

---

[1] Alternatively, the Policy, the UCC Financing Statements, and the Mortgage, in addition to other agreements, stipulate a benefit for Celtic with respect to the proceeds paid under the Policy, among other benefits, and serve as a *stipulation pour autrui* in favor of Celtic.

4

28.     Accordingly, Lloyd's and Independent both owed, and still owe, a duty to Celtic regarding insurance proceeds paid out on Mai TL's Hurricane Ida claim under the Policy and Louisiana law. *See generally* La. R.S. 22: 1973; La. R.S. 22:1892.

29.     Lloyd's and Independent breached their duties to Celtic, breached the terms of the Policy, and violated their affirmative statutory duties when they unjustifiably failed and refused to perform their obligations to Celtic by issuing the approximately $3,000,000.00 in payments to ARS and/or Mai TL, instead of issuing the payments to Celtic in accordance with the Policy and Louisiana law.

30.     Lloyd's and Independent's failure to pay the sums owed to Celtic was willful, arbitrary, capricious, and/or without probable cause in violation of Louisiana law.

31.     Upon information and belief, Lloyd's and Independent and ARS purposefully discussed and negotiated the payments to ARS without Celtic's knowledge or involvement because they knew that Celtic would object and make claim to the sums.

32.     By virtue of their actions and omissions, Lloyd's and Independent are each individually, jointly, severally, and/or solidarily to and owe Celtic the insurance proceeds payable (and that were improperly paid out and that may be paid as a result of Mai TL's Petition for Declaratory Judgment and for Damages) under the Policy for Mai TL's Hurricane Ida claim, actual, compensatory and general damages caused by their breaches of duties and breaches of contract, damages and statutory penalties under La. R.S. 22:1973 and 22:1892, reasonable attorney's fees and costs under La. R.S. 22:1892, costs of this litigation and any pre-litigation costs related to their failure to make insurance payments, judicial interest on all damages from the date of judicial demand until paid, and all other losses that will be proven through discovery or at the trial of this matter.

**II.    Mai TL's Breach of the Policy, Breach of the Mortgage, and Negligence.**

33.     Under Louisiana law and the various agreements entered into between Mai TL and Celtic, including but not limited to the Mortgage, the UCC Financing Statements, and the Policy, Mai TL owed and still owe a duty to Celtic to ensure all proceeds paid under the Policy were paid to Celtic and to refrain from taking any action that impeded or impacted Celtic's ability and right to receive such proceeds.

34.     Mai TL's failure to remit insurance proceeds to Celtic without restriction and its attempt to assign benefits under the Policy without Celtic's consent constitute breaches of Mai TL's duties under the Mortgage and the Policy and Louisiana law.

5

35.    In the event Mai TL recovers any damages or payments of any other kind from Lloyd's and Independent, Celtic is entitled to all amounts payable to Mai TL under the Policy.

36.    By virtue of their actions and omissions, Mai TL is liable to and owes Celtic the insurance proceeds payable (and that were improperly paid out that may be paid as a result of Mai TL's Petition for Declaratory Judgment and for Damages) under the Policy for Mai TL's Hurricane Ida claim, actual, compensatory and general damages caused by it breaches of duties and breaches of contract, reasonable attorney's fees and costs under the Mortgage and other related agreements, costs of this litigation and any pre-litigation costs related to their failure to make insurance payments, judicial interest on all damages from the date of judicial demand until paid, and all other losses that will be proven through discovery or at the trial of this matter.

### III.    ARS' Unjust Enrichment, Tortious Interference with Contractual Relations, and Alternative Breach of the Policy.

37.    ARS is liable to Celtic for unjust enrichment, tortious interference with contractual relations and, alternatively, breach of the Policy due to its willful and negligent conduct that resulted in ARS receiving the payments that were due and are owed to Celtic under the Policy.

38.    Specifically, ARS knew or should have known that it was not the proper payee due to the terms and limitations of the Policy and because of its knowledge of Lloyd's and Independent's acknowledgement of Celtic as the proper payee as the Mortgage Holder listed on the Policy. Further, ARS had actual knowledge of the fact that any payment to it was improper and in violation of the Policy when Celtic advised its attorney and Lloyd's and Independent of the issues detailed in this pleading.

39.    Despite having actual knowledge that it was not entitled to receive any proceeds under the Policy directly, ARS continued to solicit and demand payment from Lloyd's and Independent and ultimately received improper payments under the Policy.

40.    Upon information and belief, Lloyd's and Independent and ARS purposefully discussed and negotiated the payments to ARS without Celtic's knowledge or involvement because they knew that Celtic would object and make claim to the sums.

41.    Alternatively, if it is determined that the Assignment of Benefits was and is valid, ARS stepped into the shoes of and accedes to the rights, titled claim of Mai TL and breached its obligations to Celtic under the terms and conditions of the Policy.

42.    ARS' conduct has impoverished Celtic and has prevented Celtic from receiving insurance proceeds to which it is entitled.

43.     By virtue of its actions and omissions, ARS is individually, jointly, severally, and/or solidarily liable to and owes Celtic the insurance proceeds payable (and that were improperly paid out that may be paid as a result of Mai TL's Petition for Declaratory Judgment and for Damages) under the Policy for Mai TL's Hurricane Ida claim, actual, compensatory and general damages caused by it breaches of duties and breaches of contract, costs of this litigation and any pre-litigation costs related to their failure to make insurance payments, judicial interest on all damages from the date of judicial demand until paid, and all other losses that will  be proven through discovery or at the trial of this matter.

## CELTIC'S RIGHT TO INTERVENE

44.     Given the nature of the relief requested in the Plaintiff's Petition for Declaratory Judgments and for Damages, and the deleterious effects that such relief, if granted, would have on Celtic's interests, Celtic should be allowed to intervene in the above-captioned matter in order to ensure that its interests are protected and its rights are enforced.

45.     Given the rights provided to Celtic pursuant to the Policy, the Mortgage, the UCC Financing Statements, and Louisiana law, Celtic must be allowed to intervene in the above-captioned matter in order to ensure that its rights are protected and its rights are enforced.

46.     Celtic avers that its Petition to Intervene is timely pursuant to La. Code Civ. Pro. Art. 1091, that it will not unduly delay this proceeding, and that it will not prejudice any party.

47.     Celtic is intervening in the above-captioned matter subject to a full reservation of rights to raise and any all claims, objections, and/or defenses that are or will become available to it as an intervenor in this matter.

48.     Cetlic reserves any and all claims, rights, causes of action, and/or defenses that are or will become available to it against any entities and individuals who are or may become liable for the claims asserted herein and/or the obligations recited herein.

**WHEREFORE,** Petitioner-in-Intervention, Celtic Bank Corporation, prays that this Petition to Intervene be deemed good and sufficient; and that it be permitted to intervene in the above-captioned and entitled matter, affording it full status as a party to all further proceedings therein; and that, after due proceedings are had, this Honorable Court deny the relief sought by Plaintiff and that Plaintiff, Mai TL, Inc. dba Baymont Inn & Suites of Marrero, and Defendants, Velocity Risk Underwriters, LLC, Certain Underwriters at Lloyd's and Other Insurers Subscribing to Binding Authority B604510568622021, Independent Specialty Insurance Company, and Access

Restoration Services US, Inc., be served with a copy of this Petition to Intervene and that after expiration of all legal delays and due proceedings, there be judgment rendered in favor of Petitioner-in-Intervention and against Plaintiff, Mai TL, Inc. dba Baymont Inn & Suites of Marrero, and Defendants, Velocity Risk Underwriters, LLC, Certain Underwriters at Lloyd's and Other Insurers Subscribing to Binding Authority B604510568622021, Independent Specialty Insurance Company, and Access Restoration Services US, Inc., individually, jointly, severally, and/or solidarily in an amount that will fully compensate Petitioner-in-Intervention for its damages pursuant to the evidence and in accordance with the law, statutory penalties and fees, all sums with legal interest thereon from the date of judicial demand until fully paid, for Plaintiff's attorney's fees, for all costs of these proceedings, and for other and all general and equitable relief.

Respectfully submitted,

**ADAMS AND REESE LLP**

By: _____
ROBIN B. CHEATHAM (#4004)
SCOTT R. CHEATHAM (#31658)
HUNTER J. SCHOEN (#37862)
Hancock Whitney Building Suite 4500
New Orleans, LA 70139
Phone: (504) 581-3234
Robin.cheatham@arlaw.com
Scott.cheatham@arlaw.com
Hunter.schoen@arlaw.com

Attorneys for CELTIC BANK CORPORATION

**PLEASE SERVE**

**MAI TL, INC.**
*Through its registered agent*
Kathy Thuy Nguyen
1789 Wedgwood Drive
Harvey, Louisiana 70058

**VELOCITY RISK UNDERWRITERS, LLC**
*Through its registered agent*
Corporation Service Company
501 Louisiana Avenue.
Baton Rouge, LA 70802
EBR CHK #007439  $121.32   SOS CHK# 007451 $100
**INDEPENDENT SPECIALTY INSURANCE COMPANY**
*Through its registered agent*
Louisiana Secretary of State
8585 Archives Ave.
Baton Rouge, LA 70809

[continues on next page]

8

**CERTAIN UNDERWRITERS AT LLOYD'S AND OTHER INSURERS SUBSCRIBING TO BINDING AUTHORITY B604510568622021**
*Through its registered agent*
Louisiana Secretary of State
8585 Archives Ave.
Baton Rouge, LA 70809

**ACCESS RESTORATION SERVICES US, INC.**
*Through its registered agent*
Northwest Registered Agent, LLC
201 Rue Beauregard, Ste. 202
Lafayette, LA 70508



# ADAMS AND REESE LLP

**Attorneys at Law**
Alabama
Colorado
Florida
Georgia
**Louisiana**
Mississippi
North Carolina
South Carolina
Tennessee
Texas
Washington, DC

**Hunter J. Schoen**
Direct:  504.585.0313
E-Fax:  504.553.9759
hunter.schoen@arlaw.com

August 29, 2023

*__VIA FAX FILING - (504) 364-3780__*
Clerk of Court
24th Judicial District Court
Parish of Jefferson
Post Office Box 10
Gretna, Louisiana 70054-0010

RE:   *Mai TL, Inc. d/b/a Baymont Inn & Suites - Marrero*
*v Velocity Risk Underwriters, LLC, et al*
24th Judicial District Court, Docket No. 846-304, Division "M"
Our File No.: 11471-200

Dear Clerk:

Attached please find a *Petition to Intervene* which we ask that you file into the record of the above-referenced matter on behalf of Celtic Bank Corporation.

We are filing this pleading via facsimile pursuant to LSA-R.S. § 13:850.  We ask that you please file these into the above referenced record, date stamped with today's date.  The original signed pleadings, along with a check covering all applicable filing fees, as required by the statute, will be sent to you by mail within five (5) days.  We appreciate your assistance in this matter.

Thanking you in advance for your assistance in this matter, I remain,

Cordially,

**ADAMS AND REESE LLP**

Hunter J. Schoen

HJS:jlb
Enclosures

Hancock Whitney Center | 701 Poydras Street, Suite 4500 | New Orleans, Louisiana 70139 | 504.581.3234 | Fax 504.566.0210
**www.adamsandreese.com**

RECEIVED VIA COUNTER

FILED FOR RECORD 08/30/2023 12:22:13
Brittany N. Vitrano, DY CLERK
JEFFERSON PARISH, LA

11522925

Filed by: FAX
Date: 8/29/23
Time: 3:42 PM
Deputy Clerk: Brittany Vitrano

Southern Title, Inc.
License #124477
2325 Manhattan Blvd.
Harvey, LA 70058

43807/KS

EXHIBIT
A

MULTIPLE INDEBTEDNESS MORTGAGE

Mortgagor:     Mai TL, INC.          Mortgagee: Celtic Bank Corporation
               6589 Westbank Expressway          268 S. State Street
               Marrero, LA 70072                 Suite 300
                                                 Salt Lake City, UT  84111

MULTIPLE INDEBTEDNESS MORTGAGE          UNITED STATES OF AMERICA

                                        STATE          OF
                                        LOUISIANA

                                        PARISH          OF
                                        JEFFERSON

BY: Mai TL, INC.

IN FAVOR OF:

    Celtic Bank Corporation

    And Any Future Holder or Holders

    BE IT KNOWN, that on May 29, 2015;

    BEFORE ME, the undersigned Notary Public, and in the presence of the undersigned competent witnesses;

    PERSONALLY CAME AND APPEARED:

        Mai TL, INC., a corporation duly organized, validly existing and in good standing under the laws of the State of Louisiana and has its registered offices at 6589 Westbank Expressway, Marrero, LA, 70072, appearing herein through its duly authorized representative(s) pursuant to a resolution of its Board of Directors, a certified copy of which is attached hereto expressly made a part hereof;

    WHO DECLARED THAT:



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:1 of 20 - Jefferson Parish Clerk of Court - ID:2165626

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

11522925

A CERTAIN PLOT OF GROUND, together with all the buildings and improvements thereon and all attachments thereto, and all of the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the Parish of Jefferson, State of Louisiana, in that part thereof known as PATERNOSTRO SUBDIVISION EXTENSION, and according to a plan by J. J. Krebs & Sons, Inc., dated December 3, 1969, approved by Ordinance No. 9507, adopted January 8, 1970, registered in COB 710, folio 178, said Plot is designated and described as follows:

Plot 2, Square 8, which square is bounded by West Bank Expressway, Cholly Street, Garden Road and the East boundary line of the subdivision. Said Plot 2 commences at a distance of 194 feet from the corner of the West Bank Expressway and Garden Road and measures thence 150.84 feet front feet front on the West Bank Expressway, by a width in the rear on Cholly Street of 167.88 feet, by a depth on Plot 1 of 301.97 feet, and a depth on its eastern boundary line of 300.23 feet.

And further in accordance with survey no. T3803-L by Dufrene Surveying & Engineering, Inc., Tildon J. Dufrene, Jr., Registered Land Surveyor, dated May 26, 2006, revised July 20, 2006, print recorded in COB 3173 page 727, the property has the same designation and location as hereinabove set forth and measures 150.84 feet front on the West Bank Expressway, by a width in the rear on Cholly Street of 167.89 feet, by a depth on Plot 1 of 301.97 feet, and a depth on its eastern boundary line of 300.32 feet.

Improvements thereon bear the Municipal No. 6589 Westbank Expressway, Marrero, LA 70072

<div style="text-align: right">EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183</div>



JON A. GEGENHEIMER

11522925

# CORPORATE RESOLUTION TO BORROW / GRANT COLLATERAL

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $789,800.00 | 05-29-2015 | 06-01-2041 | [redacted] | 51 / 07 | | CN | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Corporation:** Mai TL, INC.
6589 Westbank Expressway
Marrero, LA 70072

**Lender:** Celtic Bank Corporation
268 S. State Street
Suite 300
Salt Lake City, UT 84111

WE, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:

THE CORPORATION'S EXISTENCE. The complete and correct name of the Corporation is Mai TL, INC. ("Corporation"). The Corporation is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Louisiana. The Corporation is duly authorized to transact business in all other states in which the Corporation is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Corporation is doing business. Specifically, the Corporation is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Corporation has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Corporation maintains an office at 6589 Westbank Expressway, Marrero, LA 70072. Unless the Corporation has designated otherwise in writing, the principal office is the office at which the Corporation keeps its books and records. The Corporation will notify Lender prior to any change in the location of the Corporation's state of organization or any change in the Corporation's name. The Corporation shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Corporation and the Corporation's business activities.

RESOLUTIONS ADOPTED. At a meeting of the Directors of the Corporation, or if the Corporation is a close corporation having no Board of Directors then at a meeting of the Corporation's shareholders, duly called and held on May 29, 2015, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.

OFFICERS. The following named persons are officers of Mai TL, INC.:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| Kathy Thuy Nguyen | Vice President | Y | X [signature] |
| Mai Thanh Cao | President | Y | X [signature] |

ACTIONS AUTHORIZED. Any two (2) of the authorized persons listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Corporation. Specifically, but without limitation, any two (2) of such authorized persons are authorized, empowered, and directed to do the following for and on behalf of the Corporation:

Loan. To negotiate and obtain a loan from Lender in the amount of Seven Hundred Eighty-nine Thousand Eight Hundred & 00/100 Dollars (U.S. $789,800.00) under such terms and conditions as said officers may agree to in their sole discretion, for such sum or sums of money as in their judgment should be borrowed.

Execute Notes. To execute and deliver to Lender the promissory note or notes, or other evidence of the Corporation's credit accommodations, on Lender's forms, at such rates of interest and on such terms as may be agreed upon, evidencing the sums of money so borrowed or any of the Corporation's indebtedness to Lender, and also to execute and deliver to Lender one or more renewals, extensions, modifications, refinancings, consolidations, or substitutions for one or more of the notes, any portion of the notes, or any other evidence of credit accommodations.

Grant Security. To mortgage, pledge, transfer, endorse, hypothecate, or otherwise encumber and deliver to Lender any property now or hereafter belonging to the Corporation or in which the Corporation now or hereafter may have an interest, including without limitation all of the Corporation's real (immovable) property and all of the Corporation's personal (movable) property and rights, as security for the payment of any loans or credit accommodations so obtained, any promissory notes so executed (including any amendments to or modifications, renewals, and extensions of such promissory notes), or any other or further indebtedness of the Corporation to Lender at any time owing, however the same may be evidenced. Such property may be mortgaged, pledged, transferred, endorsed, hypothecated, encumbered or otherwise secured at the time such loans are obtained or such indebtedness is incurred, or at any other time or times, and may be either in addition to or in lieu of any property theretofore mortgaged, pledged, transferred, endorsed, hypothecated, encumbered or otherwise secured.

Execute Security Documents. To execute and deliver to Lender the forms of mortgage, collateral mortgage, deed of trust, pledge agreement, hypothecation agreement, and other security agreements and financing statements which Lender may require which shall evidence the terms and conditions under and pursuant to which such liens and encumbrances, or any of them, are given, and which may contain provisions for foreclosure under Louisiana executory process procedures, confessions of judgment, waiver of appraisal and other rights, all of which remedies upon default are specifically agreed to by the Corporation; and also to execute and deliver to Lender any other written instruments, any chattel paper, or any other collateral, of any kind or nature, which Lender may deem necessary or proper in connection with or pertaining to the giving of the liens and encumbrances. Notwithstanding the foregoing, any one of the above authorized persons may execute, deliver, or record financing statements.

Negotiate Items. To draw, endorse, and discount with Lender all drafts, trade acceptances, promissory notes, or other evidences of indebtedness payable to or belonging to the Corporation or in which the Corporation may have an interest, and either to receive cash for the same or to cause such proceeds to be credited to the Corporation's account with Lender, or to cause such other disposition of the proceeds derived therefrom as they may deem advisable.

Further Acts. In the case of lines of credit, to designate additional or alternate individuals as being authorized to request advances under such lines, and in all cases, to do and perform such other acts and things, to pay any and all fees and costs, and to execute and deliver such other documents and agreements, including agreements waiving the right to a trial by jury, as the officers may in their discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution.

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:3 of 20 - Jefferson Parish Clerk of Court - ID:2165626

11522925

## CORPORATE RESOLUTION TO BORROW / GRANT COLLATERAL
(Continued)

| Loan No: ▮▮▮▮▮ | | Page 2 |
|---|---|---|

**ASSUMED BUSINESS NAMES.** The Corporation has filed or recorded all documents or filings required by law relating to all assumed business names used by the Corporation. Excluding the name of the Corporation, the following is a complete list of all assumed business names under which the Corporation does business:

| Assumed Business Name | Filing Location | Date |
|---|---|---|
| Baymont Inn & Suites of Marrero | SOS, LA | 09-11-2012 |

**NOTICES TO LENDER.** The Corporation will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in the Corporation's name; (B) change in the Corporation's assumed business name(s); (C) change in the management of the Corporation; (D) change in the authorized signer(s); (E) change in the Corporation's principal office address; (F) change in the Corporation's state of organization; (G) conversion of the Corporation to a new or different type of business entity; or, (H) change in any other aspect of the Corporation that directly or indirectly relates to any agreements between the Corporation and Lender. No change in the Corporation's name or state of organization will take effect until after Lender has received notice.

**CERTIFICATION CONCERNING OFFICERS AND RESOLUTIONS.** The officers named above are duly elected, appointed, or employed by or for the Corporation, as the case may be, and occupy the positions set opposite their respective names. This Resolution now stands of record on the books of the Corporation, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**NO CORPORATE SEAL.** The Corporation has no corporate seal, and therefore, no seal is affixed to this Resolution.

**CONTINUING VALIDITY.** Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved. This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of the Corporation's agreements or commitments in effect at the time notice is given.

**IN TESTIMONY WHEREOF,** we have hereunto set our hand and attest that the signatures set opposite the names listed above are their genuine signatures.

We each have read all the provisions of this Resolution, and we each personally and on behalf of the Corporation certify that all statements and representations made in this Resolution are true and correct. This Corporate Resolution to Borrow / Grant Collateral is dated May 29, 2015.

CERTIFIED TO AND ATTESTED BY:

X _____
Kathy Thuy Nguyen, Vice President of Mai TL, INC.

X _____
Mai Thanh Cao, President of Mai TL, INC.

NOTE: If the officers signing this Resolution are designated by the foregoing document as one of the officers authorized to act on the Corporation's behalf, it is advisable to have this Resolution signed by at least one non-authorized officer of the Corporation.

LaserPro, Ver. 15.1.10.006  Copr. D + E USA Corporation 1997, 2015.  All Rights Reserved.  - LA  Y:\CFI\LPL\C10.FC  TR-5336  PR-2



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:4 of 20 - Jefferson Parish Clerk of Court - ID:2165626

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

11522925

## TERMS AND CONDITIONS:

**INDEBTEDNESS.** The word "Indebtedness" as used in this Mortgage means individually, collectively and interchangeably any and all present and future loans, advances, and/or other extensions of credit obtained and/or to be obtained by Mortgagor from Mortgagee, as well as Mortgagee's successors and assigns, from time to time, one or more times, now and in the future, under a certain commercial loan agreement dated May 29, 2015 and any and all promissory notes evidencing such present and/or future loans, advances, and/or other extensions of credit, including without limitation, Notes dated May 29, 2015, in the principal amounts of $2,385,300.00 & $789,800.00, from Mortgagor to Mortgagee, and any and all amendments thereto and/or substitutions therefor, and any and all renewals, extensions and refinancings thereof, as well as any and all other obligations, including, without limitation, Mortgagor's covenants and agreements in any present or future loan or credit agreement or any other agreement, document or instrument executed by Mortgagor and liabilities that Mortgagor may now and/or in the future owe to and/or incur in favor of Mortgagee, whether direct or indirect, or by way of assignment or purchase of a participation interest, and whether related or unrelated, or whether committed or purely discretionary, and whether absolute or contingent, liquidated or unliquidated, voluntary or involuntary, determined or undetermined, due or to become due, and whether now existing or hereafter arising, or otherwise secured or unsecured, whether Mortgagor is obligated alone or with others on a "solidary" or "joint and several" basis, as a principal obligor or as a surety, guarantor, or endorser, of every nature and kind whatsoever.   **Notwithstanding any other provision of this Mortgage, the maximum amount of Indebtedness secured hereby shall be limited to $50,000,000.00.**

**GRANTING OF MORTGAGE.** And now, in order to secure the prompt and punctual payment and satisfaction of the Indebtedness, in principal, interest, costs, expenses, attorneys' fees and other fees and charges, and additionally to secure repayment of any and all Additional Advances that Mortgagee may make on behalf of Mortgagor as provided in this Mortgage, together with interest thereon, Mortgagor does by these presents specifically mortgage, affect and hypothecate unto and in favor of Mortgagee, any and all of Mortgagor's present and future rights, title and interest in and to the following described Property located in Jefferson Parish, State of Louisiana:

The immovable (real) property specifically described as follows:

> See Exhibit A, which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.

**Together with any and all present and future buildings, constructions, component parts, improvements, attachments, appurtenances, fixtures, rights, ways, privileges, advantages, batture, and batture rights, servitudes and easements of every type and description, now and/or in the future relating to the Property, and any and all items and fixtures attached to and/or forming integral or component parts of the Property in accordance with the Louisiana Civil Code.**

The Property or its address is commonly known as   6589 Westbank Expressway, Marrero, LA 70072.

**MORTGAGE SECURING FUTURE INDEBTEDNESS.** This Mortgage has been executed by Mortgagor pursuant to Article 3298 of the Louisiana Civil Code for the purpose of securing Mortgagor's Indebtedness that may now be existing or that may arise in the future as provided herein, with the preferences and priorities provided under applicable Louisiana law.   However, nothing under this Mortgage shall be construed as limiting the duration of this Mortgage or the purpose or purposes for which Mortgagor's Indebtedness may be requested or extended. Mortgagor's additional loans will automatically be secured by this Mortgage without the necessity that Mortgagor agrees or consents to such a result at the time additional loans are made and that the note or notes evidencing such additional loans reference the fact that such notes are secured by this Mortgage.   Mortgagor understands that Mortgagor may not subsequently have a change of mind and insist that Mortgagor's additional loans not be secured by this Mortgage unless Mortgagee

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrh $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:5 of 20 - Jefferson Parish Clerk of Court - ID:2165626

specifically agrees to such a request in writing.

**DURATION OF MORTGAGE.** This Mortgage will remain in effect until (A) all of the Indebtedness is fully paid and satisfied and there is no agreement or commitment to advance any additional Indebtedness; and (B) Mortgagor cancels this Mortgage by filing a written cancellation instrument signed by Mortgagee. When all of the indebtedness is fully paid and satisfied and there is no agreement or commitment to advance any additional indebtedness, Mortgagor may request Mortgagee to sign such a written cancellation instrument by writing Mortgagee at the above address or at such other address as Mortgagee may advise. Mortgagee may delay providing Mortgagor with such a mortgage cancellation instrument for a period of sixty (60) days following receipt of Mortgagor's written request, or such longer time as may be necessary for Mortgagee to verify that all conditions precedent for mortgage cancellation have been satisfied.

**PROHIBITIONS REGARDING PROPERTY.** So long as this Mortgage remains in effect, Mortgagor shall not, without the prior written consent of Mortgagee, sell, transfer, forego, assign, do anything or permit anything to be done that may in any way affect Mortgagee's security interests and rights in and to the mortgaged Property, or create or permit to exist any Encumbrance in or against any of the Property, in favor of any person other than Mortgagee.

**REPRESENTATIONS AND WARRANTIES CONCERNING THE PROPERTY.** Except as previously disclosed to Mortgagee in writing, Mortgagor represents and warrants that: (A) Mortgagor is and will continue to be the lawful owner of the Property; (B) Mortgagor has the right to mortgage the Property to Mortgagee; (C) as of the time this Mortgage is recorded, there are no Encumbrances affecting the Property; (D) the security rights and interest granted under this Mortgage will at no time become subordinate or junior to any security rights, interests, liens, or claims of, or in favor of, any person, firm, corporation, or other entity; and (E) this Mortgage is binding upon Mortgagor as well as Mortgagor's heirs, successors, legatees, administrators, executors, representatives and assigns, and is legally enforceable in accordance with its terms. The above representations and warranties, and all other representations and warranties contained in this Mortgage, are and will be continuing in nature and will remain in full force and effect until such time as this Mortgage is cancelled in the manner provided above.

**INSURANCE PROVISIONS.** The following insurance provisions are a part of this Mortgage:

**Required Insurance.** So long as this Mortgage remains in effect, Mortgagor shall, at its sole cost, keep and/or cause others, at their expense, to keep the Property constantly insured against loss by fire, by hazards included within the term "extended coverage," and by such other hazards (including flood insurance, where applicable) as may be required by Mortgagee. Such insurance shall be in an amount not less than the full replacement value of the Property, or such other amount or amounts as Mortgagee may require or approve in writing. Mortgagor shall further provide and maintain, at its sole cost and expense, comprehensive public liability insurance, naming both Mortgagor and Mortgagee as parties insured, protecting against claims for bodily injury, death and/or property damage arising out of the use, ownership, occupancy, possession, operation and condition of the Property, and further containing a broad form contractual liability endorsement covering Mortgagor's obligations to indemnify Mortgagee as provided hereunder. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Mortgagor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Mortgagee that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Mortgagee, and to maintain such insurance for the term of the loan.

**Insurance Companies and Policies.** Mortgagor may purchase such insurance from any insurance company or broker that is acceptable to Mortgagee, provided that such approval may not be unreasonably withheld. All such insurance policies, including renewals and replacements, must also be in form and substance acceptable to Mortgagee, and must



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:6 of 20 - Jefferson Parish Clerk of Court - ID:2165626

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225/00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

11522925

additionally contain a lender's loss payee endorsement in favor of Mortgagee, providing in part that (1) all proceeds and returned premiums under such policies of insurance will be paid directly to Mortgagee, and (2) no act or omission on the part of Mortgagor, or any of its directors, officers, agents, employees or representatives, nor breach of any warranty contained in such policies, shall affect the obligations of the insurer to pay the full amount of any loss to Mortgagee. Such policies of insurance must also contain a provision prohibiting cancellation, nonrenewal, or the alteration of such insurance without at least ten (10) daysprior written notice to Mortgagee of such intended cancellation or alteration. Mortgagor agrees to provide Mortgagee with originals or certified copies of such policies of insurance. Mortgagor further agrees to promptly furnish Mortgagee with copies of all renewal notices and, if requested by Mortgagee, with copies of receipts for paid premiums. Mortgagor shall provide Mortgagee with originals or certified copies of all renewal or replacement policies of insurance no later than fifteen (15) days before any such existing policy or policies should expire. If Mortgagor's insurance policies and renewals are held by another person, Mortgagor agrees to supply original or certified copies of the same to Mortgagee within the time periods required above.

**Property Losses and Claims.** Mortgagor agrees to immediately notify Mortgagee in writing of any material casualty to or accident involving the Property, whether or not such casualty or loss is covered by insurance. Mortgagor further agrees to promptly notify Mortgagor's insurance company and to submit an appropriate claim and proof of claim to the insurance company in the event that any of the Property is lost, damaged, or destroyed as a result of an insured hazard. Mortgagee may submit such a claim and proof of claim to the insurance company on Mortgagor's behalf, should Mortgagor fail to do so promptly for any reason. Mortgagor hereby irrevocably appoints Mortgagee as its agent and attorney-in-fact, such agency being coupled with an interest, to make, settle and adjust claims under such policy or policies of insurance and to endorse the name of Mortgagor on any check or other item of payment for the proceeds thereof; it being understood, however, that unless one or more Events of Default exist under this Mortgage, Mortgagee will not settle or adjust any such claim without the prior approval of Mortgagor (which approval shall not be unreasonably withheld).

**Insurance Proceeds.** Mortgagee shall have the right to directly receive the proceeds of all insurance protecting the Property. In the event that Mortgagor should receive any such insurance proceeds, Mortgagor agrees to immediately turn over and to pay such proceeds directly to Mortgagee. All insurance proceeds may be applied, at Mortgagee's sole option and discretion, and in such a manner as Mortgagee may determine (after payment of all reasonable costs, expenses and attorney's fees necessarily paid or fees necessarily paid or incurred by Mortgagee in this connection), for the purpose of: (1) repairing or restoring the lost, damaged or destroyed Property; or (2) reducing the then outstanding balance of the Indebtedness and any Additional Advances that Mortgagee may have made on Mortgagor's behalf, together with interest thereon. Mortgagee's receipt of such insurance proceeds and the application of such proceeds as provided herein shall not, however, affect the lien of this Mortgage. Nothing under this section shall be deemed to excuse Mortgagor from its obligations to promptly repair, replace or restore any lost or damaged Property, whether or not the same may be covered by insurance, and whether or not such proceeds of insurance are available, and whether such proceeds are sufficient in amount to complete such repair, replacement or restoration to the satisfaction of Mortgagee. Furthermore, unless otherwise confirmed by Mortgagee in writing, the application or release of any insurance proceeds by Mortgagee shall not be deemed to cure or waive any Event of Default under this Mortgage.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Mortgagor shall promptly pay or cause to be paid when due, all taxes, local and special assessments, and governmental and other charges, as well as all public and/or private utility charges, of every type and description, that may from time to time be imposed, assessed and levied against the mortgaged Property or against Mortgagor.

<div style="writing-mode: vertical-rl">EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183</div>



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:7 of 20 - Jefferson Parish Clerk of Court - ID:2165626

11522925

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Mortgagor agrees that Mortgagor's possession and use of the Property shall be governed by the following provisions:

**Use of Property.** Mortgagor shall not use the Property and shall not permit others to use the Property, for any purpose or purposes other than those previously disclosed to Mortgagee in writing, and in no event shall any of the Property be used in any manner that would damage, depreciate, or diminish its value, or that may result in a cancellation or termination of insurance coverage. Mortgagor additionally agrees not to do or to suffer to be done anything which may increase the risk of fire or other hazard to the Property or any part or parts thereof. Mortgagor shall not permit the Property, or any portion thereof, to be used by the public and others as may make possible a claim or claims of adverse usage, easement, servitude, right of way or habitation, or adverse possession by the public and others, or any implied, tacit or other dedication of the Property.

**Compliance with Applicable Laws and Regulations.** Mortgagor shall observe and abide by, and shall cause others to observe and abide by, all present and future laws, ordinances, orders, rules, regulations, restrictions, and requirements of all federal, state and municipal governments, courts, departments, commissions, boards, agencies, and officers, affecting the Property and its use.

Mortgagor shall further promptly perform and observe, and shall cause others to promptly perform and observe, all the terms, covenants and conditions of any requirements, instruments and agreements affecting the Property, non-compliance with which may adversely affect the priority of this Mortgage, or which may impose any duty or obligation upon Mortgagor, or upon any lessee or other occupant of the Property. Mortgagor shall further do and cause to be done all things necessary to preserve intact and unimpaired any and all easements, servitudes, appurtenances and other interests and rights in favor of, or constituting any portion of, the Property.

**Compliance With Environmental Laws.** Mortgagor represents and warrants to Mortgagee that: (1) During the period of Mortgagor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Mortgagor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Mortgagee in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Mortgagee in writing, (a) neither Mortgagor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Mortgagor authorizes Mortgagee and its agents to enter upon the Property to make such inspections and tests, at Mortgagor's expense, as Mortgagee may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Mortgagee shall be for Mortgagee's purposes only and shall not be construed to create any responsibility or liability on the part of Mortgagee to Mortgagor or to any other person. The representations and warranties contained herein are based on Mortgagor's due diligence in investigating the Property for Hazardous Substances. Mortgagor hereby (1) releases and waives any future claims against Mortgagee for indemnity or contribution in the event Mortgagor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Mortgagee against any and all claims, losses, liabilities, damages, penalties, and expenses which Mortgagee may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage,

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183



11522925

disposal, release or threatened release occurring prior to Mortgagor's ownership or interest in the Property, whether or not the same was or should have been known to Mortgagor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Mortgagee's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**ERISA.** Mortgagor represents and warrants to Lender that the granting of this Mortgage and the consummation of any loan or loans or other transactions contemplated or secured hereby will not violate the provisions of, and will not constitute a prohibited transaction under the ERISA.

**Alterations.** Mortgagor shall not, without the prior written consent of Mortgagee, demolish, remove, construct, restore, add to or alter any building(s) or other improvements to or upon the Property, or any part or parts thereof, or consent to, or permit any such demolition, removal, construction, restoration, addition or alteration. Mortgagor shall further not, without the prior written consent of Mortgagee, remove or permit the removal of any present or future fixtures and other property forming part of the Property. Mortgagee may condition its consent to permit Mortgagor to demolish or to remove such improvements, fixtures and/or other property upon Mortgagor's agreement to replace the same with new improvements and/or fixtures of at least equal value then satisfactory to Mortgagee.

**Abandonment of Property.** Mortgagor shall not, nor shall Mortgagor permit others to abandon, commit waste, or destroy the Property, or any part or parts thereof.

**Repairs and Maintenance.** Mortgagor shall keep and maintain, and/or cause others to keep and maintain, the Property and the sidewalks and curbs adjoining the Property, in good order, repair and condition. Mortgagor shall further make and/or cause all necessary repairs to be made to the Property (including the repair and restoration of any portion of the Property that may have been damaged, lost or destroyed).

**ENCUMBRANCES.** The following provisions relating to Encumbrances on the Property are a part of this Mortgage:

**Prior Encumbrances.** To the extent applicable, Mortgagor shall fully and timely perform any and all of Mortgagor's obligations under any prior Encumbrances affecting the Property. Without limiting the foregoing, Mortgagor shall not commit or permit to exist any breach of or default under any such prior Encumbrances. Mortgagor shall further promptly notify Mortgagee in writing upon the occurrence of any event or circumstances that would, or that might, result in a breach of or default under any such prior Encumbrance. Mortgagor shall further not modify or extend any of the terms of any prior Encumbrance or any indebtedness secured thereby, or request or obtain any additional loans or other extensions of credit from any third party creditor or creditors whenever such additional loan advances or other extensions of credit may be directly or indirectly secured, whether by cross-collateralization or otherwise, by the Property, or any part or parts thereof, with possible preference and priority over the lien of this Mortgage.

**Future Encumbrances.** Mortgagor shall not, without the prior written consent of Mortgagee, grant any Encumbrance that may affect the mortgaged Property, or any part or parts thereof, nor shall Mortgagor permit or consent to any Encumbrance attaching to or being filed against any of the mortgaged Property in favor of anyone other than Mortgagee. Mortgagor shall further promptly pay when due all statements and charges of mechanics, materialmen, laborers and others incurred in connection with the alteration, improvement, repair and maintenance of the mortgaged Property, or otherwise furnish appropriate security or bond, so that no future Encumbrance may ever attach to or be filed against the Property or any of Mortgagor's Rights.

**Notice of Encumbrances.** Mortgagor shall immediately notify Mortgagee in writing upon the filing of any attachment, lien, judicial process, claim, or other Encumbrance. Mortgagor additionally agrees to notify Mortgagee immediately in writing upon the occurrence of any default, or event that with the passage of time, failure to cure, or giving of notice, might result in a default



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:9 of 20 - Jefferson Parish Clerk of Court - ID:2165626

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

under any of Mortgagor's obligations that may be secured by any presently existing or future Encumbrance, or that might result in an Encumbrance affecting the mortgaged Property, or should any of the mortgaged Property be seized or attached or levied upon, or threatened by seizure or attachment or levy, by any person other than Mortgagee.

**ADDITIONAL ADVANCES FOR SPECIFIC PURPOSES.** Mortgagee shall have the right, within Mortgagee's sole option and discretion, to make Additional Advances on Mortgagor's behalf for the following purposes:

**Insurance.** If Mortgagor should for any reason fail to maintain insurance on the Property as required under this Mortgage, Mortgagee may make Additional Advances on Mortgagor's behalf for the purpose of purchasing and maintaining, and Mortgagee may purchase and maintain such insurance coverage (including insurance protecting only Mortgagee's interests in the Property).

**Taxes.** If Mortgagor should for any reason fail to promptly pay when due taxes, assessments and governmental and other charges as required under this Mortgage, Mortgagee may make Additional Advances on Mortgagor's behalf for the purpose of paying, and Mortgagee may pay, such taxes, assessments and governmental and other charges.

**Repairs.** If Mortgagor should for any reason fail to make all necessary repairs to the Property and to keep the Property in good working order and condition as required under this Mortgage, Mortgagor agrees that Mortgagee may make Additional Advances on Mortgagor's behalf for the purpose of making, and Mortgagee may make, such repairs and maintenance to the Property as Mortgagee may deem to be necessary and proper within its sole discretion.

**Encumbrances.** If Mortgagor should permit or allow any Encumbrance to attach to or be recorded or filed against the Property, without having first obtained Mortgagee's prior written consent, or if Mortgagor should for any reason default under any obligation secured by any presently existing or future Encumbrance, Mortgagee may make Additional Advances on Mortgagor's behalf and take such other action or actions as Mortgagee may deem to be necessary and proper, within Mortgagee's sole discretion, to pay and fully satisfy such obligation and/or Encumbrance, to cure or rectify any such default or defaults, and to prevent the occurrence of any future defaults.

**Other.** Mortgagee may further make Additional Advances on Mortgagor's behalf and take such other action or actions as Mortgagee may deem to be necessary and proper, within Mortgagee's sole discretion, to cure and rectify any actions or inactions on Mortgagor's part, as are required under this Mortgage, that are not listed immediately above.

**No Obligations.** Nothing under this Mortgage shall obligate Lender to make any such Additional Advances or to take any of the above actions on Grantor's behalf, or as making Lender in any way responsible or liable for any loss, damage or injury to Grantor, or to any other person or persons, resulting from Lender's election not to advance such additional sums or to take such action or actions. In addition, Lender's election to make Additional Advances and/or to take the above actions on Grantor's behalf shall not constitute a waiver or forbearance by Lender of any Event of Default under this Mortgage.

**OBLIGATION TO REPAY ADDITIONAL ADVANCES; INTEREST.** Mortgagor unconditionally agrees to repay any and all Additional Advances that Mortgagee may elect to make on Mortgagor's behalf, together with interest as provided herein, immediately upon demand by Mortgagee. Mortgagor further agrees to pay Mortgagee interest on the amount of such Additional Advances at the rate of interest provided under the Note or at the legal rate of interest provided under applicable law, whichever is greater from the date of each such Advance until all such Advances are repaid in full. Mortgagor's obligations to repay Additional Advances to Mortgagee, together with interest thereon, shall be secured by this Mortgage.

**COLLATERAL ASSIGNMENT AND PLEDGE OF RIGHTS AS ADDITIONAL SECURITY.** As additional collateral security for the prompt and punctual payment and satisfaction of any and all



JON A. GEGENHEIMER

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrh $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

present and future Indebtedness in favor of Mortgagee as may be outstanding from time to time, at any one or more times, and all Additional Advances that Mortgagee may make on Mortgagor's behalf pursuant to this Mortgage, together with interest thereon as provided herein, Mortgagor hereby assigns, pledges, and grants Mortgagee a continuing security interest in and to:

**Proceeds.** Any and all proceeds derived or to be derived from the sale, transfer, conveyance, insurance loss, damage, destruction, condemnation, expropriation, or other taking of the Property, or other proceeds and proceeds of proceeds, and any unearned insurance premiums relating thereto, including the rights of Mortgagor to receive such proceeds directly from the obligor or obligors therefor, and to further enforce any rights that Mortgagor may have to collect such proceeds, including without limitation, Mortgagor's rights to commence an appropriate collection or enforcement action or actions incident thereto.

**Leases, Rents and Profits.** Any and all present and future leases or subleases affecting the mortgaged Property, and all rents, income, and profits therefrom, including without limitation, any and all rents, income, profits, bonuses, revenues, royalties, cash or security deposits, advance rentals and other payments, and further including Mortgagor's rights to enforce all present and future leases or subleases and to receive and enforce any rights that Mortgagor might have to collect rental and all other payments.

**Deposits.** Any and all present and future deposits or other security or advance payments, including rental payments, made by or on behalf of Mortgagor to others, with respect to (1) utility service regarding the Property, (2) cleaning, maintenance, repair, or similar services regarding the Property, (3) refuse removal or sewer service regarding the Property, (4) rentals of equipment, if any, used in the operation by or on behalf of Mortgagor regarding the Property, and/or (5) parking or similar services or rights regarding the Property.

**Options.** Any and all present and future options to sell or lease the mortgaged Property or any interest therein.

**Contract Rights.** To the extent assignable and/or transferrable, any and all of Mortgagor's present and future contract rights, instruments, documents, and general intangibles necessary for use or useful in connection with the ownership and operation of all or any part of the Property, whether now existing or hereafter created, or otherwise acquired by Mortgagor, and all liens, security interests, guaranties, remedies, privileges and other rights pertaining thereto, and all rights and remedies of any kind forming the subject matter thereof.

**REPRESENTATIONS AND WARRANTIES CONCERNING RIGHTS.** Mortgagor represents and warrants that: (A) Mortgagor is and/or will be the lawful owner of all of the Rights; (B) Mortgagor has the right to collaterally assign and pledge all such Rights to Mortgagee; (C) Mortgagor has not granted any previous security interests and has not otherwise encumbered any of Mortgagor's Rights; (D) to the extent applicable, all of Mortgagor's Rights that consist of or give rise to obligations of third parties, represent and/or will at all times continue to represent bona fide obligations of the obligors thereunder, free of any offset, compensation, deduction or counterclaim. The collateral assignment and pledge of Mortgagor's Rights are further binding upon Mortgagor, as well as Mortgagor's heirs, successors, representatives and assigns, and are legally enforceable in accordance with the foregoing terms and conditions.

**ADDITIONAL OBLIGATIONS OF MORTGAGOR WITH REGARD TO COLLATERALLY ASSIGNED AND PLEDGED RIGHTS.** Mortgagor additionally agrees:

**Prohibitions Regarding Property.** So long as this Mortgage remains in effect, Mortgagor shall not, without the prior written consent of Mortgagee, sell, transfer, forego, assign, do anything or permit anything to be done that may in any way affect Mortgagee's security interests and rights in and to the mortgaged Property, or create or permit to exist any Encumbrance in or against any of the Property, in favor of any person other than Mortgagee.

**No Settlement or Compromise.** Mortgagor shall not, without the prior written consent of



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:11 of 20 - Jefferson Parish Clerk of Court - ID:2165626

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

11522925

Mortgagee, compromise, settle, adjust or extend payment under or with regard to any of Mortgagor's Rights subject hereto.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Mortgagee to examine and audit Mortgagor's books and records at all reasonable times.

**Notice to Obligors.** Upon request by Mortgagee, Mortgagor immediately will notify individual obligors and debtors under Mortgagor's Rights, advising such obligors and debtors of the fact that their respective agreements or obligations have been collaterally assigned and pledged to Mortgagee. In the event that Mortgagor should fail to provide such notices for any reason upon Mortgagee's request, Mortgagor agrees that Mortgagee may forward appropriate notices to such obligors and debtors either in Mortgagee's name or in Mortgagor's name.

**Protection of Rights.** Mortgagor will at all times protect and preserve all of Mortgagor's Rights.

**Notice of Change of Names.** Mortgagor will promptly notify Mortgagee of any change in Mortgagor's name, including any change to the assumed business names of Mortgagor. Mortgagor will also promptly notify Mortgagee of any change in Mortgagor's social security number or employer identification number. Mortgagor further agrees to notify Mortgagee in writing prior to any change in address or location of Mortgagor's principal office.

**EVENTS OF DEFAULT.** The following actions or inactions or both shall constitute Events of Default under this Mortgage:

**Default Under Loan Agreement.** If an Event of Default occurs or exists under the terms of Mortgagor's Loan Agreement in favor of Mortgagee.

**Default Under the Note.** Should Mortgagor default in the payment of principal or interest under the Note or any of the Indebtedness.

**Default Under this Mortgage.** Should Mortgagor violate, or fail to comply fully with any of the terms and conditions of, or default under this Mortgage.

**Default Under other Agreements.** Should any default occur or exist under any Related Document which directly or indirectly secures repayment of any of the Indebtedness.

**Other Defaults in Favor of Mortgagee.** Mortgagor or any guarantor defaults under any other loan, extension of credit, security right, instrument, document, or agreement, or obligation in favor of Mortgagee.

**Default in Favor of Third Parties.** Should any guarantor or Mortgagor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Mortgagor's property or Mortgagor's or any guarantor's ability to repay the Indebtedness or any guarantor's or Mortgagor's ability to perform their respective obligations under this Mortgage or any of the Related Documents.

**Death.** Mortgagor, or any guarantor of the Indebtedness, dies.

**Insolvency.** Should the suspension, failure or insolvency, however evidenced, of Mortgagor or any Guarantor occur or exist.

**Readjustment of Indebtedness.** Should proceedings for readjustment of indebtedness, reorganization, composition or extension under any insolvency law be brought by or against Mortgagor or any Guarantor.

**Assignment for Benefit of Creditors.** Should Mortgagor or any Guarantor file proceedings for a respite or make a general assignment for the benefit of creditors.

**Receivership.** Should a receiver of all or any part of Mortgagor's property, or the property of any Guarantor, be applied for or appointed.



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:12 of 20 - Jefferson Parish Clerk of Court - ID:2165626

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

**Dissolution Proceedings.** Proceedings for the dissolution or appointment of a liquidator of Mortgagor or any guarantor are commenced.

**Failure to Pay Additional Advances.** Mortgagor fails to pay any Additional Advance, together with interest thereon, as provided in this Mortgage, upon Mortgagee's demand.

**False Statements.** Any warranty, representation or statement made or furnished to Mortgagee by Mortgagor or on Mortgagor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insecurity.** Mortgagee in good faith believes itself insecure with regard to repayment of the Indebtedness.

**OTHER DEFAULTS.** Mortgagor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Mortgagee and Mortgagor.

**MORTGAGEE'S RIGHTS UPON DEFAULT.** Should one or more Event of Default occur or exist under this Mortgage, as provided above, Mortgagee, at its option, may exercise any one or more of the following rights and remedies, in addition to any other rights and remedies provided by law:

**Acceleration; Foreclosure.** Mortgagee shall have the right, at its sole option, to accelerate the maturity and demand immediate payment in full of any and all of the Indebtedness. Mortgagee shall then have the right to commence appropriate foreclosure proceedings against the Property and against Mortgagor's Rights as provided in this Mortgage.

**Seizure and Sale of Property.** In the event that Mortgagee elects to commence appropriate Louisiana foreclosure proceedings under this Mortgage, Mortgagee may cause the Property, or any part or parts thereof, with the exception of any Rights described in the "Leases, Rents, and Profits" provision above, to be immediately seized and sold, whether in term of court or in vacation, under ordinary or executory process, in accordance with applicable Louisiana law, to the highest bidder for cash, with or without appraisement, and without the necessity of making additional demand upon or notifying Mortgagor or placing Mortgagor in default, all of which are expressly waived.

**Executory Process.** For purposes of foreclosure under Louisiana executory process procedures, Mortgagor confesses judgment and acknowledges to be indebted to Mortgagee, up to the full amount of the Indebtedness in principal, interest, costs, expenses, reasonable attorneys' fees and other fees and charges. Mortgagor further confesses judgment and acknowledges to be indebted unto and in favor of Mortgagee in the amount of all Additional Advances that Mortgagee may make on Mortgagor's behalf pursuant to this Mortgage, together with interest thereon. To the extent permitted under applicable Louisiana law, Mortgagor additionally waives the following: (1) the benefit of appraisal as provided in Articles 2332, 2336, 2723, and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sale; (2) the demand and three (3) days' delay as provided under Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (3) the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (4) the three (3) days' delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (5) all other benefits provided under Articles 2331, 2722 and 2723 of the Louisiana Code of Civil Procedure and all other Articles not specifically mentioned above. Mortgagor further agrees that any declaration of fact made by authentic act before a Notary Public and two witnesses, by a person declaring that such facts are within his or her knowledge, shall constitute authentic evidence of such facts for purposes of foreclosure under applicable Louisiana law and for purposes of La. R.S. 9:3504(D)(6) and La. R.S. 10:9-629, to the extent applicable.

**Keeper.** Should any or all of the Property be seized as an incident to an action for the



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:13 of 20 - Jefferson Parish Clerk of Court - ID:2165626

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

recognition or enforcement of this Mortgage, by executory process, sequestration, attachment, writ of fieri facias or otherwise, Mortgagor hereby agrees that the court issuing any such order shall, if requested by Mortgagee, appoint Mortgagee, or any agent designated by Mortgagee or any person or entity named by Mortgagee at the time such seizure is requested, or any time thereafter, as Keeper of the Property as provided under La. R.S. 9:5136, et seq. Such a Keeper shall be entitled to reasonable compensation. Mortgagor agrees to pay the reasonable fees of such Keeper, which compensation to the Keeper shall also be secured by this Mortgage in the form of an Additional Advance as provided in this Mortgage.

**Declaration of Fact.** Should it become necessary for Mortgagee to foreclose under this Mortgage, all declarations of fact, which are made under an authentic act before a Notary Public in the presence of two witnesses, by a person declaring such facts to lie within his or her knowledge, shall constitute authentic evidence for purposes of executory process and also for purposes of La. R.S. 9:3509.1, La. R.S. 9:3504(D)(6) and La. R.S. 10:9-629, as applicable.

**Separate Sale of Mortgagor's Rights Following Default.** Should one or more Event of Default occur or exist under this Mortgage, Mortgagee shall have the additional right, at its sole option, to separately sell the aforesaid Rights, or any part or parts thereof, with the exception of any Rights described in the "Leases, Rents and Profits" provision above, at private or public sale, at such price or prices as Mortgagee may deem best, either for cash or for any other compensation, or on credit, or for future delivery, without the assumption of any credit risk. The sale of the aforesaid Rights may be without appraisalment, the benefit of which is also expressly waived by Mortgagor. Mortgagee may exercise any other remedies with regard to Mortgagor's Rights as may be authorized under the Louisiana Commercial Laws (La. R.S. 10:9-101, et seq.).

**Automatic Transfer of Rights.** In the event of foreclosure under this Mortgage, or other transfer of title or assignment of the Property, or any part or parts thereof, in lieu of payment of the Indebtedness , whether in whole or in part, all policies of Insurance and other Rights applicable to the foreclosed upon or transferred Property shall automatically inure to the benefit of and shall pass to the purchaser(s) or transferee(s) thereof, subject to the rights of the purchaser(s) or transferee(s) to reject such insurance coverage and/or Rights at its or their sole option and election.

**Specific Performance.** Mortgagee may, in addition to or in lieu of the foregoing remedies, in Mortgagee's sole discretion, commence an appropriate action against Mortgagor seeking specific performance of any covenant contained in this Mortgage or in aid of the execution or enforcement of any power in this Mortgage granted.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Mortgagee's rights and remedies, whether evidenced by this Mortgage or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Mortgagee to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Mortgagor under this Mortgage, after Mortgagor's failure to perform, shall not affect Mortgagee's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Mortgagee following an Event of Default, or in any way to limit or restrict the rights and ability of Mortgagee to proceed directly against Mortgagor and/or against any other co-maker, guarantor, surety or endorser of the Indebtedness, and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**MORTGAGEE'S RIGHT TO DIRECTLY COLLECT AND RECEIVE PROCEEDS AND PAYMENTS BEFORE OR AFTER DEFAULT.** Mortgagee shall have the right, at its sole option and election, at any time, whether or not one or more Event of Default then exist under this Mortgage, to directly collect and receive all proceeds and/or payments arising under or in any way accruing from Mortgagor's Rights, as such amounts become due and payable. In order to permit the foregoing, Mortgagor unconditionally agrees to deliver to Mortgagee, immediately following demand, any and all of Mortgagor's records, ledger sheets, and other documentation, in the form requested by Mortgagee,



EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

11522925

with regard to Mortgagor's Rights and any and all proceeds and/or payments applicable thereto.

Mortgagee shall have the further right, whether or not an Event of Default then exists under this Mortgage, where appropriate and within Mortgagee's sole discretion, to file suit, either in Mortgagee's own name or in the name of Mortgagor, to collect any and all proceeds and payments that may then and/or in the future be due and owing under and/or as a result of such rights. Where it is necessary for Mortgagee to attempt to collect any such proceeds and/or payments from the obligors thereof, Mortgagee may compromise, settle, extend, or renew for any period (whether or not longer than the original period) any obligation or indebtedness thereunder or evidenced thereby, or surrender, release, or exchange all or any part of said obligation or indebtedness, without affecting the liability of Mortgagor under this Mortgage or under the Indebtedness. To that end, Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its attorney-in-fact, coupled with an interest and with full power of substitution, to take any and all such actions and any and all other actions permitted hereby, either in the name of Mortgagor or Mortgagee.

PROTECTION OF MORTGAGEE'S SECURITY RIGHTS. Mortgagee will be fully responsible for any losses that Mortgagee may suffer as a result of anyone other than Mortgagee asserting any rights or interest in or to the Property and/or Mortgagor's Rights collaterally assigned and pledged hereunder. Mortgagor agrees to appear in and to defend all actions or proceedings purporting to affect Mortgagee's security interests in any of the Property and/or Rights subject to this Mortgage and any of the rights and powers granted Mortgagee hereunder. In the event that Mortgagor fails to do what is required of it under this Mortgage, or if any action or proceeding is commenced naming Mortgagee as a party or affecting Mortgagee's security interests or the rights and powers granted under this Mortgage, then Mortgagee may, without releasing Mortgagor from any of its obligations under this Mortgage, do whatever Mortgagee believes to be necessary and proper within its sole discretion to protect the security of this Mortgage, including without limitation making Additional Advances on Mortgagor's behalf as provided herein. Should the reappraisal of the Property occur, whether to comply with appropriate regulatory requirements or otherwise, Mortgagor agrees to pay the costs of such appraisal or reappraisals or to reimburse Mortgagee for the costs thereof.

INDEMNIFICATION OF MORTGAGEE. Mortgagor agrees to indemnify, to defend and to save and hold Mortgagee harmless from any and all claims, suits, obligations, damages, losses, costs, expenses (including, without limitation, Mortgagee's attorney's fees), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by Mortgagee, its officers, directors, employees, and agents arising out of or in any manner occasioned by this Mortgage and the exercise of the rights and remedies granted Mortgagee hereunder. The foregoing indemnity provisions shall survive the cancellation of this Mortgage as to all matters arising or accruing prior to such cancellation and the foregoing indemnity shall survive in the event that Mortgagee elects to exercise any of the remedies as provided under this Mortgage following default hereunder.

EXECUTION OF ADDITIONAL DOCUMENT. Mortgagor agrees to execute all additional documents, instruments and agreements that Mortgagee may deem to be necessary and proper, within its sole discretion, in form and substance satisfactory to Mortgagee, to keep this Mortgage in effect, to better reflect the true intent of this Mortgage, and to consummate fully all of the transactions contemplated hereby and by any other agreement, instrument or document heretofore, now or at any time or times hereafter executed by Mortgagor and delivered to Mortgagee.

INSPECTION OF PROPERTY. Mortgagee and Mortgagee's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Property wherever located.

AUDITS. Mortgagee and its agents may also periodically conduct audits of Mortgagor's books and records that in any way pertain to the Property, the foregoing Rights and any part or parts thereof.

APPLICATION OF PAYMENTS. Mortgagor agrees that all payments and other sums and amounts received by Mortgagee under the Indebtedness or under this Mortgage, including, but not limited to, the net proceeds of any judicial or other sale, of any charter, management or other use of the



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:15 of 20 - Jefferson Parish Clerk of Court - ID:2165626

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

11522925

Property by Mortgagee, of any claim for damages to the Property and of any insurance proceeds received by Mortgagee (except to the extent that such insurance proceeds are to be paid to Mortgagor pursuant to any other provisions of this Mortgage) shall be held and applied by Mortgagee from time to time in accordance with the terms of the Note.

**TAXATION.** In the event that there should be any change in law with regard to taxation of mortgages or the debts they secure, Mortgagor agrees to pay any taxes, assessments or charges that may be imposed upon Mortgagee as a result of this Mortgage.

**ADDITIONAL REPRESENTATIONS AND WARRANTIES.** Mortgagor further represents, warrants and covenants that:

**Organization.** Mortgagor is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Louisiana. Mortgagor is duly authorized to transact business in all other states in which Mortgagor is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Mortgagor is doing business. Specifically, Mortgagor is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Mortgagor has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Mortgagor maintains an office at 6569 Westbank Expressway, Marrero, LA 70072. Unless Mortgagor has designated otherwise in writing, the principal office is the office at which Mortgagor keeps its books and records including its records concerning the Collateral. Mortgagor will notify Mortgagee prior to any change in the location of Mortgagor's state of organization or any change in Mortgagor's name. Mortgagor shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Mortgagor and Mortgagor's business activities.

**Authorization.** Mortgagor's execution, delivery, and performance of this Mortgage and all the Related Documents have been duly authorized by all necessary action by Mortgagor and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Mortgagor's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Mortgagor or (2) any law, governmental regulation, court decree, or order applicable to Mortgagor or to Mortgagor's properties.

**Consents and Approvals.** If notice to or the consent or approval of any governmental body or authority, or any third party (including without limitation, any other creditor of Mortgagor) is now or any time hereafter required in connection with the execution, delivery and performance by Mortgagor of this Mortgage, then (1) with respect to all currently applicable requirements, such notice has been given and consent or approval obtained by Mortgagor prior to the execution hereof and written evidence thereof has been concurrently herewith delivered to Mortgagee, and (2) with respect to such requirements that shall at any time hereafter be imposed or become applicable, such notice will be given and such consent or approval will be obtained by Mortgagor prior to the time such failure to do so will constitute a violation of law or result in any breach, default or failure by Mortgagor under any contract or instrument, and written evidence thereof will at such time be delivered to Mortgagee.

**ADDITIONAL WAIVERS.** In granting this Mortgage, Mortgagor waives any and all homestead exemptions and other rights and all other exemptions from seizure or sale with regard to the Property to which Mortgagor may be entitled under the laws of the State of Louisiana. Mortgagor is also waiving the production of Mortgage, Conveyance and any and all other Certificates and relieves and releases the Notary Public before whom this Mortgage was passed from all responsibility and liability in connection therewith.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:16 of 20 - Jefferson Parish Clerk of Court - ID:2165626

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

Mortgage:

**Amendments.** No amendment, modification, consent or waiver of any provision of this Mortgage, and no consent to any departure by Mortgagor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of Mortgagee, and then shall be effective only as to the specific instance and for the specific purpose for which given.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Effect of Waivers.** Any failure or delay on the part of the Mortgagee to exercise any of the rights and remedies granted under this Mortgage or under any other agreement or agreements by and between Mortgagor and Mortgagee, shall not have the effect of waiving any of Mortgagee's rights and remedies. Any partial exercise of any rights and remedies granted to Mortgagee shall furthermore not constitute a waiver of any of Mortgagee's other rights and remedies; it being Mortgagor's intent and agreement that all of Mortgagee's rights and remedies shall be cumulative in nature. Furthermore, any failure on the part of Mortgagee at any time or times hereafter to require strict performance by Mortgagor of any of the provisions, warranties, terms and conditions contained herein or in any other agreement, document or instrument now or hereafter executed by Mortgagor and delivered to Mortgagee, shall not waive, affect, or diminish the rights of Mortgagee to thereafter demand strict compliance and performance therewith and with respect to all other provisions, warranties, terms and conditions contained herein or therein. None of the warranties, conditions, provisions and terms contained in this Mortgage or any other agreement, document, or instrument now or hereafter executed by Mortgagor and delivered to Mortgagee, shall be deemed to have been waived by any act or knowledge of Mortgagee, its agents, directors, officers or employees; but only by an instrument in writing specifying such waiver, signed by a duly authorized officer of Mortgagee and delivered to Mortgagor. A waiver or forbearance on the part of Mortgagee as to one Event of Default shall not constitute a waiver or forbearance as to any other or subsequent default.

**Successors and Assigns Bound; Solidary Liability.** Mortgagor's obligations and agreements under this Mortgage shall be binding upon Mortgagor's successors, heirs, legatees, devisees, administrators, executors and assigns. In the event that there is more than one Mortgagor under this Mortgage, all of the agreements and obligations made and/or incurred by Mortgagors under this Mortgage shall be on a "solidary" or "joint and several" basis.

**Applicable Law.** The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations: (a) When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law. (b) Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan. Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

**Severability.** If any provision of this Mortgage is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable. This Mortgage shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Mortgage shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Mortgage, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be



EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

possible and legal, valid and enforceable.

**WAIVER OF CERTIFICATES.** The parties to this Mortgage hereby waive the production of mortgage, conveyance, tax, paving, chattel mortgage, assignment of accounts, and all other certificates and relieve and release the Notary before whom this Mortgage was passed from all responsibilities and liabilities in connection therewith.

**WAIVE JURY.** All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Louisiana Commercial Laws (La. R.S. 10: 9-101, et seq.):

**Additional Advance.** The words "Additional Advance" mean any and all additional sums that Mortgagee may advance on Mortgagor's behalf as provided under this Mortgage.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Mortgagor or on Mortgagor's behalf on a line of credit or multiple advance basis under the terms and conditions of this Mortgage.

**Borrower.** The word "Borrower" means Mai TL, INC. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Encumbrance.** The word "Encumbrance" means individually, collectively and interchangeably any and all presently existing and/or future mortgages, liens, privileges and other contractual and/or statutory security interests and rights, of every nature and kind, whether in admiralty, at law, or in equity, that now and/or in the future may affect the Property or any part or parts thereof.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**ERISA.** The word "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and including all regulations and published interpretations of the act.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the default section of this Mortgage.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means and includes all amounts identified in the Indebtedness section of this Mortgage.



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:18 of 20 - Jefferson Parish Clerk of Court - ID:2165626

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

11522925

**Mortgage.** The word "Mortgage" means this Multiple Indebtedness Mortgage as this Multiple Indebtedness Mortgage may be amended, supplemented, restated or otherwise modified from time to time.

**Mortgagee.** The word "Mortgagee" means Celtic Bank Corporation, Mortgagee's successors and assigns, and any future holder or holders of the Indebtedness or any interest therein.

**Mortgagor.** The word "Mortgagor" means individually, collectively and interchangeably Mai TL, INC., as well as any and all persons and entities subsequently purchasing the mortgaged Property, with or without assumption of this Mortgage.

**Note.** The word "Note" means the notes or credit agreements dated **May 29, 2015, in the principal amounts of $2,385,300.00 & $789,800.00** from Mai TL, INC. to Lender, together with all substitute or replacement notes therefor, as well as all renewals, extensions, modifications, refinancings, consolidations and substitutions of and for the note or credit agreement.

**Property.** The word "Property" means all of Mortgagor's right, title and interest in and to all the Property as described in the "Granting of Mortgage" section of this Mortgage.

**Real Property.** The words "Real Property" mean the real immovable property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rights.** The word "Rights" means any and all of Mortgagor's additional rights collaterally assigned and pledged to Mortgagee as provided under this Mortgage.



JON A. GEGENHEIMER

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:19 of 20 - Jefferson Parish Clerk of Court - ID:2165626

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

11522925

THUS DONE AND PASSED, on the day, month and year first written above, in the presence of the undersigned Notary and the undersigned competent witnesses, who hereunto sign their names with Mortgagor after reading of the whole.

WITNESSES:

X _____
Witness   Cecilia Borne

X _____
Witness   KAREN SCHOUEST

MORTGAGOR:

MAI TL, INC.

By: _____
Kathy Thuy Nguyen, Vice President of Mai TL, INC.

By: _____
Mai Thanh Cao, President of Mai TL, INC.

_____
NOTARY PUBLIC
LA Bar/Notary ID No. _____

DERYLE A. BOURGEOIS
NOTARY PUBLIC
NOTARY ID NUMBER: 12032
JEFFERSON PARISH, LA
MY COMMISSION IS ISSUED FOR LIFE



Southern Title, Inc.
License #124477
2325 Manhattan Blvd.
Harvey, LA 70058
WFG National Title
George S. Ruppenicker
LA Bar Number: 21851

EFILE: 06/03/2015 9:36 AM JEFF PAR 4430585 hrb $225.00 ::: 11522925 MORTGAGE BOOK 4653 PAGE 183

05/10/2021 13:38:01 CERTIFIED TRUE COPY - Pg:20 of 20 - Jefferson Parish Clerk of Court - ID:2165626

FILED FOR RECORD 08/30/2023 12:37:04
Brittany N. Virtano, DY CLERK
JEFFERSON PARISH, LA

RECEIVED VIA COUNTER

Filed by: FAX
Date: 8/29/23
Time: 3:42 PM
Deputy Clerk: Brittany Virtano

**velocity**
risk underwriters®

10 Burton Hills Blvd. Suite 300
Nashville, TN 37215
844-878-7529
www.VelocityRisk.com



EXHIBIT
C

## General Property Policy Declarations

This Declaration Page is attached to and forms part of the Policy as defined herein.

| Mailing Address & Named Insured | Policy Term: 12:01 AM Local Time | Policy Number: 2021-800969-01 |
|---|---|---|
| Mai T L Inc Dba Baymont Inn & Suites-Marrero<br>1789 Wedgewood Dr.<br>Harvey, LA 70058 | Effective Date: 04/14/2021<br><br>Expiration Date: 04/14/2022 | Home state: LA |

| Producing agent:<br><br>Liz Olagues<br>2121 Airline Drive, Suite 600<br>Metairie, LA 70001 | Surplus Lines Producer:<br><br>Burns & Wilcox of LA, Ltd.<br>2121 Airline Drive<br>Suite 600<br>Metairie, LA 70001<br><br>LA License #: 175306 |
|---|---|

**This insurance policy is delivered as a surplus line coverage under the Insurance Code of the State of Louisiana. In the event of insolvency of the company issuing this contract, the policyholder or claimant is not covered by the Louisiana Insurance Guaranty Association or the Louisiana Life and Health Insurance Guaranty Association which guarantees only specific policies issued by an insurance company authorized to do business in Louisiana.**

VRU Policy Number 2021-800969-01

| Carriers | Carrier Policy ID | Premium (X TRIA) | TRIA Premium | Policy Fee | Inspection Fee | Total Premium & Fees |
|---|---|---|---|---|---|---|
| **Independent Specialty Insurance Company**<br>1900 L. Don Dodson Drive<br>Bedford, TX 76201 | VVX-CU-800969-01 | $19,930.44 | $0.00 | $128.00 | $96.00 | $20,154.44 |
| **Certain Underwriters at Lloyd's and Other Insurers Subscribing to Binding Authority B604510568622021**<br>Renaissance Re<br>18th Floor, 125 Old Broad Street<br>London EC2N 1AR<br>United Kingdom | VRR-CU-800969-01 | $10,951.56 | $0.00 | $72.00 | $54.00 | $11,077.56 |

Summary of Premium, Taxes, and Fees:

| Coverage Premium | Wind & Hail | $14,595.00 |
|---|---|---|
| | All Other Perils | $13,182.00 |

SMB 200 2101 LA ALL DECLARATIONS

Page 1 of 7

| | | |
|---|---|---|
| | Equipment Breakdown | $461.00 |
| | Ancillary Coverage and Sublimits Package | $2,644.00 |
| | *Sub Total Premium* | **$30,882.00** |
| **Policy Fee** | Policy Fee | $200.00 |
| **Subtotal** | | **$31,082.00** |
| **Inspection Fee** | | $150.00 |
| **Total Policy Cost** | | $31,232.00 |

## Coverage Information:

Perils/Coverages/Deductibles/Forms:

| Peril/Item | Coverage selected | Deductible (if covered) | Form(s) |
|---|---|---|---|
| Catastrophe Wind & Hail % Deductible. All Other Wind & Hail is $10K ($5K if under $500K in TIV) per occurrence | Yes | 5% | SMB 300 2103 CW ALL Commercial Property |
| Flood Including Surge | No | N/A | |
| Earthquake | No | N/A | |
| All Other Perils | Yes | $5,000 | SMB 402 1712 CW ALL All Other Perils |
| Equipment Breakdown | Yes | $5,000 | SMB 403 1805 CW ALL Equipment Breakdown Coverage |
| Terrorism Risk Insurance Act | No | N/A | SMB 517 2102 CW ALL TRIA Rejection Notice |
| Ancillary Coverage and Sublimits Package | Silver | Applicable policy deductible applies | SMB 407 2103 CW ALL Ancillary Coverage and Sublimits |
| Velocity Direct Repair Program | No | N/A | |

## Additional Policy Forms and Endorsements

| Description | Form |
|---|---|
| Protective Safeguards | SMB 412 1712 CW ALL |
| Roof Valuation | SMB 410 2010 CW ALL |
| Multiple Buildings | SMB 411 1712 CW ALL |
| Property Cyber and Data Exclusion | SMB 424 2101 CW ALL |

| Description | Form |
|---|---|
| Claims | SMB 501 1712 CW ALL |
| Fraud Notice | SMB 502 1805 CW ALL |
| Binding Authority Endorsement | SMB 426 2102 CW ALL RR |
| Service of Suit | SMB 500 2102 LA ALL PHN |
| General Complaint Notice | SMB 515 2010 CW ALL |
| U.S. Treasury Department's Office of Foreign Assets Control Notice | SMB 504 1712 CW ALL |
| Allocation Endorsement | SMB 419 2102 CW ALL |
| Privacy Notice | SMB 503 1712 CW ALL |
| Louisiana Disclosure | SMB 507 2103 LA ALL |
| Several Liability Clause | SMB 418 2007 CW ALL |
| Minimum Earned Premium | SMB 415 1907 GULF COAST ALL |
| Restrictive AOB | SMB 421 2010 LA ALL |

## Location & Building Detail:

**Location 1 - 6589 Westbank Expy - Marrero, LA 70072**

Building: 1 of 1

| Item | Limit |
|------|-------|
| Coverage A: Building | $4,200,000 |
| Coverage B: Other Structures | $75,000 |
| Coverage C: Contents | $350,000 |
| Coverage D: Business Income | $300,000 |

| Rating Information | Value |
|-------------------|-------|
| Zip Code | 70072 |
| County/Parish | Jefferson Parish (051) |
| Occupancy | Hotels-Motels |
| Secondary Occupancy | Franchise Hotel with interior room access |
| Building Construction | Frame |
| Roof Shape | Complex |
| Building - Year Built | 2007 |
| Number of Stories | 3 |
| Roof Replacement Year | 2012 |
| Protection Class | 2 |
| Central Monitored Burglar Alarm | Unknown |
| Central Monitored Fire Alarm | Yes |
| Fire Protection Sprinklers | Yes |
| Have there been roof leaks in the last 3 years? | No |
| Roof Anchorage | Unknown |
| Roof Cover | Asphalt shingles |
| Roof Deck | Unknown |
| Roof Deck Attachment | Unknown |
| Does more than 20% EIFS exists on the building? | No |
| Year plumbing was last updated | 2007 |
| Year HVAC was last updated | 2007 |

| Rating Information | Value |
|---|---|
| Year electrical was last updated | 2007 |
| Square Footage | 37000 |
| Flood Zone | X500 |

| Underwriting Questions | Answer | Explanation |
|---|---|---|
| Have there been any sinkhole claims at this / these location(s)? | no | |
| Do any of the following hazards exist at any subject locations?<br>- Federal Pacific Electrical Panels<br>- Aluminum wiring<br>- Solid Fuels for cooking or heating<br>- Highly flammable contents, such as fireworks or bulk flammable liquids, etc. | no | |
| Does this risk have any Section 8 HUD tenants or student housing? | no | |
| Is the risk at least 50% occupied throughout the year? (Risks less than 50% occupied may not be eligible). | yes | |
| Do any of the subject insured risks have any of the following characteristics:<br>- Building under construction or renovation<br>- Building over water<br>- Building without permanent foundation / mobile home or trailer<br>- National Registry Building | no | |
| Has the customer had any of the following in the past 5 years?<br>- Prior Cancellations<br>- Non-renewals from previous carrier<br>- Bankruptcy<br>- Foreclosure | no | |

| Total TIV: | $4,925,000.00 |
|---|---|

## Named Insureds/Additional Insureds:

Mortgagee Holder:
**Celtic Bank Corporation**
268 South State St.
Ste. 300
Salt Lake City, UT 84111

THESE DECLARATIONS TOGETHER WITH THE COVERAGE PART DECLARATIONS, COVERAGE FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

This surplus lines policy has been procured by the following licensed Louisiana surplus lines broker:

Signature of Licensed Louisiana Surplus Lines Broker
or Authorized Representative:

Printed Name of Licensed Louisiana Surplus Lines Broker:

Insured Signature:                    Date:

Agent Signature:                     Date:

SMB 200 2101 LA ALL DECLARATIONS                    Page 7 of 7

SMB 515 2010 CW ALL Complaint Notice

# POLICYHOLDER NOTIFICATION

## QUESTIONS OR COMPLAINTS ABOUT YOUR INSURANCE?

FOR INFORMATION OR QUESTIONS ABOUT YOUR INSURANCE, COVERAGE, OR ASSISTANCE IN RESOLVING COMPLAINTS, PLEASE CONTACT VELOCITY RISK UNDERWRITERS AT 844-878-1267.

SMB 300 2103 CW ALL COMMERCIAL PROPERTY

# SMALL COMMERCIAL PROPERTY FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us," and "our" refer to the Insurer providing this insurance.

Other words and phrases that appear in *italics* have special meaning. Refer to Section I. Definitions.

## A. Coverages

The Coverage Territory under this policy applies within the United States of America being the fifty (50) states of the Union, its territories and possessions and the District of Columbia.

We will pay for sudden and accidental direct physical loss of or damage to Covered Property at the *locations* described in the Declarations caused by or resulting from any Covered Cause of Loss, during the policy period shown in the Declarations.

This policy only insures against losses resulting from the Covered Causes of Loss of sudden and accidental direct physical loss or damage to Covered Property, except as excluded. Loss or damage from all other causes of loss, whether caused directly or indirectly, are excluded from coverage under this policy, including, but not limited to, any pre-existing building damage at the time of any loss or damage for which claim is made under this policy.

The Covered Causes of Loss are indicated on the Declarations, Coverage Information Section, with a selection of "Yes" in Coverages Selected, or added by endorsement.   If the word "NO" is shown on the Declarations Coverage Information Section – Coverage Selected, then no coverage is provided for that coverage or Covered Cause of Loss.

If there is no limit for Coverage A, B, C or D on the declarations, the additional coverage that relates to Coverage A, B, C, or D has a $0 sublimit for all packages.

### 1. Coverage A - Covered Property

**Covered Property,** as used in this Coverage Part, means the type of property described in this Covered Property Section and limited in the Property Not Covered Section, if a Limit of Insurance is shown in the Declarations for that type of property.

a. **Building,** meaning the building or structure described in the Declarations, including:

1) Completed additions;

2) Fixtures, including outdoor fixtures;

3) Permanently installed:

   a) Machinery; and / or

   b) Equipment;

4) **Hard costs,** meaning:

   a) Foundations, fixtures, attachments and similar property that has become or intended to become a permanent part of the building(s) or structure(s); and / or

   b) Materials, supplies and similar property owned by others for which you are responsible for. This property must be used in the construction operations insured under this policy and be located at the premise(s) described in the schedule of values.

5) **Business Personal Property** owned by you that is used to maintain or service the building or structure or its *locations,* including:

   a) Fire-extinguishing equipment;

SMB 300 2103 CW
ALL COMMERCIAL
PROPERTY

Copyright material from
© Insurance Services Office, Inc., 2011

Page 1 of 39

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

        b)   Floor coverings; and / or

        c)   Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering.

    6)   If not covered by other insurance:

        a)   Additions under construction, alterations and repairs to the building or structure; and / or

        b)   Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the described *locations*, used for making additions, alterations or repairs to the building or structure.

  b.  **Coverage B – Other Buildings / Structures -** Additional Building Property(ies) and / or structure(s) as described on the Declarations.

    1)   Includes swimming pools, detached garages, sheds, signs, pump houses

    2)   Includes all fixed outdoor property, and some categories are subject to sublimits.

  c.  **Coverage C - Your Business Personal Property** consists of the following property located in or on the building(s) or structure(s) described in the Declarations, in the open, or in a vehicle within 1,000 feet of the covered building or structure or within 1,000 feet of the *locations* described in the Declarations, whichever distance is greater.

    1)   Furniture and fixtures;

    2)   Machinery and equipment;

    3)   *Stock*;

    4)   All other Business Personal Property owned by you and used in your business;

    5)   Labor, materials or services furnished or arranged by you on Business Personal Property of others;

    6)   Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

        a)   Made a part of the building or structure you occupy but do not own; and / or

        b)   You acquired or made at your expense but cannot legally remove;

    7)   Leased Business Personal Property for which you have a contractual responsibility to insure, unless otherwise provided for under Business Personal Property of Others and / or

    8)   Animals, owned by others and boarded by you, or if owned by you, only as stock while inside of buildings.

**2.**  **Property Not Covered**

Covered Property does not include:

  a.  Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

  b.  Animals, unless owned by others and boarded by you, or if owned by you, only as *stock* while inside of buildings;

  c.  Air, *land*, *land* values, and any substance in or on *land*, or any alteration to the natural condition of the *land*. This does not apply to the cost of reclaiming, restoring or repairing *land* improvements, provided the loss is from a Covered Cause of Loss;

  d.  Water, except water which is normally contained within any type of tank, piping system or other process equipment;

  e.  Standing timber, growing crops, turf, grass and / or lawns;

  f.  Bridges, boardwalks, roadways, drainage systems, walks, patios or other paved surfaces;

Copyright material from
© Insurance Services Office, Inc., 2011

g. Contraband, or property during illegal transportation or trade;

h. The cost of excavations, grading, backfilling or filling;

i. Foundations of buildings, structures, machinery or boilers if their foundations are below:

    1) The lowest basement floor; or

    2) The surface of the ground, if there is no basement;

j. Business Personal Property while airborne or waterborne;

k. Property shipped by mail;

l. Bulkheads, pilings, piers, wharves, boathouses, docks, jetties, quays, and breakwaters;

m. Property that is covered under another coverage form of this or any other policy where it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

n. Property sold by the you under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers;

o. Property in transit, except expressly as provided elsewhere in this policy;

p. Dams, dikes, levees, bridges, tunnels, reservoirs, sea walls, property lines, revetments, flood retaining walls and canals; except when scheduled on the Declarations;

q. Underground mines or mining shafts and any related mining property and equipment while underground;

r. Underground pipes, flues, drains or tanks;

s. Offshore oil rigs, platforms and property contained therein or thereon;

t. Satellites and spacecraft while on the launch pad, or after time of a launch;

u. Transmission and distribution lines, including support structures, of every type and description; except when located on the insured *locations* or within 1,000 feet;

v. Property of unit owners within individual residential condominium units, consisting of:

    1) Personal property and improvements & betterments; and / or

    2) Floor coverings, wall coverings and ceiling coverings which only serve that unit.

    However, this exclusion shall not apply to:

    3) Appliances; refrigerators; air conditioning equipment (including air conditioning compressors); heating equipment; cooking ranges; dishwashers; clothes washers/dryers; and fixtures, installations or permanent additions initially installed in accordance with the original plans and specifications; all contained within the units.

w. Electronic data, except as provided under the Additional Coverages, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and funrainctions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph does not apply to your *stock* of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system;

x. The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Additional Coverages for Valuable Papers and Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

y.  Vehicles or self-propelled machines (including aircraft, watercraft and railroad rolling *stock*) that:

1)  Are held for sale or lease; and / or

2)  Are licensed for use on public roads; and / or

3)  Are operated principally away from the described *locations*.

This paragraph does not apply to:

a)  Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

b)  Rowboats or canoes out of water at the described *locations*;

z.  The following property while outside of buildings:

1)  Grain, hay, straw or other crops; and / or

2)  Smokestacks, silos or their contents, windmills, wind pumps, wind generators or their towers;

aa.  Greenhouses, hothouses, gazebos, slat houses, trellises, pergolas, cabanas, and outdoor equipment pertaining to the services of these *locations*.

bb.  Gas station pumps and gas station canopies.

cc.  Solar Panels, solar panel systems, and/or any related equipment.

**3.  Coverage D - Business Income Coverages**

This policy is extended to cover Business Income Coverages and Additional Business Income Coverages for the Actual Loss Sustained by you up to the annual limits shown in the Declarations, during the Period of Interruption directly resulting from a Covered Cause of Loss to Covered Property.

a.  **Actual loss sustained** occurs in the event you are prevented from producing goods or from continuing its business operations or services and are unable to:

1)  Make up lost production within 365 continuous days after the Period of Interruption, or

2)  Continue business operations or services:

a)  through the use of any property or service owned or controlled by you; or

b)  obtainable from other sources, whether the property or service is at an insured *location;* or

c)  through working extra time or overtime at any other substitute *locations*, including any other *locations* acquired or for this purpose;

then subject to all other conditions of this policy, for the Actual Loss Sustained of the following during the Period of Interruption shall be Covered Property.

b.  The **Period of Interruption**, not to exceed 365 continuous days, is

1)  from the time of physical loss or damage insured against by this policy to the time when, with the exercise of due diligence and dispatch, to either:

a)  Resume normal operations; or

b)  Repair, replace, or prepare for operations, the physically damaged covered buildings and equipment, to the same or equivalent physical and operating conditions that existed prior to the loss or damage, whichever is less.

c)  Such period of time shall not be cut short by the expiration or earlier termination date of the policy.

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

2) In addition, if applicable, such time as may be required with the exercise of due diligence and dispatch:

   a) To restore *stock* in process to the same state of manufacture in which it stood at the time of the initial interruption of production or *suspension* of business operations or services; or

   b) To replace physically damaged or destroyed mercantile *stock* necessary to resume operations; or

   c) To replace raw materials and supplies in order to continue operations.

However, the inability to procure destroyed mercantile stock or suitable raw materials and supplies to replace similar *stock* or materials and supplies physically damaged or destroyed shall not increase the Period of Interruption.

3) For Property Under Construction: The time period between the anticipated date of substantial completion had no covered loss occurred and the actual date of completion. In calculating the amount of loss, due consideration will be given to the actual experience of the business compiled after substantial completion and start-up.

The Period of Interruption does not include any additional time:

   a) Required for re-staffing or re-training employees; or

   b) Required due to your inability to resume operations for reasons other than those enumerated in 2.a. through 2.b. above; or

   c) Required for making change(s) to the covered buildings, structures, or equipment for any reason except as provided in the Ordinance or Law coverage.

Consideration will be given to the experience of the business prior to the *occurrence* of the Covered Cause of Loss and the probable experience had no loss occurred. Only normal charges and expenses that would have existed had no interruption of production or *suspension* of business operations or services occurred will be covered.

c. **Business Income Monthly Limitation of Indemnity:** The most we will pay each month during the Period of Interruption for Business Income Coverage Actual Loss Sustained by you resulting directly from a Covered Cause of Loss will be not greater than 1/12 of the annual limit for Business Income Coverages shown on the Declarations. There shall be no liability under this policy for more than the Business Income Monthly Limitation of Indemnity shown on the Declarations for all Business Income Coverages, except for those that have a sublimit on the Additional Coverages and Sublimits Endorsement. Business Income Monthly Limitation of Indemnity is payable each period of thirty (30) consecutive days after the beginning of the Period of Interruption.

d. **Business Income Coverages** will be:

1) **Gross Earnings**, which in the event of a loss and for the purpose of this coverage are:

   a) For manufacturing operations: The net sales value of production less the cost of all raw *stock*, materials and supplies utilized in such production; or

   b) For mercantile or non-manufacturing operations: The total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by you;

   c) Plus, all other earnings derived from the operation of the business;

   d) Less all charges and expenses which do not necessarily continue during the interruption of production or *suspension* of business operations or services.

2) **Net Sales**, which in the event of loss at mercantile or non-manufacturing operations, and for the purpose of this coverage, are determined as the amount for which merchandise could have been sold to your regular customers if there was no loss or damage to merchandise.

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

    3) **Ordinary Payroll**, which is the entire payroll expense for all your employees except officers, executives, department managers, employees under contract, and other essential employees. The specified number of days that Ordinary Payroll expense is covered is shown on the Additional Coverages and Sublimits Endorsement. The number of days need not be consecutive, but must fall within the Period of Interruption of production or *suspension* of business operations or services, or fall within the extension of that period, if an extension is provided.

    4) *Rental Value:* In respect to Covered Property held for rental to others, this policy is extended to cover the Actual Loss Sustained during the Period of Interruption but not exceeding the reduction in *rental value* less charges and expenses which do not necessarily continue. Due consideration will be given to the historic rental expenses prior to the loss and the probable expenses.

  e. **Additional Business Income Coverages** will be:

    1) **Contingent Business Income Costs** will be covered up to the Sublimits shown on the Additional Coverages and Sublimits Endorsement if sudden and accidental direct physical loss or damage to the real or personal property of a direct supplier or direct customer of you is damaged by a Covered Cause of Loss under this policy, and such damage:

      a) wholly or partially prevents any of your direct suppliers from supplying their goods and/or services to you; or

      b) wholly or partially prevents any of your direct customers from accepting your goods and/or services;

    This policy is extended to cover the Actual Loss Sustained by you during the Period of Interruption with respect to such real or personal property, if the property of the supplier or customer which sustains loss or damage is of the type of property which would be Covered Property under this policy.

    This coverage applies to your direct suppliers or direct customers located within the Coverage Territory.

    2) **Extended Period of Indemnity** covers extra expense incurred during the additional length of time required to restore you to the same condition as existed had no loss occurred.  This will commence with the later of the following dates:

      a. the date on which the coverage for loss or damage would otherwise terminate; or

      b. the earliest date on which either normal operations resume, or repair, replacement, or rebuilding of the property that has been damaged is actually completed; but in no event for a period of time exceeding the number of days specified in the Additional Coverages and Sublimits Endorsement.  The Extended Period of Indemnity does not apply to any Business Income Coverages.

    3) **Extra Expense** covers expenses, during the Period of Interruption, over and above normal operating expenses, necessarily incurred by you to avoid or minimize the *suspension* of business at the described *location* or at replacement *locations* or temporary *locations*, including relocation expenses and costs to equip and operate the replacement *location* or temporary *location* and to minimize *suspension* of business if you cannot continue operations up to the Sublimits shown on the Additional Coverages and Sublimits Endorsement.

    You will agree to use any suitable property or service owned or controlled by you or obtainable from other sources in reducing the Extra Expense incurred under this policy.

    4) **Ingress and Egress:** This policy is extended to cover the Actual Loss Sustained during the Period of Interruption when ingress to or egress from your covered *location* is prohibited as a direct result of a Covered Cause of Loss to real property not insured. The insured physical loss or damage must occur within five (5) statute miles from your covered *location* in order for coverage to apply. Such period of time begins on the date that ingress to or egress from real

SMB 300 2103 CW
ALL COMMERCIAL
PROPERTY

Copyright material from
© Insurance Services Office, Inc., 2011

Page 6 of 39

or personal property is prohibited and ends when ingress or egress is no longer prohibited, but no more than the number of days shown on the Sublimits of the Additional Coverages and Sublimits Endorsement.

5) **Interruption by Civil or Military Authority:** This policy is extended to cover the Actual Loss Sustained during the Period of Interruption when access to your covered *location* is prohibited by an order of civil or military authority, if, such order is a direct result of a Covered Cause of Loss to real property not insured. Your physical loss or damage must occur within five (5) statute miles from your covered *location* for coverage to apply. Such period of time begins with the effective date of the order of civil or military authority and ends when the order expires, but no more than the number of days shown on the Additional Coverages and Sublimits Endorsement.

6) **Royalties:** This policy is extended to cover loss of income sustained by you under a royalty, licensing fee, or commission agreement between you and another party during the Period of Interruption arising out of sudden and accidental direct physical loss or damage by a Covered Cause of Loss during the term of this policy to real or personal property of such other party, only if such Royalties are up to the Sublimits shown on the Additional Coverages and Sublimits Endorsement. When determining the amount payable, consideration will be given to the amount of income derived by you from such agreements before, and the probable amount of income after, the date of loss or damage.

7) **Service Interruption:** This policy is extended to cover the loss or damage to Covered Property and Business Income Coverage resulting from sudden and accidental direct physical loss or damage from a Covered Cause of Loss to: (1) incoming electrical, gas, water and telecommunication equipment and outgoing sewer; or (2) electrical, telecommunication, fuel, water, steam, refrigeration, or other service transmission lines; all situated outside the insured *locations*.

a) However, Service Interruption DOES NOT apply to any loss caused by damage to any utility service listed Additional Coverages, Contingent Business Income Costs above, if located more than five (5) statute miles from the covered *location*.

b) There shall be no loss payable under this Additional Business Income Coverage unless the interruption exceeds the qualifying period shown on the Additional Coverages and Sublimits Endorsement. In such case, the loss shall be measured from date and time of the loss. With respect to any Business Income Coverage provided, the Period of Interruption ends when: (1) incoming electrical, gas, water, or telecommunication equipment or outgoing sewer or (2) electrical, telecommunication, fuel, water, steam, refrigeration, or other service transmission lines, is restored.

c) The Sublimit of Insurance shown on the Additional Coverages and Sublimits Endorsement applies to all loss or damage to Covered Property and/or Business Income Coverages, combined arising out of one Service Interruption. None of the Additional Business Income Coverages apply to the Business Income Coverage provided herein, except *rental value*.

Service Interruption does not include coverage for any increase in loss due to fines or damages for breach of contract or for late or non-completion of orders, or penalties of any nature.

f. **Business Income Not Covered:**

The following are excluded from Business Income Coverages:

1) **Berth and/or Port Blockage:**

Any loss due to blockage of a port or berth. Blockage means a blockage of any part of the port or berth arising from an *occurrence* which results in the sinking or stranding of a ship, or the inability of a ship to gain access to a berth.

2) **Finished Products:**

SMB 300 2103 CW
ALL COMMERCIAL
PROPERTY

Copyright material from
© Insurance Services Office, Inc., 2011

Page 7 of 39

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

Any loss resulting from loss or damage to finished products manufactured by you nor for the time required for their reproduction.

3) **Idle Periods:**

Any loss during any period in which goods would not have been produced, or business operations or services would not have been maintained, for any reason other than physical loss or damage from a Covered Cause of Loss to which this coverage applies.

4) **Remote Loss:**

a) Any increase in loss due to the suspension, cancellation, or lapse of any lease, contract, license or order; and / or

b) Any loss due to fines or damages for breach of contract; or for late, or non-completion of orders or penalties of whatever nature; and / or

c) Any increase in loss due to interference at your *location* by strikers or other persons with rebuilding, repairing, or replacing the property damaged or destroyed, or with the resumption or continuation of business, or with the re-occupancy of the *locations*.

d) Nor shall there be any liability under this policy for any other consequential or remote loss, other than as specifically stated in the Additional Business Income Coverages in this policy.

5) **Transit:**

Any Business Income loss resulting from loss or damage to property in transit.

B. **Covered Causes of Loss**

The Covered Causes of Loss included in this policy means all loss and/or damage arising from the following:

1. **Windstorm or Hail** which means direct action of wind or direct action of hail, accompanied by wind or not, which causes loss or damage.

   a. Windstorm or Hail excludes:

   1) Frost or cold weather, and / or

   2) Accumulation of ice, snow, sleet, water or any other form of precipitation.

C. **Additional Coverages**

The following Additional Coverages are subject to the terms and conditions of this policy, including the Deductibles and Sublimits of Insurance corresponding to each Additional Coverage as included on the Additional Coverages and Sublimits Endorsement. These Additional Coverage items are either included or excluded Sublimits of Insurance and are part of, and not in addition to the Limits of Insurance of this policy.

1. **Accounts Receivable**

   This policy covers any shortage in the collection of Accounts Receivable directly resulting from a Covered Cause of Loss to Accounts Receivable records.

   a. This additional coverage does not apply to loss due to:

   1) Bookkeeping, accounting or billing errors and omissions; and / or

   2) Alteration, falsification, manipulation, concealment, destruction, or disposal of Accounts Receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property, but only to the extent of such wrongful giving, taking, obtaining or withholding.

2. **Business Personal Property Temporarily in Portable Storage Units**

SMB 300 2103 CW
ALL COMMERCIAL
PROPERTY

Copyright material from
© Insurance Services Office, Inc., 2011

Page 8 of 39

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

    a. You may extend the insurance that applies to Your Business Personal Property to apply to such property while temporarily stored in a portable storage unit (including a non-owned detached trailer) located within 1,000 feet of the building or structure described in the Declarations.

    b. If the applicable Covered Causes of Loss form or endorsement contains a limitation or exclusion concerning loss or damage from sand, dust, sleet, snow, ice or rain to property in a structure, such limitation or exclusion also applies to property in a portable storage unit.

    c. This Additional Coverage does not apply to loss or damage otherwise covered under this policy or any endorsement to this policy and does not apply to loss or damage to the storage unit itself.

3. **Debris Removal**

    a. We will pay your expense to remove debris of Covered Property and other debris that is on the described *location(s)*, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of the sudden and accidental direct physical loss or damage.

    b. Debris Removal does not apply to costs to:

        1) Remove debris of property owned by or leased to the landlord of the building where your described *location(s)* are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

        2) Remove any property that is Property Not Covered, including property addressed under the Outdoor Signs, Fences, Antennas, and Vegetation Additional Coverage;

        3) Remove property of others;

        4) Remove deposits of mud or earth from the grounds of the described *locations*;

        5) Extract *pollutants or contaminants* from *land* or water; and / or

        6) Remove, restore or replace polluted *land* or water.

4. **Electronic Data**

    a. Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data. This Additional Coverage does not apply to your *stock* of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

    b. Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

    c. The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

        1) Coverage under this Additional Coverage, Electronic Data, includes *collapse*.

        2) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. There is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

        3) The most we will pay under this Additional Coverage, Electronic Data, is on the Sublimit in the Additional Coverages and Sublimits Endorsement for all loss or damage sustained in any one policy year, regardless of the number of *occurrences* of loss or damage, the number of *locations*, or the number of computer systems involved. If loss payment on the first *occurrence*

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year.

6. *Fine Arts*

This policy is extended to cover sudden and accidental direct physical loss or damage from a Covered Cause of Loss to *Fine Arts*. However, no coverage is provided for:

a. Breakage, marring, scratching, chipping or denting of *Fine Arts*, unless such breakage, marring, scratching, chipping or denting is caused by a Covered Cause of Loss; and / or

b. Physical loss or damage as a result of restoring, repairing or retouching processes.

7. **Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay for services at each *location* described in the Declarations. The Sublimit in the Additional Coverages and Sublimits Endorsement is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

a. Assumed by contract or agreement prior to loss; and/ or

b. Required by local ordinance.

No Deductible applies to this Additional Coverage. There is no coverage for any costs incurred as a result of a false alarm.

8. *Fungus, Mold(s), Mildew, Spores, or Yeast*

Associated losses will be covered if you establish that the *Fungus, Mold(s), Mildew, Spores, or Yeast* is a direct result of a Covered Cause of Loss and this loss is reported within twelve (12) months from the expiration date of the policy.

9. **Gems and Jewelry**

We will pay for sudden and accidental direct physical loss or damage from a Covered Cause of Loss to precious stones, gems and jewelry.

10. **Leased or Rented Equipment**

This policy is extended to cover sudden and accidental direct physical loss or damage at insured *locations* from a Covered Cause of Loss to equipment that you have leased and/or rented for which you are legally liable.

11. **Leasehold Improvements and Betterments**

This policy is extended to cover the value of undamaged tenant improvements and betterments when your lease is cancelled by the lessor acting under a valid condition of the lease due to sudden and accidental direct physical loss or damage to a building and/or personal property caused by or resulting from a Covered Cause of Loss at an insured *location*.

12. **Leasehold Interest**

If Covered Property is: (1) rendered wholly or partially untenantable by a Covered Cause of Loss during the policy period and (2) your lease is canceled by a party, other than you, or an entity with any common ownership with you, in accordance with the conditions of the lease or as a result of a statutory requirement of the appropriate jurisdiction in which the damaged or destroyed Covered Property is located, then this policy is extended to cover "The Interest of the Insured as Lessee"(as defined below) or "The Interest of the Insured as Lessor"(as defined below), whichever is applicable, but only for the first three (3) months succeeding the date of the loss and the "Net Lease Interest" (as defined below) shall be paid for the remaining months of the unexpired lease.

a. Recovery under this additional coverage shall be the pro-rata proportion from the date of loss to expiration date of the lease (to be paid without discount) on your interest in:

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

1) The amount of bonus paid by you for the acquisition of the lease not recoverable under the terms of the lease;

2) Improvements and betterments to real property which are not covered under any other section of this policy; and / or

3) The amount of advance rental paid by you and not recoverable under the terms of the lease.

b. Definitions: The following terms, wherever used in this Paragraph 13, shall mean:

1) The "The Interest of the Insured as Lessee" is defined as:

a) the excess of the *rental value* of similar *locations* over the actual rental payable by the lessee (including any maintenance or operating charges paid by the lessee) during the unexpired term of the lease; and

b) the rental income earned by you from sublease agreements, to the extent not covered under any other section of this policy, over and above the rental expenses specified in the lease between you and the lessor.

2) The "The Interest of the Insured as Lessor" is defined as the difference between the rents payable to the lessor under the terms of the lease in effect at the time of loss and the actual rent collectible by the lessor during the unexpired term of the lease provided the lease is canceled by the lessee, to the extent not covered under any other section of this policy.

3) "Net Lease Interest" is defined as that sum, which placed at 6% interest compounded annually will be equivalent to the "The Interest of the Insured as Lessee or Lessor."

4) There shall be no liability under this policy for any increase of loss which may be occasioned by the suspension, lapse or cancellation of any license or by you exercising any option to cancel the lease. Furthermore, you shall use due diligence, including all things reasonably practicable, to diminish loss under this additional coverage.

13. **Limited Pollutant or Contaminant Clean-up and Removal**

We will pay your reasonable and necessary additional expense incurred to extract, dispose of or clean up actual presence of *pollutants or contaminants* from *land* or water at the described *locations* if the discharge, dispersal, seepage, migration, release or escape of the *pollutants or contaminants are* caused by or results from a Covered Cause of Loss that occurs during the policy period. The additional expense will be paid only if reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of *pollutants or contaminants*. We will pay for testing which is performed in the course of extracting the *pollutants or contaminants* from the *land* or water.

The most we will pay under this Additional Coverage is the Sublimit in the Additional Coverages and Sublimits Endorsement for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

14. **Loading and Unloading of Property for Transit**

This policy is extended to cover your Business Personal Property only while being loaded and unloaded for transit.

15. **Lock and Key Replacement**

This policy covers the necessary expense to repair or replace the exterior or interior door locks and keys of a covered building when there is sudden and accidental direct physical loss or damage from a Covered Cause of Loss:

a. If the door keys are stolen in a covered theft loss; and / or

b. When the Covered Property is damaged, and the door keys are stolen by burglars.

16. **Moveable Equipment and Inventory in the Open**

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 300 2103 CW ALL COMMERCIAL PROPERTY

We will pay for sudden and accidental direct physical loss or damage from a Covered Cause of Loss to moveable equipment and inventory that is not in a fully enclosed structure.

17. **Newly Acquired or Constructed Property**

    a. **Buildings**

        If this policy covers buildings, you may extend insurance to apply to:

        1) Your new buildings while being built on the described *locations*; and / or

        2) Buildings you acquire at *locations*, other than the described *locations*, intended for:

            a) Similar use as the building described in the Declarations; or

            b) Use as a warehouse.

    b. **Your Business Personal Property**

        1) If this policy covers Your Business Personal Property, you may extend insurance to apply to:

            a) Business personal property, including such property that you newly acquire, at any *location* you acquire other than at fairs, trade shows or exhibitions; and / or

            b) Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the *location* described in the Declarations.

        2) This Additional Coverage does not apply to:

            a) Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

            b) Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

    c. **Period of Coverage**

        With respect to insurance provided under this Additional Coverage for Newly Acquired or Constructed Property, coverage will end when any of the following first occurs:

        1) This policy expires;

        2) 60 days after you acquire the property or begin construction of that part of the building that would qualify as covered property;

        3) You report values to us; or

        4) When we notify you that we will not bind the newly acquired property.

        There is no coverage for any property that is partially or wholly insured under any other insurance.

        We will charge additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

18. **Ordinance or Law**

    In the event of sudden and accidental direct physical loss or damage from a Covered Cause of Loss under this policy that results in the enforcement of any law, ordinance, governmental directive or standard in effect at the time of loss or damage regulating the construction, repair or use and occupancy of the property, the following is covered under this policy:

    a. **Coverage A – Coverage for Loss to Undamaged Portion of the Building -** For the loss in value of the undamaged portion of the building due to the enforcement of an Ordinance or Law that requires demolition of undamaged parts of the same building.

    b. **Coverage B – Demolition Cost Coverage-** For the cost to demolish and clear the site of undamaged parts of the same building, due to the enforcement of an Ordinance or Law that requires demolition of such undamaged property.

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

    c. **Coverage C - Increased Cost of Construction** -  For the increased cost of repair or replacement of the damaged and undamaged building on the same or another site, limited to the cost that would have been incurred to comply with the minimum requirements of such Ordinance or Law regulating the repair or reconstruction of the damaged property on the same site. However, there is no coverage for any increased cost of construction loss unless the damaged property is rebuilt or replaced.

    If the Ordinance or Law requires relocation to another *location*, the most we will pay for the increased cost of construction is the increased cost of construction at the new *location*. The increased rebuilding costs must be kept to the minimum needed to satisfy legal requirements.

19. **Outdoor Signs, Fences, Antennas, and Vegetation**

    You may extend the insurance provided by this policy to apply to your outdoor signs, fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than trees, shrubs or plants which are *stock* or are part of a vegetated roof), including debris removal expense.

    Subject to all terms and limitations of coverage, this Additional Coverage includes the expense of removing from the described *locations* the debris of trees, shrubs and plants which are the property of others, except when you are a tenant and such property is owned by the landlord of the described *locations*.

    Outdoor Signs, Fences, Antennas, and Vegetation has a sublimit within Coverage B, Other Buildings and Structures.

20. **Pairs or Sets**

    If two or more components or parts are necessary for a whole or complete product, then this policy covers the reduction in value of insured components or parts of products due to sudden and accidental direct physical loss or damage from a Covered Cause of Loss insured against by this policy to the other insured components or parts of such products.

21. **Personal Effects and Property of Others**

    If this policy covers Your Business Personal Property, you may extend insurance to apply to:

    a. Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Additional Coverage does not apply to loss or damage by theft.

    b. Personal property of others in your care, custody or control.

    Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

22. **Professional Fees**

    This policy is extended to cover reasonable and necessary Claim Preparation Costs (as defined below) incurred by you at our request to determine the extent or amount of insured loss or damage as a result of a Covered Cause of Loss under this policy, provided that you obtain the prior written approval for the vendor to be engaged.

    a. Claim Preparation Costs means:

        1) The cost of taking inventory and the cost of gathering and preparing other data to substantiate the extent or amount of loss or damage; and

        2) The cost of services provided by accountants, contractors, and engineers solely to determine the extent or amount of loss.

    b. Claim Preparation Costs and Professional Fees does not mean and excludes:

        1) Legal fees, charges and expenses;

        2) Fees and costs of a public claims adjuster, claim consultant, insurance broker or agent (except forensic accounting services), or any person acting for or on behalf of a public claims adjuster, claim consultant, or insurance broker or agent;

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 300 2103 CW ALL COMMERCIAL PROPERTY

3) Costs associated with negotiation or presentation of any claim or part of a claim that is disputed or denied;

4) Costs associated with establishing that any claim or part of a claim is covered by the policy; and / or

5) Costs which represent overhead or operating expense of yours, including salaries of your such employees.

23. **Property Removed from Insured *Locations***

a. You may extend the insurance provided by this policy to apply to your Covered Property while it is away from the insured *locations*, if it is:

1) Temporarily at a *location* you do not own, lease or operate;

2) In storage at a *location* you lease, provided the lease was executed after the beginning of the current policy term; and / or

3) At any fair, trade show or exhibition.

24. **Protection and Preservation of Property**

If it is necessary to move Covered Property from the described *locations* to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any sudden and accidental direct physical loss or damage to that property:

a. While it is being moved or while temporarily stored at another *location*; and

b. Only if the loss or damage occurs within 30 days after the property is first moved.

25. **Reclaiming, Restoring, or Repairing *Land* Improvements**

This policy is extended to cover the cost of reclaiming, restoring or repairing *land* improvements, provided the loss is from a Covered Cause of Loss.

26. **Reward Reimbursement**

This policy covers monetary rewards for information that leads to a criminal conviction in connection with loss or damage to Covered Property by a Covered Cause of Loss, up to amounts agreed by you and the Insurer.

27. **Seasonal Inventory**

We will cover temporary increases in Business Personal Property as stated on the Additional Coverages and Sublimits Endorsement during the months of November to May due to seasonal fluctuations as reflected on your historical inventory, or if not available, based on similar industry fluctuations.

28. **Sewer or Water Back Up**

We will pay for sudden and accidental direct physical loss or damage due to a Covered Cause of Loss to Covered Property, caused by or resulting from discharge of water or waterborne material from a sewer, drain or sump located at the described *location(s)*, provided such discharge is not induced by *flood* or *flood* related conditions. For the purposes of this coverage, the term drain includes a roof drain and related fixtures.

29. **Sidewalks, Paved Surfaces and Roadways**

We will pay for sudden and accidental direct physical loss or damage due to a Covered Cause of Loss to Covered Property to any Sidewalks, Paved Surfaces or Roadways you own or are responsible for repairs or replacement.

30. **Spoilage**

This policy is extended to cover Spoilage as a direct result of a Covered Cause of Loss. This policy will pay for sudden and accidental direct physical loss or damage to:

Copyright material from
© Insurance Services Office, Inc., 2011

a. Perishable Goods due to Spoilage;

b. Perishable Goods due to contamination from the release of refrigerant, including but not limited to ammonia; and / or

c. Perishable Goods due to Spoilage caused by a Covered Cause of Loss to equipment that is owned by a utility, landlord, or other supplier of any of the following services: electrical power, communications, waste disposal, air conditioning, refrigeration, heating, gas, air, water or steam.

If you are unable to replace the Perishable Goods before their anticipated sale, payment will be determined based on the sales price of the Perishable Goods at the time of the loss, less discounts and expenses that otherwise would have been incurred. Otherwise, payment will be determined in accordance with the Loss Settlement Conditions of this policy.

Perishable Goods means personal property:

1) maintained under controlled conditions for its preservation, and

2) susceptible to loss or damage if the controlled conditions change.

Spoilage Exclusions: There shall be no coverage under this policy for loss or damage caused by or resulting from:

1) The disconnection of any refrigerating, cooling or humidity control system from the source of power; and/ or.

2) The deactivation of electrical power caused by the manipulation of any switch or other device used to control the flow of electrical power or current.

31. **Tenant's Glass**

We will pay for sudden and accidental direct physical loss or damage due to a Covered Cause of Loss to glass that the insured is responsible to cover as a tenant.

32. **Valuable Papers and Records (Other Than Electronic Data)**

a. You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. This Additional Coverage does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

b. Coverage under this Additional Coverage includes *collapse*.

c. We will also pay for the cost of blank material for reproducing the records (if duplicates exist) and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and, therefore, coverage of such costs is not additional insurance.

**D. Exclusions and Limitations**

The stated exclusions (or failure to include other exclusions) shall in no way expand the coverage provided by this policy or provide coverage for perils not named in this policy. Further, loss, damage, costs, and expenses associated with the exclusions are similarly excluded from coverage under this policy, whether or not a Covered Cause of Loss contributes concurrently or in any sequence to such loss, damage, costs and expenses.

For each Covered Cause of Loss shown on the Declarations Coverage Information section, the respective endorsement contains the policy details relating to the respective peril. If the coverage is selected "Yes" in the Declarations, the peril as defined in the respective endorsement attached to this policy shall be a Covered Cause of Loss and not be excluded. If the coverage is selected "No" in the Declarations, the peril as defined in the respective endorsement attached to this policy shall be excluded from coverage under this policy.

Any Covered Cause of Loss added by endorsement, shall only provide coverage as defined in the

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

respective endorsement. Any other exclusion contained in this policy shall be an exclusion if not specifically defined in the policy forms or attached endorsements.

There is no coverage under this policy for loss or damage caused directly or indirectly by any of the following exclusions. Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage.

1. **Asbestos Exclusion**

    a. Loss, damage or remediation expenses caused by or resulting from the presence of asbestos or asbestos-containing materials is excluded. As used in this exclusion, remediation expenses are expenses incurred for or in connection with the investigation, monitoring, removal, increased cost of reconstruction, disposal, treatment, abatement or neutralization of asbestos or asbestos-containing materials to the extent required by federal, state or local laws, regulations or statutes or any subsequent amendments to address asbestos.

    b. However, this asbestos exclusion does not apply to the extent that coverage is provided under the following:

        1) This policy insures asbestos located within an insured building or structure, and then only that part of the asbestos which has been physically damaged during the policy period by a Covered Cause of Loss.

        2) This coverage is subject to all limitations in the policy and, in addition, to each of the following specific conditions to coverage:

            a) The said building or structure must be insured under this policy for damage by this Covered Cause of Loss.

            b) The Covered Cause of Loss must be the immediate, sole cause of the damage to the asbestos.

            c) You must report the existence and cost of the damage as soon as practicable after the Covered Cause of Loss first damaged the asbestos. However, there is only coverage for reports of loss no later than 12 (twelve) months after the expiration, or termination, of the policy period.

            d) Insurance under this policy in respect of asbestos shall exclude any sum relating to:

                i. any faults in the design, manufacture or installation of the asbestos; or

                ii. asbestos not physically damaged by a Covered Cause of Loss including any governmental or regulatory authority direction or request of whatsoever nature relating to undamaged asbestos.

2. ***Named Storm* Exclusion**

    Loss or damage directly or indirectly caused by a *Named Storm* that is in existence at the time that written request to bind is given to us, until coverage for such *Named Storm* has been bound by written agreement between the Insurer and the Named Insured is excluded. In addition, no increase in limits or additional coverages will be provided for any insured *location*(s) threatened by such *Named Storm*, until coverage for such *Named Storm* has been bound by written agreement between the Insurer and the Named Insured.

3. **Collapse Exclusion**

    Loss or damage caused by *collapse* is excluded. Other than "All Other Peril" Covered Causes of Loss, (if applicable) *collapse* is not excluded if caused by any other Covered Cause of Loss.

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 300 2103 CW ALL COMMERCIAL PROPERTY

4. **Defect Exclusion**

Loss or damage caused by faulty or defective workmanship, material, construction, installation, or design from any cause; or faulty planning, zoning, development, surveying or siting is excluded unless the resulting damage is the direct result of sudden and accidental direct physical loss or damage from a Covered Cause of Loss. In that event, this policy will cover only the resulting damage.

In addition, loss or damage caused by fault, defect, error, deficiency or omission in design, plan or specification is excluded, unless the resulting damage is the direct result of sudden and accidental direct physical loss or damage from a Covered Cause of Loss. In this event, this policy will cover only such resulting damage.

5. **Delay, Loss of Market or Loss of Use Exclusion**

Loss or damage caused by the delay, loss of market, or loss of use, other than as expressly set forth in this policy, is excluded.

6. **Depletion Exclusion**

Loss or damage caused by deterioration, depletion, rust, corrosion, erosion, wet or dry rot, decay, evaporation, leakage, animal, insect or vermin damage, inherent vice or latent defect, shrinkage or change in color, flavor, texture or finish, extremes or changes of temperature damage or changes in relative humidity damage, whether atmospheric or not is excluded.

7. ***Earthquake and Earth Movement* Exclusion**

Loss or damage caused by *earthquake* and *earth movement* is excluded.

8. **EIFS Exclusion**

Loss or damage caused by or resulting from the design, manufacture, installation, or use of any Exterior Insulation and Finish System (EIFS), Dryvit construction, or similar synthetic stucco finishing surfaces are excluded. However, this exclusion shall not apply to sudden and accidental direct physical damage to EIFS or Dryvit or similar synthetic stucco finishing surfaces as the direct result of a Covered Cause of Loss.

9. **Electrical Surge Exclusion**

Loss or damage caused by or resulting from any of the following is excluded:

a. Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

1) Electrical or electronic wire, device, appliance, system or network; or

2) Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

a) Electrical current, including arcing;

b) Electrical charge produced or conducted by a magnetic or electromagnetic field;

c) Pulse of electromagnetic energy; or

d) Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

10. **Electronic Data Exclusion**

a. Loss or damage caused by exposure to cyber liability.

b. Loss, damage destruction, distortion, erasure, corruption, alteration, loss of use, reduction in functionality, cost, or expense caused by or resulting from a *computer virus* is excluded.

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 300 2103 CW ALL COMMERCIAL PROPERTY

   c.   However, if a Covered Cause of Loss results from any of the matters described in this Electronic Data Exclusion paragraphs a. and b. above, this policy, subject to all its terms, conditions and exclusions, will cover sudden and accidental physical damage occurring during the policy period to property insured by this policy directly caused by such Covered Cause of Loss.

**11. Electronic Date Recognition Exclusion**

Loss, damage, cost, claim or expense is excluded, whether preventative, remedial or otherwise, directly or indirectly arising out of or relating to:

   a.   the calculations, comparison, differentiation, sequencing or processing of data involving any date change, including leap year calculations, by any computer system, hardware, program or software and/or any microchip, integrated circuit or similar device in computer equipment or non-computer equipment, whether the it is your property or not; or

   b.   any change, alteration or modification involving any other date change, including leap year calculations, to any such computer system, hardware, program or software and/or any microchip, integrated circuit or similar device in computer equipment or non-computer equipment, whether the property of the Insured or not.

   c.   This clause applies regardless of any other cause or event that contributes concurrently or in any sequence to the loss, damage, cost, claim or expense.

**12. *Equipment Breakdown* or *Explosion* Exclusion**

Loss or damage caused by *equipment breakdown* or *explosion* is excluded.

**13. *Equipment Breakdown* to Vehicles Exclusion**

Loss or damage caused by *equipment breakdown* to vehicles (or any equipment on vehicles), draglines, cranes, excavation or construction equipment is excluded.

**14. Equipment Testing Exclusion**

Loss or damage caused by hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment is excluded unless physical damage not excluded by this policy results. In this event, this policy will cover only such resulting damage.

**15. Erosion Exclusion**

Loss or damage caused by erosion of graded or planted finish or rough grades which results from normally expected or predictable precipitation and surface water runoff is excluded.

**16. Fines or Penalties Exclusion**

Costs, expenses, fines or penalties incurred or sustained by or imposed on you at the order of any government agency, court or other authority arising from any cause whatsoever are excluded.

**17. *Flood* Exclusion**

Loss or damage caused by *flood* is excluded.

**18. Fraudulent or Dishonest Act or Acts Exclusion**

Loss or damage from any Fraudulent or Dishonest Act or Acts intended to result in financial gain, loss or damage to Covered Property committed alone or in collusion with others: by any proprietor, partner, director, trustee, officer or employee of yours (including leased employees), or by any party to whom the property may have been entrusted (other than a carrier for hire) is excluded.

**19. Fungus, Mold(s), Mildew, Spore(s), Yeast or Toxins Exclusion**

Loss or damage in the form of, caused by, arising out of, contributed to, or resulting from *fungus, mold(s), mildew, spore(s) or yeast* or toxins created or produced by or emanating from *such fungus, mold(s), mildew, spore(s) yeast* or toxins is excluded. However, this exclusion shall not apply provided you establish that the *fungus, mold(s), mildew, spores yeast* or toxins is a direct result of a covered

Copyright material from
© Insurance Services Office, Inc., 2011

loss from a Covered Cause of Loss or *Flood* (provided *Flood* is a Covered Cause of Loss) and as a condition of coverage under this policy, this loss is reported within twelve (12) months from the expiration date of the policy, and the Limit of Insurance shall then be limited to the Sublimits on the Additional Coverages and Sublimits Endorsement.

20. **Government Authority Seizure Exclusion**

Loss or damage due to seizure or destruction of property by order of governmental authority is excluded. However, coverage is provided for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire is a Covered Cause of Loss.

21. **Ground Water Seepage Exclusion**

Loss or damage from water under the ground surface pressing on, or flowing or seeping through:

a. Foundations, walls, floors or paved surfaces;

b. Basements, whether paved or not; or

c. Doors, windows or other openings

is excluded.

22. **High Hazard Exclusion**

Loss or damage from explosives, fireworks, or high hazard material stored or maintained on the property is excluded.

23. **Hot Testing Exclusion**

Loss or damage from Hot Testing is excluded.

Hot Testing;

a. which means:

1) Startup, commissioning or performance testing;

2) Any testing involving the introduction of flammable or explosive feedstock or similar media beginning when such feedstock is first introduced; or

3) The rotational operation of any turbine or generator, except for rotational operation by turning gear only when the turbine or generator is not energized.

b. Hot Testing does not mean the startup, commissioning or performance testing of:

1) Heating;

2) Cooling;

3) Air handling; or

4) Electrical systems that are part of building systems.

24. **Infestation, Disease, Freeze, Drought, Weight of Ice or Snow or any Damage Caused by Insects, Vermin, Rodents or Animals Exclusion**

Loss or damage caused by the infestation, disease, freeze, drought, weight of ice or snow or any damage caused by insects, vermin, rodents or animals to plants, lawns, trees, or shrubs is excluded.

25. **Lack of Utility Supply Exclusion**

Loss or damage caused by the lack of incoming electricity, fuel, water, gas, steam, refrigerant, or outgoing sewerage, or incoming or outgoing data or telecommunications all of which are caused by an *occurrence* away from any *location* insured under this policy, unless specifically provided and only to the extent provided is excluded.

26. **Loss Due to Virus or Bacteria Exclusion**

Copyright material from
© Insurance Services Office, Inc., 2011

a. The exclusion set forth in subparagraph b. below, applies to all coverage under all forms and endorsements that comprise this policy, including but not limited to forms or endorsements that cover property damage to building(s) or personal property and forms or endorsements relating to Business Income Coverages.

b. Loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease is excluded.

However, this exclusion does not apply to loss or damage caused by or resulting from *fungus, mold(s), mildew, spore(s) or yeast*. Such loss or damage is addressed in a separate exclusion in this policy.

1) With respect to any loss or damage subject to the exclusion in subparagraph b. above, such exclusion supersedes any exclusion relating to *pollutants or contaminants*.

2) The terms of the exclusion in subparagraph b. above, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded by this policy.

27. **Manufacturing Damage to Stock or Materials Exclusion**

Loss or damage attributable to manufacturing or processing operations which result in damage to *stock* or materials while such *stock* or materials are being processed, manufactured, tested or otherwise being worked upon is excluded; unless physical damage not excluded by this policy results. In this event, this policy shall cover only such resulting damage.

28. **Mysterious Disappearance Exclusion**

Mysterious disappearance, loss, or shortage disclosed on taking inventory or any unexplained losses is excluded.

29. **Nuclear, Biological, Chemical and Radiological Exclusions**

Loss, damage, cost or expense, whether real or alleged, that is caused by, results from, is exacerbated by, or otherwise impacted by, either directly or indirectly, from any of the following is excluded:

a. Nuclear Hazard - including, but not limited to, nuclear reaction, nuclear detonation, nuclear radiation, radioactive contamination and all agents, materials, products or substances, whether engineered or naturally occurring;

b. Biological Hazard - including, but not limited to, any biological and/or poisonous or pathogenic agent, material, product or substance, whether engineered or naturally occurring, that induces or is capable of inducing physical distress, illness, or disease;

c. Chemical Hazard - including, but not limited to, any chemical agent, material, product or substance; or

d. Radioactive Hazard - including, but not limited to, any electromagnetic, optical, or ionizing radiation or energy, including all generators and emitters, whether engineered or naturally occurring.

The provisions of subparagraphs b, c, and d above will not apply where the agent, material, product or substance at issue is utilized in the course of business by you.

Only if, and to the extent required by state law, the following exception to the exclusions in subparagraph a. applies:

If a hazard excluded under subparagraph a above results in fire (and provided fire is a Covered Cause of Loss), this policy will pay for the loss, damage, cost or expense caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected Covered Property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. This coverage does not apply to insurance provided under Business Income Coverages, including but not limited to, Business Income, *Rental Value* or Extra Expense coverage or endorsements that apply to those coverages.

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 300 2103 CW ALL COMMERCIAL PROPERTY

30. **Pollution / Contamination Exclusion**

Except as otherwise specifically provided in Additional Coverages,

a.  any loss, damage, cost or expense,

b.  any increase in insured loss, damage, cost or expense, and / or

c.  any loss, damage, cost, expense, fine or penalty, which is incurred, sustained or imposed by order, direction, instruction or request of, or by any agreement with, any court, government agency or any public, civil or military authority, or threat, (and whether or not as a result of public or private litigation),

which arises from any kind of seepage or any kind of pollution and/or contamination, or threat, whether or not caused by or resulting from a peril insured, or from steps or measures taken in connection with the avoidance, prevention, abatement, mitigation, remediation, clean-up or removal of such seepage or pollution and/or contamination or threat is excluded.

The term "any kind of seepage or any kind of pollution and/or contamination" as used in this clause includes (but is not limited to):

a.  seepage of, or pollution and/or contamination by, anything, actual, alleged or threatened release, discharge, escape or dispersal of *pollutants or contaminants*, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any sudden and accidental direct physical loss or damage from a Covered Cause of Loss insured by this policy including but not limited to, any material designated as a "hazardous substance" by the United States Environmental Protection Agency or as a "hazardous material" by the United States Department of Transportation, defined as a "toxic substance" by the Canadian Environmental Protection Act for the purposes of Part II of that Act, or any substance designated or defined as toxic, dangerous, hazardous or deleterious to persons or the environment under any other Federal, State, Provincial, Municipal or other law, ordinance or regulation; and

b.  the presence, existence, or release of anything which endangers or threatens to endanger the health, safety or welfare of persons or the environment.

31. **Pre-Existing Damage Exclusion**

Loss or damage arising out of pre-existing damage as outlined below is excluded:

a.  A building or any part of a building that is in danger of *collapse*, falling down or caving in,

b.  Any part of a building that has separated from another part of the building, or

c.  A building or any part of a building that is standing which shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

32. **Property in the Open Exclusion**

Loss or damage from rain, snow, ice or sleet to personal property in the open is excluded.

33. **Rain, Snow, Sleet, Sand or Dust Exclusion**

Loss or damage caused by rain, snow, sleet, sand or dust to the interior of a building or property contained in a building is excluded unless a covered peril first damages the building causing an opening in a roof or outside wall, door or window and the rain, snow, sleet, sand or dust enters through this opening.

34. **Remote or Consequential Loss or Damage Exclusion**

Remote or consequential loss or damage, including but not limited to liquidated damages, performance penalties, penalties for non-completion, delay in completion, or noncompliance with contract conditions whether caused by an insured peril or otherwise is excluded. This exclusion does not apply to Business Income Coverages when it is covered under this policy.

35. **Sanction Limitation and Exclusion Clause** means no (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 300 2103 CW ALL COMMERCIAL PROPERTY

the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

36. **Smoke and Smog Exclusion**

Loss or damage caused by smog, smoke, vapor or gas from agricultural smudging or industrial operations is excluded.

37. **Subsidence, *Sinkhole Loss* and Settling Exclusion**

Loss or damage from subsidence, *sinkhole loss*, settling, cracking, shrinking, bulging, or expansion of pavements, foundations, walls, floors, or ceilings is excluded unless physical damage not excluded by this policy results.

38. **Tenant Relocation Cost Exclusion**

The cost or expense to move your tenants to a temporary *location* due to the Covered Property becoming uninhabitable or unusable is excluded.

39. **Terrorism Exclusion**

Loss, damage, cost or expense of any nature directly or indirectly caused by, resulting from or in connection with any act of terrorism, regardless of any other cause or event contributing concurrently or in any other sequence to the loss is excluded.

For the purpose of this exclusion, an "act of terrorism" means an act, including but not limited to the use of force or violence and/or the threat, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This clause also excludes loss, damage, cost or expense of any nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to any act of terrorism. Such loss or damage is excluded regardless of any other cause, event or intervention that contributes concurrently or in sequence to the loss or damage.

When coverage is denied due to this exclusion, any loss, damage, cost or expense is not covered by this insurance and it is agreed the burden of proving the contrary shall be upon you.

In the event, any portion of this exclusion is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

40. **Vegetated Roof Exclusion**

Loss or damage to lawns, trees, shrubs or plants which are part of a vegetated roof is excluded when caused by or resulting from:

a. Dampness or dryness of atmosphere or of soil supporting the vegetation;

b. Changes in or extremes of temperature;

c. Disease;

d. Frost or hail; or

e. Rain, snow, ice or sleet

41. **Voluntary Parting with Title or Possession Exclusion**

Loss, damage, cost or expense from the voluntary parting with the title or possession of any property including voluntary parting which is the result of any fraudulent scheme, trick, devise, false pretenses, or any other similar act is excluded.

42. **War or Warlike Action Exclusions**

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

Damage, loss, cost or expense from the following is excluded:

a. War, hostile or warlike action in time of peace or war, whether or not declared, including action in hindering, combating, or defending against an actual, impending, or expected attack:

   1) By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces;

   2) By military, naval, or air forces; and / or

   3) By an agent of any such government, power, authority, or force;

b. Any weapon of war employing atomic fission or radioactive force, whether in time of peace or war, whether or not its discharge was accidental; and / or

c. Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating, or defending against such *occurrence*, seizure or destruction;

   Including any consequence of Subparagraphs a.1., a.2., a.3., above.

43. **Warranty Exclusion**

   Loss, damage, cost, or expense covered under any express or implied guarantee or warranty from a manufacturer or supplier, whether or not such manufacturer or supplier is a Named Insured under this policy, is excluded.

44. **Wear and Tear Exclusion**

   Loss or damage from wear and tear is excluded.

44. **Wiring Exclusion**

   We will not pay for loss or damage caused by or resulting from the existence/use of pigtail wiring, aluminum wiring or Federal Pacific Electrical Panels.

**E.  Limits of Insurance**

The total maximum limit in any one *occurrence* as a result of a Covered Cause of Loss regardless of the number of *location(s)*, coverages, or perils insured under this policy shall not exceed the lesser amount of the Actual Loss Sustained or the limit provided on the Declarations, Locations and Building Detail section, after the application of any Deductible.

The Sublimits of Insurance as stated on the Additional Coverages and Sublimits Packages Endorsement, are included within, and not in addition to the Limit of Insurance. The Sublimits of Insurance and the specified limits of insurance contained in the forms, endorsements and extensions attached, if any, are per *occurrence*, unless otherwise indicated.

If the word "No" is shown on the Declarations Coverage Information Section – Coverages Selected, then no coverage is provided for that coverage or Covered Cause of Loss.

**F.  Deductible**

If the amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss and will pay the resulting amount or the Limit of Insurance, whichever is less.

A *Named Storm* Deductible will apply to the covered perils of wind & hail and ALL *flood* and / or *earthquake losses*, with a minimum *occurrence* deductible of $5,000. A *Named Storm* Deductible applies as an aggregate percentage of the total of all Coverages (A, B, C and D) at the damaged location, on a per occurrence basis.

The *Named Storm* Deductible amount will be determined by multiplying the percentage in the Declarations by the aggregate sum of Coverage A, Coverage B, Coverage C and Coverage D values for each location as defined in the Building Details in the Declaration and applying the policy percentage for the *Named Storm* Deductible to that amount to determine the applicable deductible.

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

If two or more locations are indicated in the Declarations, then the applicable *Named Storm* Deductible will be applied separately at each location against the sum of all losses or damages incurred at each location on a per *occurrence* basis.

An All Other Wind and Hail Deductible will apply to all other wind and hail losses that are not caused by a *Named Storm* (per *occurrence*.) A deductible of $5,000 per *occurrence* will apply to all policies with less than $500,000 in Total Insured Value (TIV) for Coverages A, B, C and D total. A deductible of $10,000 per *occurrence* will apply to all policies with $500,000 or more TIV for Coverages A, B, C and D total. Only one All Other Wind Deductible will apply per *occurrence*.

An All Other Peril Deductible will apply if the covered perils are other than wind, hail, *flood* and / or earthquake. The All Other Peril Deductible applies per *occurrence*.

**G. Policy Conditions**

1. **Assignment**

   You may not assign this policy without prior written consent from us.

2. **Cancellation and Additions or Deletions**

   a. If we do not receive any payment for this policy, there is no contract or coverage and a flat cancellation will be issued.

   b. This policy can be canceled by you by providing:

      1) An advanced written request for cancellation stating when the cancellation shall be effective; and

      2) The original policy or a lost policyholder release signed by you or your legal representative.

      3) Minimum earned premium may apply per Minimum Earned Premium Endorsement SMB 415.

   c. We may cancel this policy by giving you at least 30 days written notice of cancellation, plus 3 days mail time for all cancellation reasons except mid-term non-payment of premium.

   d. We may cancel this policy by giving you at least 10 days written notice of cancellation plus 3 days mail time for mid-term non-payment of premium.

   e. The cancellation will be effective even if a refund has not been made or offered.

   f. If you cancel this policy, we will send you any premium refund due per the cancellation provisions affixed to this policy.

   g. Additions and Deletions:

      1) Coverage cannot be increased, nor additional *locations* added, if a *Named Storm* is in existence, unless with our express written consent.

      2) Nothing will act to provide coverage for the Newly Acquired Property

         a) beyond a period of sixty (60) days from the date of acquisition or lease of such property or

         b) when we notify you that we will not bind the Newly Acquired policy.

   h. Proof of mailing will be sufficient proof of notice of cancellation.

3. **Control of Property**

   Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

   The breach of any condition of this policy at any one or more locations will not affect coverage at any *location* where, at the time of loss or damage, the breach of condition does not exist.

4. **Currency**

   Any amount of money specified in the policy, including Limits of Insurance, Deductibles and Premiums

SMB 300 2103 CW
ALL COMMERCIAL
PROPERTY

Copyright material from
© Insurance Services Office, Inc., 2011

Page 24 of 39

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

shall be in the currency of the United States of America.

5. **Increase in Hazard**

   If the circumstances in which this insurance was entered shall be altered or if the risk shall be materially increased, you shall give us notice as soon as possible.

6. **Inspection and Audit**

   You shall permit inspections of all Covered Property at reasonable times during this policy period. Neither the right to make inspections, nor making inspections nor any report on behalf of or your benefit or others, will warrant that such property is safe or healthful or that the operations comply with any law, rule, or regulation.

   You shall also permit examination and audit of your books and records at any reasonable time during the policy period and within one year after the policy termination, if such examination and audit relate to the subject matter of this policy.

7. **Legal Action Against Us**

   No person or organization may commence, bring or cause to be commenced, or bring legal action, claim, demand or suit against us unless:

   a. There has been full compliance with all terms and conditions and the terms; and

   b. The legal action, claim, demand or suit is brought within two (2) years after the date of the *occurrence* or event which occasioned the sudden and accidental direct physical loss or damage from a Covered Cause of Loss or within the shortest limit of time permitted by applicable laws.

   Damages outside the terms and conditions of this policy and more than the policy sublimits and limits will not be paid. Any settlements agreed to will be signed by all parties involved and will release us of all future liability.

8. **Location and Building Details**

   The *locations* and buildings, as provided by you at policy inception and each subsequent anniversary date of this policy, as listed on the Location and Building Detail, of the Declarations, shall consist 100% of the Property and Business Income Values for all insured *locations*.

   Such values shall be reported separately for each *location*, with separate figures shown for each type of coverage at each *location*. The property values shall be shown on a *replacement cost* basis for property which is covered on a *replacement cost* basis and on an *actual cash value* basis for other property. The value of *stock* and supplies to be included in the property values shall be in accordance with the Loss Settlement Conditions clause contained in this policy and shall be based on the approximate average of the *stock* and supplies on hand during the twelve months immediately preceding the annual review of values. Business Income Values (if covered) shall be provided in accordance with the terms of the applicable Business Income Coverages provisions.

9. **Misrepresentation and Fraud**

   This entire policy shall be void if you have

   a. willfully concealed or misrepresented any material fact or circumstance; and / or

   b. committed fraud, or false swearing as it relates to this policy.

10. **No Benefit to Bailee**

    No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

11. **Other Insurance/ Excess Insurance / Underlying Insurance**

    If there is Other Insurance covering the same loss or damage insured under this policy, then this policy shall apply only as excess and in no event as contributory insurance (unless this policy is specifically

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

written to be contributory insurance), and then only after all other insurance has been exhausted, whether or not such insurance is collectible, but in no case, more than the Sublimits or Limits of Insurance. Permission is granted for you to purchase Excess Insurance over the limits provided by this policy, and underlying insurance on all or any part of the Deductibles of this policy.

12. **Reinstatement of Limits**

Except for any Covered Cause of Loss which is subject to an annual aggregate limit or Sublimit of Insurance, payment of a claim will not reduce the amount payable under this policy for any subsequent covered loss.

13. **Several Liability Clause**

Our Limit of Insurance under this policy for covered losses is several and not joint with other insurers party to this contract. We are liable only for the proportion of insurance we have underwritten. We are not jointly liable for the proportion of insurance underwritten by any other insurer. Nor are we otherwise responsible for any liability of any other insurer that may underwrite this policy.

Our liability may not be increased if any other insurer or other party to this contract who for any reason does not satisfy all or part of its obligations.

14. **Titles of Paragraphs**

The titles of the various paragraphs of this policy (and of endorsements included in this policy) are solely for reference and shall not in any way affect the provisions to which they relate.

15. **Vacancy**

   a. Description of Terms

      1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

         a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

         b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

            i. Rented to a lessee or sub lessee and used by the lessee or sub lessee to conduct its customary operations; and/or

            ii. Used by the building owner to conduct customary operations.

      2) Buildings under construction or renovation are not considered vacant.

   b. **Vacancy Provisions**

      If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

      1) We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss:

         a) Vandalism;

         b) Sprinkler leakage, unless you have protected the system against freezing;

         c) Building glass breakage;

         d) Water damage;

         e) Theft; and / or

         f) Attempted theft.

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

2) With respect to Covered Causes of Loss other than those listed in the Vacancy Provisions paragraphs above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

H. **Property Loss Conditions**

The following Property Loss Conditions apply:

1. **Abandonment**

There can be no abandonment of any property to us.

2. **Adjustment of Loss and Named Insured Clause**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

The first Named Insured shown in the Declarations is responsible for the payment of all premiums.

If this policy insures more than one entity, the First Named Insured is authorized to act on behalf of all other insureds with respect to their rights, obligations and duties under this policy. Payment of loss or return premium under this policy shall constitute payment under this policy with respect to all insureds.

3. **Appraisal**

Appraisal applies after we confirm that the damage due to a loss is covered. If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser within 20 days. The two appraisers will select an umpire. If they cannot agree within 20 days, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

Appraisers and umpires are not authorized to determine if coverage, exclusions, conditions and any other contractual issues exist between us. If there is an appraisal, we will still retain our right to deny the claim. The appraisal award cannot be used by either party in any proceedings concerning coverage, exclusions, conditions or any other contractual issues.

4. **Arbitration Clause**

All matters in dispute between you and us (referred to in this policy as "the parties") in relation to this insurance, including this policy's formation and validity, and whether arising during or after the period of this insurance, shall be referred to an Arbitration Tribunal in the manner described below.

Unless the parties agree upon a single disinterested or impartial Arbitrator within thirty (30) days of one party receiving a written request from the other for Arbitration, the Claimant (the party requesting Arbitration) shall appoint his or her disinterested or impartial Arbitrator and give written notice to the Respondent (the party receiving notice of Arbitration). Within thirty (30) days of receiving such notice from the Claimant, the Respondent shall appoint his or her Arbitrator and give written notice to the Claimant

If the two Arbitrators fail to agree on the selection of the disinterested or impartial umpire within thirty (30) days of the appointment of the second named Arbitrator, each Arbitrator shall submit to the other a list of three Umpire candidates, each Arbitrator shall select one name from the list submitted by the other and the Umpire shall be selected from the two names chosen by a lot drawing procedure to be agreed upon by the Arbitrators. Unless the parties otherwise agree, the Arbitration Tribunal shall consist of disinterested or impartial persons presently or formerly employed or engaged in a senior position in insurance underwriting or claims.

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 300 2103 CW ALL COMMERCIAL PROPERTY

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders which it may consider proper in the circumstances of the case, regarding pleadings, discovery, inspection of documents, examination of witnesses and any other matter relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall think fit.

All costs of the Arbitration shall be in the discretion of the Arbitration Tribunal who may direct to, and by whom, and in what manner they shall be paid.

Any Arbitration hearing shall take place in Nashville, Tennessee, unless some other locale is agreed by the Arbitrator or Arbitration Tribunal.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal shall be in writing and binding. If either of the parties should fail to carry out any award the other may apply for its enforcement to a court of competent jurisdiction in any territory in which the party in default is domiciled or has assets or carries on business.

5.  **Brands and Labels**

    If branded or labeled merchandise covered by this policy is physically damaged and we elect to take all or any part of such merchandise at the value established by the terms of this policy, you may, at your own expense, stamp "SALVAGE" on the merchandise or its containers, or may remove or obliterate the brands or labels, if such stamp, removal or obliteration will not physically damage the merchandise. You must relabel the merchandise or containers in compliance with the requirements of law.

6.  **Control of Damaged Merchandise**

    Exercising reasonable discretion, you shall be the sole judge as to whether the goods involved in any loss under this policy are fit for normal intended use or consumption. No goods deemed by you to be unfit for consumption shall be sold or otherwise disposed of except by you or with your consent, but you shall allow us any salvage obtained by you on any sale or other disposition of such goods. You shall have full right to the possession of and retain control of all goods involved in any loss under this policy.

7.  **Divisible Contract**

    Subject to 16.c.17. Mortgage holders Section below, if the *locations* described in this policy include two or more buildings or the contents of two or more buildings, the breach of any condition of this policy in respect to any one or more of the buildings insured or containing the Covered Property, shall not prejudice the right to recover for physical loss or damage occurring in any building insured or containing the Covered Property where, at the time of such loss or damage, a breach of condition does not exist.

8.  **Duties in the Event of Loss or Damage**

    a.  You must see that the following are done in the event of loss or damage to Covered Property:

        1)  Notify the police if a law may have been broken.

        2)  Give us prompt notice of the loss or damage, including a description of the property involved.

        3)  As soon as possible, give us a description of how, when and where the loss or damage occurred.

        4)  Take all reasonable steps to protect the Covered Property from further damage, mitigate additional losses (e.g. Business Income), and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 300 2103 CW ALL COMMERCIAL PROPERTY

5) At our request, give us complete inventories of the damaged and undamaged property, including quantities, costs, values and amount of loss claimed.

6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 90 days after our request and include the following:

   a. The time and origin of the loss;

   b. Your interest and the interest of all others in the property;

   c. The value of each item determined in accordance with the Loss Settlement Conditions of this policy, the amount of loss, and all related encumbrances;

   d. All other contracts of insurance, whether collectible or not, covering any of said property; and

   e. Any changes in the title, use, occupation, *location*, possession, or exposures of Covered Property after the issuance of this policy, by whom and for what purpose any building described and the several parts were occupied at the time of loss, and whether or not it then stood on leased ground.

8) Cooperate with us in the investigation or settlement of the claim.

   b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

9. **Protection and Preservation of Property**

In case of actual or imminent sudden and accidental direct physical loss or damage by a Covered Cause of Loss, the expenses incurred by you in taking reasonable and necessary actions for the temporary protection and preservation of Covered Property shall be added to the total physical loss or damage otherwise recoverable under this policy and be subject to the applicable Deductible, Sublimit of Insurance, and policy limit.

10. **Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

11. **Salvage and Recoveries**

All Business Income Values, *Replacement Cost* Basis, Recoveries and payments, excluding proceeds from subrogation and underlying insurance recovered or received prior to a loss settlement under this policy, shall reduce the loss accordingly.

12. **Settlement of Claims**

The amount of loss under this policy shall be payable within thirty (30) days after valid proof of loss is received, accepted, and ascertainment of the amount of loss is made either by agreement with you or an amount is determined by binding Arbitration in accordance with the provisions of this policy.

We shall have the option to take all or any part of the property at the agreed or arbitrated value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, on giving notice of its intention to do so within sixty (60) days after receipt of the proof of loss required.

Copyright material from
© Insurance Services Office, Inc., 2011

### 13. Subrogation

An assignment of all rights of recovery against any party for loss may be required from you to the extent that payment has been made, but the assignee shall not acquire any rights of recovery which you have expressly waived in writing prior to loss nor shall such waiver in writing affect your rights under this policy. We waive the rights of recovery against any Mortgagee listed on the Declaration. However, notwithstanding the foregoing, we shall be subrogated to all your rights of recover against:

a. any Architect or Engineer, whether named as a Named Insured or not, for any loss or damage arising out of the performance of professional services in their capacity as such and caused by an error, omission, deficiency or act of the Architect or Engineer, by any person employed by them or by any others for whose acts they are legally liable, and

b. any manufacturer or supplier of machinery, equipment or other property, whether named as a Named Insured or not, for the cost of making good any loss or damage which said party has agreed to make good under a guarantee or warranty, whether expressed or implied.

Any recovery as a result of subrogation proceedings arising out of an *occurrence*, after expenses incurred in such subrogation proceedings are deducted, shall accrue in the proportion that the Deductible amount and/or any provable uninsured loss amount bears to the entire provable loss amount.

You will cooperate with us and, upon our request, will:

a. Attend hearings and trials; and

b. Assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and conducting suits.

### 14. Transfer of Rights of Recovery Against Others to Us

If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. You may waive your rights against another party in writing:

a. Prior to a loss to your Covered Property.

b. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

    1) Someone insured by this insurance;

    2) A business firm:

        a) Owned or controlled by you; or

        b) That owns or controls you; or

    3) Your tenant.

This will not restrict your insurance.

### 15. Undamaged Material

We will not pay to replace undamaged material due to mismatched material between undamaged material and new material used to repair or replace damaged material. We do not cover the loss in value to any property due to mismatched material between undamaged material and new material used to repair or replace damaged material.

### 16. Loss Settlement Conditions

We will pay no more than the *actual cash value* of covered damages until actual repair or replacement is complete. Once actual repair or replacement is complete, we will pay the applicable and supported *replacement cost* up to, but not in excess of, any applicable policy limits.

However, if the cost to repair or replace the damage is less than $5,000, we will pay the *replacement*

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

*cost* up front without deduction(s) for depreciation.

The amount of loss under this policy shall be payable within thirty (30) days after the required proof of loss is received and accepted. Ascertainment of the amount of loss is made either by agreement with you or an amount is determined by binding Arbitration in accordance with the provisions of this policy.

We shall have the option to take all or any part of the property at the agreed or arbitrated value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, on giving notice of its intention to do so within sixty (60) days after receipt of the proof of loss herein required.

We will determine the value of Covered Property in the event of loss or damage as follows:

a.  The total maximum limit paid in any one *occurrence* as a result of a Covered Cause of Loss regardless of the number of *locations*, coverages, or perils insured under this policy shall not exceed the lessor amount of the Actual Loss Sustained or the limit provided on the Declarations, Locations and Building Detail section, after the application of any Deductible.

b.  If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

c.  Unless otherwise endorsed, the property, as described below, will be valued as follows:

 1) Accounts Receivable: the amount owed to you which you are unable to collect from customers, and shall include:

 a) Any collection expenses over and above the normal collection costs;

 b) Interest charges on any loan to offset impaired collections pending repayment of such sums that cannot be collected; and

 c) Other reasonable and necessary expenses incurred by you to recreate Accounts Receivable records.

 Unearned interest and service charges on deferred payment accounts and normal credit/ losses on bad debts shall be deducted in determining the recovery.

 After payment of loss, all amounts you recover on Accounts Receivable for which you have been paid will belong to and will be paid to us up to the total amount of loss paid. All recoveries more than such amounts will belong to you.

 In the event it is possible to reconstruct your Accounts Receivable records after they have been physically lost or damaged, so that no shortage in collection of Accounts Receivable is sustained, the only recoverable loss will be the costs of the material and the time required to reconstruct such records, with the exercise of due diligence and dispatch, but only to the extent that such amounts are not covered by any other insurance.

 2) Contractor's tools, machinery (including spare parts and accessories), equipment and vehicles (if covered): will be valued at *actual cash value*, unless an agreed value applies.

 3) Electronic Data and Media: the cost of the blank media, plus the costs of copying the Electronic Data and Media from back-up or from originals of a previous generation. These costs will not include research and engineering nor any costs of recreating, gathering or assembling such Electronic Data and Media. If the Electronic Data and Media is not repaired, replaced or restored, the basis of valuation shall be the cost of the blank media. However, this policy does not insure any amount pertaining to the value of such Electronic Data and Media to you or any other party, even if such Electronic Data and Media cannot be recreated, gathered or assembled.

 4) *Fine arts*:

 a) The value of the *Fine Arts* shall be the lesser of:

 i.  The cost to repair or replace the *Fine Arts*, or

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 300 2103 CW ALL COMMERCIAL PROPERTY

ii.  The appraised value, which will be determined as of the time of the loss.

(a)  If a *Fine Arts* article is part of a pair or set, and a physically damaged article cannot be replaced, or cannot be repaired or restored to the condition that existed immediately prior to the loss, the appraised value will be used in the settlement of such pair or set. You will surrender the damaged pair or set.

5)  Finished Goods manufactured by you: the regular cash selling price at the *location* where the loss occurs, less all discounts and charges to which the merchandise would have been subject had no loss occurred.

6)  Jigs and Fixtures, dies, small tools, patterns, employees' jigs and fixtures personal property; and jigs and fixtures personal property of third parties: the *replacement cost* if *replacement cost* values have been reported and if replaced; otherwise the *actual cash value*, but not to exceed the cost to repair or replace the property with material of like kind and quality.

7)  Leasehold Improvements and Betterments:

a)  If repaired or replaced at your expense within two (2) years after the date of the loss, the cost to repair or replace the damaged improvements and betterments.

b)  If not repaired or replaced within two (2) years after the date of the loss, a proportion of your original cost.

The proportionate value will be determined as follows:

i.  Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

ii.  Divide the amount determined in subparagraph i. above by the number of days from the installation of improvements to the expiration of the lease.

iii.  If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure; or

c)  Nothing, if others pay for repairs or replacement.

8)  A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, Loss Settlement Conditions and all other provisions and conditions of this policy. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer of Rights of Recovery Against Others to Us Condition in this policy.

9)  Property for Sale: If, at the time of the loss, any real property is being offered for sale, the loss or damage to such property will be valued at the lesser of:

a)  The cost to repair or replace the damaged property, or

b)  The price at which the property is offered for sale less the market value of the *land*.

10)  Raw materials, supplies and other merchandise not manufactured by you: the *replacement cost*.

11)  *Stock* in Progress: the cost of raw materials and labor expended, plus the proper proportion of overhead charges.

12)  Business Income Value is determined by calculating the "Average Daily Value" (ADV).  ADV means the total 100% Business Income Value that would have been projected for the Period of Interruption for the *locations* where the physical loss or damage occurs, had no physical loss

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

or damage occurred, divided by the number of working days in such Period of Interruption. The sum shall include all Business Income Values to which the operations of the *locations* directly or indirectly contribute.

13) Valuable Papers and Records: the cost to replace or restore the property with like kind and quality including the cost to research, gather and assemble information. If not replaced, this policy will only pay the blank value of the Valuable Papers and Records.

14) All Other Property: Will be valued at *replacement cost* if replaced; otherwise, will be valued at the *actual cash value*, but not to exceed the cost to repair or replace the property with material of like kind and quality.

With respect to Subparagraphs 1 through 14, inclusive, unless otherwise specifically stated, the valuations will be computed at the time and place of the loss.

15) The following property will always be valued at the *actual cash value*, even when attached to the building:

   a) Awnings or floor coverings;

   b) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; and / or

   c) Outdoor equipment or furniture.

16) Glass at the cost of replacement with safety-glazing material if allowed by law.

17) Mortgage holders

   a) The term mortgage holder includes trustee.

   b) We will pay for covered loss of or damage to buildings or structures to each mortgage holder shown in the Declarations in their order of precedence, as interests may appear.

   c) The mortgage holder has the right to receive loss payment even if the mortgage holder has started foreclosure or similar action on the building or structure.

   d) If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgage holder will still have the right to receive loss payment if the mortgage holder:

      i. Pays any premium due under this policy at our request if you have failed to do so;

      ii. Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

      iii. Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgage holder.

   All the terms of this Coverage Part will then apply directly to the mortgage holder.

   e) If we pay the mortgage holder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

      i. The mortgage holder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

      ii. The mortgage holder's right to recover the full amount of the mortgage holder's claim will not be impaired.

   At our option, we may pay to the mortgage holder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

   f) If we cancel this policy, we will give written notice to the mortgage holder at least:

      i. 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

Copyright material from
© Insurance Services Office, Inc., 2011

ii.  30 days before the effective date of cancellation if we cancel for any other reason.

g)  If we elect not to renew this policy, we will give written notice to the mortgage holder at least 30 days before the expiration date of this policy.

## I.  Definitions

1.  ***Actual Cash Value*** means the amount it would cost to repair or replace Covered Property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence. *Actual cash value* applies to valuation of Covered Property regardless of whether that property has sustained partial or total loss or damage.

    The *actual cash value* of the lost or damaged property may be significantly less than its *replacement cost*.

2.  ***Actual Total Loss*** means a loss that occurs when the insured property is totally destroyed or damaged in such a way that it can be neither recovered nor repaired for further use.

3.  ***Catastrophic Ground Cover Collapse*** means geological activity that results in all of the following:

    a.  The abrupt collapse of the ground cover;

    b.  A depression in the ground cover clearly visible to the naked eye;

    c.  Structural damage to the building, including the foundation; and

    d.  The insured building being condemned and ordered to be vacated by the governmental agency authorized by law to issue such an order for that structure.

4.  ***Cloud computing*** means on-demand network access to a shared pool of computing resources via networks, servers, storage, applications and services provided by an organization with whom you have a contract with using the following service models: Software as a Service (SaaS), Platform as a Service (PaaS) and Infrastructure as a Service (IaaS) on the following deployment models: public cloud, community cloud, hybrid cloud and private cloud.

5.  ***Collapse*** means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

6.  ***Computer equipment*** means is electronic computer or other data processing equipment, including peripherals used in conjunction with such equipment and electronic media and records.

7.  ***Computer virus*** means a set of corrupting, harmful or otherwise unauthorized instructions or code including a set of maliciously introduced unauthorized instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of any nature. *Computer Virus* includes, but is not limited to, "Trojan Horses," "worms" and "time or logic bombs."

8.  ***Cosmetic Damage*** means any kind of marring, pitting or other superficial damage which may alter the appearance, but does not prohibit it from functioning as intended.

9.  ***Earthquake*** means:

    a.  Quaking, vibratory or undulating movement of a portion of the earth's crust, produced by tectonic or underground volcanic forces or by breaking, shaking, trembling or shifting of rock beneath the earth's crust. The definition of *earthquake* does not include subsidence, landslide, rockslide, mudflow, earth rising, earth sinking, earth shifting or settling, unless as a direct result of such *earthquake*.

    b.  ***Earthquake Shock*** means the sum of all your losses attributable directly from the peril of *earthquake* sustained during any period of one hundred sixty-eight (168) consecutive hours due to one *Earthquake Shock* or a series of *Earthquake Shocks*.

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

   c. **Volcanic eruption**, meaning the eruption, *explosion* or effusion of a volcano, excluding tsunami. All volcanic eruptions that occur within any one hundred sixty-eight (168) hour period will constitute a single *occurrence*.

   d. Tsunami flooding, whether caused by *earthquake* or not, is not included in the *earthquake* peril.

   e. **Earth Movement** means:

   1) Any natural or manmade landslide, mudslide, mudflow, rock falls, including any earth sinking, rising or shifting related to such event;

   2) Subsidence of a man-made mine, whether or not mining activity has ceased;

   3) Earth sinking (other than *sinkhole loss* if covered elsewhere), rising or shifting, including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface;

   4) Tsunami flooding is not included in *earth movement*.

   5) Coverage for *earth movement* does not extend to provide coverage for Florida *catastrophic ground cover collapse* and Florida *sinkhole loss*, absent an endorsement specifying that coverage for *catastrophic ground cover collapse* and / or *sinkhole loss* is provided.

10. **Electronic equipment** means devices which operate using many small electrical parts such as, but not limited to, microchips, transistors or circuits.

11. **Electronic equipment deficiency** means the quality or condition inside of *electronic equipment* which renders this equipment unexpectedly inoperable and which is operable again once a piece of *electronic equipment* has been replaced.

   However, *electronic equipment deficiency* will not include replacement of *electronic equipment* for any condition that could have been resolved without replacement of the *electronic equipment* including but not limited to *computer equipment* maintenance or the reinstallation or incompatibility of software.

12. **Equipment Breakdown** means:

   a. Physical loss or damage both originating within:

   1) Boilers, fired or unfired pressure vessels, vacuum vessels, and pressure piping, all normally subject to vacuum or internal pressure other than static pressure of contents, excluding:

      a) Waste disposal piping;

      b) Any piping forming part of a fire protective system;

      c) Furnaces; and

      d) Any water piping other than

         i. Boiler feed water piping between the feed pump and the boiler;

         ii. Boiler condensate return piping; or

         iii. Water piping forming part of a refrigerating or air conditioning system used for cooling, humidifying or space heating purposes.

   2) All mechanical, electrical, fiber optic equipment or "electronic equipment"; and

   b. Caused by, resulting from, or consisting of:

   1) Mechanical breakdown;

   2) Electrical or electronic breakdown and "electronic equipment deficiency"; or

   3) Rupture, bursting, bulging, implosion, or steam explosion.

   However, *equipment breakdown* will not mean:

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

   **a.** Physical loss or damage caused by or resulting from any of the following; however, if loss or damage not otherwise excluded results, then we will pay for such resulting damage:

     1) Wear and Tear;

     2) Rust or other corrosion, decay, deterioration, hidden or latent defect, mold or any other quality in property that causes it to damage or destroy itself;

     3) Smog;

     4) Settling, cracking, shrinking or expansion;

     5) Nesting or infestation, or discharge or release of waste products or secretions, by birds, rodents or other animals;

     6) Any accident, loss, damage, cost, claim, or expense, whether preventative, remedial, or otherwise, directly or indirectly arising out of or relating to the recognition, interpretation, calculation, comparison, differentiation, sequencing, or processing of data by any computer system including any hardware, programs or software;

     7) Scratching and marring.

   **b.** Loss, damage, cost or expense directly caused by, contributed to, resulting from, or arising out of the following causes of loss:

     Fire, lightning, combustion, *explosion*, windstorm or hail, weight of snow, ice or sleet, freezing, falling objects, smoke, aircraft or vehicles, riot or civil commotion, vandalism, *sinkhole loss, collapse, earthquake,* leakage from fire extinguishing equipment, water, water damage, or *flood*.

**13. Explosion** means a sudden, accidental and destructive shattering or eruption. *Explosion* does not include loss or damage occasioned by or incident to explosion in or relating to the following equipment you own, operate or control:

   **a.** Steam boiler, steam turbines, steam engines, and steam pipes interconnecting any of the foregoing;

   **b.** Moving or rotating machinery or parts when direct loss or damage is caused by centrifugal force or mechanical breakdown;

   **c.** Combustion gas turbines;

To the extent of the loss to products; any products you manufacture or other property attached to these products or forming a part of these products, including those products and property undergoing pressure tests. *Explosion* will include loss or damage arising or resulting from:

   **a.** The *explosion* of accumulated combustible gases or unconsumed fuel within the furnace of a boiler or pressure vessel, other than combustion gas turbines, or within the flues or passages which conduct the gases of combustion;

   **b.** A combustion *explosion* occurring outside of any equipment excluded above, even though such combustion *explosion* may have been the direct result of the *explosion* or such excluded equipment.

The following are not *explosion*s within the intent or meaning of this definition:

   **a.** Electric arcing or any coincident rupture of electrical equipment due to such arcing;

   **b.** Bursting or rupture caused by freezing;

   **c.** Sonic shock waves, generally known as Sonic Boom;

   **d.** Bursting, rupture or collapse of any safety disc, rupture diaphragm or fusible link.

**14. Fine Arts** means works of art, paintings, etchings, pictures, statuary, tapestries, stained glass, and other bona fide works of art which have rare or historical value, or artistic merit on temporary exhibit.

Copyright material from
© Insurance Services Office, Inc., 2011

**SMB 300 2103 CW ALL COMMERCIAL PROPERTY**

15. **Flood** means, whether natural or manmade, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow or rupture of any body of water, dam, levee, dike, floodgate or other surface containment structure, including *storm surge* which rise, overflow or break the boundaries of natural or manmade bodies of water or the spray from any of the foregoing, all whether driven by wind or not. Tsunami induced flooding is considered *flood*.

Water which backups or discharges from sewers, drains or sumps on your *location* is not considered *flood*, unless such backup or discharge was due to *flood* as defined above.

a. **Storm Surge** means: water that is pushed toward the shore due to the force of winds swirling around a storm advancing across a body of water.

16. **Fungus, mold, mildew, spores or yeast** means any type or form of *fungus*, including *mold* or *mildew*, and any mycotoxins, *spores*, scents, *yeast* or by-products produced or released by fungi.

a. **Fungus** includes, but is not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including *mold(s)*, rusts, *mildew*, smuts and mushrooms.

b. **Mold** includes, but is not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and fungi that produce *mold(s)*.

c. *Mildew includes but is not limited to any of similar coatings or discolorations, caused by fungi, as that which appears on fabric, paper, leather, etc. when exposed to moisture.*

d. **Spore** means any dormant or reproductive body produced by or arising or emanating out of any *fungus, mold(s), mildew*, plants, organisms or microorganisms.

e. **Yeast** includes any of various small, single-celled fungi that reproduces by fission or budding.

17. **Land** means *land* (except *Land* for which values are reported and premiums are charged), such as dikes, levees, and other surface containment structures. Surface containment structures are not *land* to a depth of six inches below such surface containment structures.

18. **Location(s)** is/are defined as specified in the Declarations on file with us; but if not so specified, *locations* mean any building(s), or any group of buildings bounded on all sides by public streets, clear *land* space or open waterways, each not less than two hundred feet wide. Any bridge or tunnel crossing such street, space or waterway shall render such separation inoperative for the purpose of this definition.

19. **Named Storm** means a storm that has been declared by the National Weather Service or the National Oceanic Atmospheric Administration to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression.

20. **Occurrence(s)** means any one loss, disaster, casualty, incident or series of losses, disasters, casualties or incidents, arising out of a single event, and includes all resultant or concomitant insured losses. However:

a. All earthquake shocks or volcanic eruptions that occur within any 168-hour period will constitute a single earthquake or volcanic eruption, and will be considered a single *occurrence*. The expiration of this policy will not reduce the 168-hour period.

b. With respect to *flood, occurrence* means the sum of all *flood* losses arising during a continuous period of 72 hours during the policy period. You may elect the moment when the 72-hour period begins, but no two such periods shall overlap; and

c. With respect to *Named Storm, occurrence* means the sum of all *Named Storm* losses arising during a continuous period of 72 hours during the policy period. You may elect the moment when the 72-hour period begins, but no two such periods shall overlap.

d. With respect to an *occurrence* which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the *occurrence* began.

e. The *occurrence* must begin during the policy period.

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 300 2103 CW ALL COMMERCIAL PROPERTY

21. **Perishable goods** means stock preserved and maintained under controlled conditions and susceptible to loss or damage if the controlled conditions change.

22. **Pollutants or Contaminants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smog, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act or as designated by the U. S. Environmental Protection Agency. Waste includes materials to be recycled, reconditioned or reclaimed.

23. **Production machinery** means any machine which processes, forms, shapes, or transports raw materials, materials in process, waste materials or finished products.

24. **Reasonable extra cost** shall mean the extra cost of temporary repair and of expediting the repair of such damaged equipment of the insured, including overtime and the extra cost of express or other rapid means of transportation.

25. **Rental Value** means the sum of:

   a. The total anticipated gross rental income from tenant occupancy of the described property as furnished and equipped by you including taxes, rent based on percentage of sales, and other charges paid by tenants in respect of the leased *locations*; and

   b. The amount of all charges which, by the terms of a written lease, are the legal obligation of the tenant(s) and which would otherwise be obligations of you; and

   c. The fair *rental value* of any portion of such property which is occupied by you.

26. **Replacement Cost** means the actual cost of repairs or replacement without deduction for depreciation, subject to limitations stated in the policy. Repairs or replacement will restore the property to the same current function using today's repairs and construction material up to any applicable policy sublimits or limits.

27. **Sinkhole Loss** means loss or damage to Covered Property when *structural damage* to the covered building, including the foundation, is caused by settlement or systematic weakening of the earth supporting the covered building, only if the settlement or systematic weakening results from contemporaneous movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.

   a. **Structural damage** means a covered building, regardless of the date of its construction, has experienced the following:

   1) Interior floor displacement or deflection in excess of acceptable variances as defined in ACI 117-90 or the Florida Building Code, which results in settlement related damage to the interior such that the interior building structure or members become unfit for service or represent a safety hazard as defined within the Florida Building Code;

   2) Foundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement related damage to the *primary structural members* or *primary structural system* and that prevents those members or systems from supporting the loads and forces they were designed to support to the extent that stresses in those *primary structural members* or *primary structural systems* exceed one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar structure, purpose, or location;

   3) Damage that results in listing, leaning, or buckling of the exterior load bearing walls or other vertical *primary structural members* to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base as defined within the Florida Building Code;

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 300 2103 CW ALL COMMERCIAL PROPERTY

4) Damage that results in the building, or any portion of the building containing primary structural members or primary structural systems, being significantly likely to imminently collapse because of the movement or instability of the ground within the influence zone of the supporting ground within the sheer plane necessary for the purpose of supporting such building as defined within the Florida Building Code; or

5) Damage occurring on or after October 15, 2005, that qualifies as *substantial structural damage* as defined in the Florida Building Code.

   a) *Primary structural member* means a structural element designed to provide support and stability for the vertical or lateral loads of the overall structure.

   b) *Primary structural system* means an assemblage of *primary structural members*.

   c) *Substantial Structural Damage means:*

      i. in any story of the building, the vertical elements of the lateral force resisting system have suffered damage such that the lateral load-carrying capacity of the structure in any horizontal direction has been reduced by more than 33 percent from its pre-damage condition; or

      ii. the capacity of any vertical load-carrying component, or any group of such components, that supports more than 30 percent of the total area of the structure's floors and roofs has been reduced more than 20 percent from its pre-damage condition and the remaining capacity of such affected elements, with respect to all dead and live loads, is less than 75 percent of that required by the Florida Building Code for new structures of similar structure, purpose and locations.

28. *Stock* means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

29. *Suspension* means:

   a. the slowdown or cessation of your business activities; and / or

   b. a part of or all of the described *location* is rendered untenantable, if coverage for Business Income including *rental value* applies.

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 402 1712 CW ALL OTHER PERILS

# ALL OTHER PERILS

## THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY

**This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.**

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

Words and phrases that appear in *italics* in the remainder of this form have special meaning. Refer to Section I. Definitions of the policy form and *l* or this endorsement.

**B.  COVERED CAUSE OF LOSS:**

In addition to the Covered Causes of Loss in the policy, the following Causes of Loss are included:

1. Covered Causes of Loss shall include all other perils, which means all sudden and accidental direct physical loss unless the loss is excluded or limited in this policy.

    a. All Other Peril excludes *collapse.*

All other terms and conditions, insured coverage, and exclusions of this insurance policy remain unchanged, including applicable limits, sublimits, and deductibles, and apply in full force and effect to the coverage provided by this policy.

SMB 402 1712 CW ALL OTHER PERILS

Page 1 of 1

SMB 407 2103 CW ALL ADDITIONAL COVERAGES AND SUBLIMIT OPTIONS

# ADDITIONAL COVERAGES & SUBLIMIT OPTIONS

## THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY

### This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.

---

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

---

Words and phrases that appear in *italics* in the remainder of this form have special meaning. Refer to Section I. Definitions of the policy form and / or this endorsement.

The following items shall be sublimits of coverage as provided by the policy. Each value stated shall be the maximum this policy shall pay in any one *occurrence*, regardless of the types or number of items lost or damaged, unless further stated below. This endorsement does not create coverage not otherwise stated in the Declarations and provided in the policy. All values are sublimits of the limits provided by the policy, and not in addition to the limits provided in the policy.

**If there is no limit for Coverage A, B, C or D on the declarations, the additional coverages and sub-limits that relate to Coverage A, B, C, or D have a $0 sublimit for all packages (no coverage afforded.)**

**Section I: Additional Coverages and Sublimit Options by Package Level**

The following items are specific to the coverage level shown on the Declarations and further defined in the policy for Additional Coverages and Sublimits.

| Description | Sublimit of Coverage | Bronze Package Limits | Silver Package Limits | Gold Package Limits |
|---|---|---|---|---|
| **A. Accounts Receivable:** | C | $10,000 | $25,000 | $50,000 |
| **B. Debris Removal:** (lessor of % of the amount paid for direct physical loss or damage to Covered Property or the amount stated) (Amounts are Maximum Annual Aggregate Amount) | A, B, C | 25% or $250,000 | 25% or $500,000 | 25% or $1,000,000 |
| a. Maximum limit per *location* for Debris Removal of other property if no Covered Property sustained direct physical loss or damage | | $5,000 | $10,000 | $25,000 |
| **C. Extended Period of Indemnity** | D | 30 Days | 90 Days | 180 Days |
| **D. Fine Arts:** | C | $10,000 | $25,000 | $50,000 |
| **E. Leasehold Improvements and Betterments:** | A | $50,000 | $100,000 | $250,000 |

**SMB 407 2103 CW ALL ADDITIONAL COVERAGES AND SUBLIMITS**

| Description | Sublimit of Coverage | Bronze Package Limits | Silver Package Limits | Gold Package Limits |
|---|---|---|---|---|
| F.  Loading and Unloading Property for Transit: | C | $25,000 | $50,000 | $100,000 |
| G.  Moveable Equipment and Inventory in the Open: | C | $10,000 | $25,000 | $50,000 |
| H.  Ordinance or Law: Coverage A -Coverage for Loss to the Undamaged Portion of the Building (lessor of % Coverage A-Covered Property or fixed dollar amount if indicated) | A | 100% or $250,000 | 100% | 100% |
| I.  Ordinance or Law: Coverage B – Demolition Cost Coverage (% of Coverage A- Covered Property) | A | 10% | 15% | 20% |
| J.  Ordinance or Law: Coverage C – Increased Cost of Construction (lessor of % Coverage A – Covered Property or fixed dollar amount) | A | 5% | 10% | 15% |
| K.  Ordinary Payroll: | D | 1 Month | 2 Months | 3 Months |
| L.  Outdoor Signs, Fences, Antennas, and Vegetation (lessor of $ amount given or Coverage B limit)<br>a.  Sublimit for each tree, shrub or plant (per item and occurrence maximum)<br>b.  Sublimit for fences | B | $50,000<br><br>a) $250/ $5,000<br><br>b) $10,000 | $100,000<br><br>a) $250/ $5,000<br><br>b) $20,000 | $250,000<br><br>a) $250/ $5,000<br><br>b) $30,000 |
| M.  Personal Effects and Personal Property of Others: | C | $25,000 | $50,000 | $100,000 |
| N.  Property Removed from Insured Locations: | C | $10,000 | $25,000 | $50,000 |
| O.  Seasonal Inventory: % of Business Personal Property | C | 0% | 25% | 50% |
| P.  Sewer or Water Back Up: | A, B, C, D | $15,000 | $35,000 | $50,000 |
| Q.  Spoilage: | C | $5,000 | $25,000 | $50,000 |
| R.  Tenant's Glass | C | $5,000 | $10,000 | $25,000 |
| S.  Valuable Papers and Records: | C | $10,000 | $25,000 | $100,000 |

SMB 407 2103 CW ALL ADDITIONAL COVERAGES AND SUBLIMITS

**Section II: Additional Coverages and Sublimits for Coverage A, B, C as applicable for All Additional Coverage Package Levels**

The following items apply to Coverage A, B, and C as shown on the declarations and to all Package levels shown on the Declarations for Additional Coverages and Sublimits.

| Description | Limits for All Packages |
|---|---|
| **A. Animals:** | $500 per Animal<br>$25,000 Per Occurrence |
| **B. Business Personal Property Temporarily in Portable Storage Units:** | Annual Aggregate:<br>$100,000 |
| **C. Electronic Data and Media:** | Annual Aggregate:<br>$50,000 |
| **D. Fire Department Services Charges:** | $15,000 |
| **E. Fungus, Molds, Mildew, Spores Yeast:**<br>Per Occurrence and Annual Aggregate | $15,000 |
| **F. Gems and Jewelry** | $5,000 |
| **G. Leased or Rented Equipment:** | Any one item: $5,000<br>Per Occurrence: $25,000 |
| **H. Leasehold Interest:** | $25,000 |
| **I. Limited Pollutant or Contaminant Clean-up and Removal Coverage:** | Annual Aggregate:<br>$15,000 |
| **J. Lock and Key Replacement:** | $5,000 |
| **K. Newly Acquired or Constructed Property:** (not more than 60 days from date of acquisition or construction): Subject to all other Sublimits contained herein<br><br>a) Buildings<br>b) Business Personal Property | Each Annual Aggregate:<br><br><br><br>$250,000<br>$100,000 |
| **L. Pair or Sets:** | $25,000 |
| **M. Professional Fees for Covered Claims Preparation Costs:**<br>Per Occurrence and Annual Aggregate | $10,000 |
| **N. Protection and Preservation of Property:** | $100,000 |
| **O. Reclaiming, Restoring, or Repairing Land Improvements:** | $10,000 |

**SMB 407 2103 CW ALL ADDITIONAL COVERAGES AND SUBLIMITS**

| Description | Limits For All Packages |
|---|---|
| **P.  Reward Reimbursement:** | $25,000 |
| **Q.  Sidewalks, Paved Surfaces, Roadways and / or Attached Patios:** Includes cost of excavation, grading, backfilling, filling | $50,000 |
| **R.  *Sinkhole Loss*:** For insureds with Earthquake Coverage only; in states other than Florida | $10,000 |

**Section III: Additional Coverages and Sublimits for Business Income Coverage**

The following items apply to all coverage levels shown on the Declarations for Additional Coverages and Sublimits and further specific to Coverage D: Business Income Coverage.

**If there is no limit for Coverage D on the declarations, the additional coverages and sublimits below will have a $0 or 0 day sublimit (no coverage afforded).**

| Description | Limits for All Packages |
|---|---|
| **A.  Contingent Business Income: The lessor of:** | 30 Days, or $50,000 |
| **B.  Extra Expense:** | $100,000 |
| **C.  Ingress / Egress Coverage: The lessor of:** but in no event, will this policy pay more than the amount subject to a 72-hour qualifying period. The qualifying period does not apply wind / hail, flood, and / or earthquake events | 30 Days, or $100,000 |
| **D.  Interruption by Civil or Military Authority: The lessor of:** but in no event will this policy pay more than the amount subject to a 72-hour qualifying period.  The qualifying period does not apply wind / hail, flood, and / or earthquake events | 30 Days, or $100,000 |
| **E.  Royalties:** | $10,000 |
| **F.  Service Interruption: The lessor of:** but in no event will this policy pay more than the amount subject to a 72-hour qualifying period. The qualifying period does not apply wind / hail, flood, and / or earthquake events | 3 Weeks, or $100,000 |

All other terms and conditions, insured coverage and exclusions of this policy, including applicable limits and deductibles, remain unchanged and apply in full force and effect to the Coverage provided by this policy.

SMB 410 2010 CW ALL ROOF VALUATION

# ROOF VALUATION

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

Words and phrases that appear in *italics* in the remainder of this form have special meaning. Refer to Section I. Definitions of the policy form and / or this endorsement.

### H.  Property Loss Conditions

The following Property Loss Condition is added to the policy Property Loss Conditions:

1. Any damage to an existing Roof Surface that has been in place, at the time of loss, on an insured building or structure for a period of years greater than the years listed in the table below will be subject to *actual cash valuation*, as defined by the policy.

   Policies where an inspection reveals the roof is not in good condition, regardless of roof age, will also be subject to *actual cash valuation*, as defined by the policy, and outlined in form SMB 417 CW ROOF ACV.

| Primary Roof Protection Material | Years |
|---|---|
| Clay concrete tile, Slate, or similar performing material | 30 |
| Light metal panels, Standing seam metal, or similar performing material * | 25 |
| Asphalt composite shingle, Built-up with gravel or without gravel, Single-ply membrane, Single-ply membrane ballasted, similar performing material, and All other | 15 |

   * Metal roofing material of any definition shall not be covered for *cosmetic damage.*

### I. Definitions

The following Definition is added to the policy Definitions:

Roof Surface means the roof surface material type (slate, composition, wood, tile, metal, all other roof surface material types) of the building or other structures covered under this policy and all other roof components, including, but not limited to:

a.  Flashing, caps, vents, drips edges, and ice shields;
b.  Sheeting, felt and membranes;
c.  Modified bitumen, bitumen, rubber, built-up and sprayed polyurethane foam roofing;

SMB 410 2010 CW ALL ROOF VALUATION

Page 1 of 2

SMB 410 2010 CW ALL ROOF VALUATION

      d.   Foam inserts and elastomeric coating;

      e.   Finials, eave, and gable trim and snow guards;

      f.   Battens, counter battens, bird stops, gravel stops; and

      g.   Coatings, adhesives, adherents and other finishing materials for roof surface materials and all other roof components.

All other terms and conditions, insured coverage and exclusions of this policy remain unchanged, including applicable limits, sublimits and deductibles, and apply in full force and effect to the coverage provided by this policy.

SMB 410 2010 CW ALL ROOF VALUATION

Page **2** of **2**

SMB 415 1907 GULF COAST.ALL MINIMUM EARNED PREMIUM – GULF COAST

# MINIMUM EARNED PREMIUM – GULF COAST

## THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY

**This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.**

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

Words and phrases that appear in *italics* in the remainder of this form have special meaning. Refer to Section I. Definitions of the policy form and / or this endorsement.

### G. Policy Conditions

#### 2. Cancellation and Additions or Deletions

In addition to the Cancellation and Additions or Deletions Policy Conditions in the policy, the following is included:

If you cancel this policy between January 1 and May 31 or between December 1 and December 31, we will refund you 75% of any full policy term premium or the pro-rated unearned premium, whichever is less.

If you cancel this policy between June 1 and November 30, we will refund you 15% of any full policy term premium or the pro-rated unearned premium, whichever is less.

All other terms and conditions, insured coverage and exclusions of this policy, including applicable limits and deductibles, remain unchanged and apply in full force and effect to the Coverage provided by this policy.

SMB 415 1907 GULF COAST ALL MINIMUM EARNED PREMIUM – GULF COAST          Page 1 of 1

SMB 418 2007 CW ALL Several Liability Clause

# SEVERAL LIABILITY CLAUSE

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.**

---

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

---

The liability of an insurer under this contract is several and not joint with other insurers party to this contract.  An insurer is liable only for the proportion of liability it has underwritten.  An insurer is not jointly liable for the proportion of liability underwritten by any other insurer.  Nor is an insurer otherwise responsible for any liability of any other insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by an insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown in this contract.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is an insurer.  Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together).  The liability of each member of the syndicate is several and not joint with other members.  A member is liable only for that member's proportion.  A member is not jointly liable for any other member's proportion.  Nor is any member otherwise responsible for any liability of any other insurer that may underwrite this contract.  The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA.  The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

All other terms and conditions, insured coverage and exclusions of this policy remain unchanged, including applicable limits, sublimits and deductibles, and apply in full force and effect to the coverage provided by this policy.

SMB 418 2007 CW ALL Several Liability Clause                                                  Page 1 of 1

SMB 419 2102 CW ALL Allocation Endorsement

# ALLOCATION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

Words and phrases that appear in *italics* in the remainder of this form have special meaning. Refer to Section I. Definitions of the policy form and / or this endorsement.

In consideration of the premium charged for this policy as outlined by the Insurer(s) in the declarations, the applicable participation of each Insurer(s) as a percentage (%) of the limit of liability shown in the policy is as follows:

| Perils (As Per Policy) | Insurer | Contract | Policy Number | Participation (as a %) |
|---|---|---|---|---|
| All Covered Causes of Losses Except Equipment Breakdown | Independent Specialty Insurance Company | NA | See Declaration | 64% |
| All Covered Causes of Losses Except Equipment Breakdown | Certain Underwriters at Lloyds and Other Insurers subscribing to Binding Authority UMR B604510568622021 | B604510568622021 | See Declaration | 36% |
| Equipment Breakdown - if selected on the Declaration | Independent Specialty Insurance Company | NA | See Declaration if purchased | 100% |

The contracts herein cover mutually exclusive perils. The maximum limit of liability is not to exceed the per *occurrence* participation stated in the policy, regardless of whether multiple perils and multiple contracts are involved. Recognition of liability by either of the contracts reduces the limit of liability of any corresponding contract.

The liability otherwise determined to exist under the terms and conditions of this policy shall be bourne by the contract covering the proximate cause of loss identified in the allocation of security. Covered perils shall be defined by the applicable forms attached to this policy.

The Insurer's liability under this policy for covered losses is several and not joint with other insurers party to this contract. The Insurer is liable only for the proportion of liability it has underwritten. The Insurer is not jointly liable for the proportion of liability underwritten by any other insurer. Nor is the Insurer otherwise responsible for any liability of any other insurer that may underwrite this policy.

The Insurer's liability may not be increased in the event that any other insurer or other party to this contract who for any reason does not satisfy all or part of its obligations.

SMB 419 2102 CW ALL Allocation Endorsement

SMB 419 2102 CW ALL Allocation Endorsement

This contract shall be constructed as a separate contract between the Named Insured and each of the Insurers. This evidence of coverage consists of separate sections of a composite insurance for all Underwriters at Lloyd's combined and separate policies issued by the Insurer(s), all as identified above. This evidence of coverage does not constitute in any manner or form a joint certificate of coverage by Underwriters at Lloyd's with any other Insurer(s).

All other terms and conditions, Named Insured coverage and exclusions of this policy remain unchanged, including applicable limits, sublimits and deductibles, and apply in full force and effect to the coverage provided by this policy.

SMB 419 2102 CW ALL Allocation Endorsement

SMB 421 2010 LA ALL Restrictive AOB

## Restricted Assignment of Post-Loss Benefits

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.
**This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.**

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

Words and phrases that appear in *italics* in the remainder of this form have special meaning.  Refer to Section I. Definitions of the policy form and / or this endorsement.

**THIS POLICY DOES NOT ALLOW THE ASSIGNMENT OF POST-LOSS INSURANCE BENEFITS. BY SELECTING THIS POLICY, YOU WAIVE YOUR RIGHT TO FREELY ASSIGN OR TRANSFER THE POST-LOSS PROPERTY INSURANCE BENEFITS AVAILABLE UNDER THIS POLICY TO A THIRD PARTY OR TO OTHERWISE FREELY ENTER INTO AN ASSIGNMENT AGREEMENT.**

In exchange for a reduced premium, your policy is endorsed to restrict the assignment of post-loss benefits.

In Policy Form SMB 300 under Section G. Policy Conditions, 1. Assignment is deleted and replaced by the following:

    1.  Assignment
        a.  You may not assign this policy without prior written consent from us.
        b.  Post-loss assignment of rights, benefits or claims arising under this policy are prohibited.

All other terms and conditions, insured coverage and exclusions of this policy remain unchanged, including applicable limits, sublimits and deductibles, and apply in full force and effect to the coverage provided by this policy.

SMB 424 2101 CW ALL Property Cyber and Data Exclusion

# Property Cyber and Data Exclusion

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.**

---

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of the insurance policy unless another effective date is shown on the Declarations Page.*

---

This insurance policy to which this Endorsement is attached is amended to:
Under D. Exclusions and Limitations, in addition to exclusions and limitations in the Policy, the following exclusions and limitations are added:

### D. Exclusions and Limitations

1. Property Cyber and Data Exclusion.
   a. *Cyber Loss:*
      1) loss, damage, liability, claim, cost, expense of whatsoever nature directly or indirectly caused by, contributed to by, resulting from, arising out of or in connection with any loss of use, reduction in functionality, repair, replacement, restoration or reproduction of any *Data*, including any amount pertaining to the value of such *Data*; regardless of any other cause or event contributing concurrently or in any other sequence thereto.
   b. In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.
   c. This endorsement supersedes and, if in conflict with any other wording in the policy or any endorsement thereto having a bearing on *Cyber Loss* or *Data*, replaces that wording.

Under I. Definitions, words and phrases that appear in *italics* in the remainder of this Endorsement have special meaning and apply to this Endorsement only. Refer to I. Definitions of the Policy form for the meaning of all other words and phrases that apply to this insurance policy. The following Definitions are added to the Policy:

### I. Definitions

30. *Cyber Loss* means any loss, damage, liability, claim, cost or expense of whatsoever nature directly or indirectly caused by, contributed to by, resulting from, arising out of or in connection with any *Cyber Act* or *Cyber Incident* including, but not limited to, any action taken in controlling, preventing, suppressing or remediating any *Cyber Act* or *Cyber Incident*.

31. *Cyber Act* means an unauthorized, malicious or criminal act or series of related unauthorized, malicious or criminal acts, regardless of time and place, or the threat or hoax thereof involving access to, processing of, use of or operation of any *Computer System*.

32. *Cyber Incident* means:
    a. any error or omission or series of related errors or omissions involving access to, processing of, use of or operation of any *Computer System*; or

    b. any partial or total unavailability or failure or series of related partial or total unavailability or failures to access, process, use or operate any *Computer System*.

33. *Computer System* means:
    a. any computer, hardware, software, communications system, electronic device (including, but not limited to, a smart phone, laptop, tablet, wearable device), server, cloud or microcontroller including any other similar system or any configuration of the aforementioned and any associated input, output, data storage device, networking equipment or back up facility, owned or operated by an Insured or any other party.

SMB 424 2101 CW ALL Property Cyber and Data Exclusion

SMB 424 2101 CW ALL Property Cyber and Data Exclusion

34. *Data* means information, facts, concepts, code or any other information of any kind that is recorded or transmitted in a form that can be used, accessed, processed, transmitted or stored by a *Computer System*.

All other terms, conditions, Named Insured coverage, and exclusions of this policy remain unchanged, including applicable policy limits, sub-limits and deductibles, and apply to the coverage provided under this policy.

SMB 426 2102 CW ALL RR Binding Authority Endorsement

# CERTAIN UNDERWRITERS AT LLOYD'S AND OTHER INSURERS SUBSCRIBING TO BINDING AUTHORITY UMR B604510568622021 LIST

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

If Certain Underwriters at Lloyd's and Other Insures Subscribing to Binding Authority UMR B604510568622021 are listed as security on the Allocation Endorsement attached to the policy, the list of participants is shown below:

| Account Number: | See Declarations | |
|---|---|---|
| UMR: | B604510568622021 | |
| Policy Number: | See Declarations | |

| | Syndicate / Carrier | Participation |
|---|---|---|
| | Certain Underwriters at Lloyd's – Syndicate 1458 18th Floor, 125 Old Broad Street, London, EC2N 1AR, United Kingdom | 50% |
| | RenaissanceRe Specialty U.S. LTD | 50% |

All other terms and conditions, Named Insured coverage and exclusions of this policy remain unchanged, including applicable limits, sublimits and deductibles, and apply in full force and effect to the coverage provided by this policy.

SMB 426 2102 CW ALL RR Binding Authority Endorsement                    Page 1 of 1

SMB 500 2102 LA ALL PHN SERVICE OF SUIT

# POLICYHOLDER NOTICE
## SERVICE OF SUIT

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.**

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

In the event of failure to pay any amount claimed to be due under the terms of this policy and at your request, we agree to submit to the jurisdiction of any court of competent jurisdiction within the United States of America (the "United States") in which a suit for these amounts may be brought. Nothing in this condition constitutes or should be understood to constitute:

1. a waiver of our rights to commence an action in any court of competent jurisdiction in the United States;
2. to remove an action to a United States District Court; or
3. to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

It is further agreed that service of process in such suit will be made upon:

Independent Specialty Insurance Company
National Registered Agents, Inc.
2 North Jackson Street, Suite 605
Montgomery, AL 36107

Certain Underwriters at Lloyd's and Other Insurers
subscribing to Binding Authority UMR
B604510568622021
McDermott, Will & Emery
340 Madison Avenue
New York, NY  10173-1922

or his or her representative, and that in any suit instituted against us with respect to this policy, we will abide by the final decision of such court or of any appellate court in the event of an appeal.

Additionally, pursuant to any statute of any state, territory, or district of the United States which makes provision, we designate the Superintendent, Commissioner, or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as our true and lawful attorney upon whom service may be made of any lawful process in any action, suit, or proceeding instituted by you or on your behalf or any beneficiary arising out of this policy of insurance and we designate the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

SMB 507 2103 LA ALL LOUSIANA DISCLOSURE

## NOTICE TO POLICYHOLDERS

### LOUISIANA

### IMPORTANT INFORMATION REQUIRED BY
### THE LOUISIANA DEPARTMENT OF INSURANCE

Commercial Insurance Policy Coverage Disclosure Summary

This form is promulgated pursuant to LSA-R.S. 22:1319

**THIS IS ONLY A SUMMARY OF YOUR COVERAGE AND DOES NOT AMEND, EXTEND, OR ALTER THE COVERAGES OR ANY OTHER PROVISIONS CONTAINED IN YOUR POLICY. INSURANCE IS A CONTRACT. THE LANGUAGE IN YOUR POLICY CONTROLS YOUR LEGAL RIGHTS AND OBLIGATIONS.**

### **\*\*READ YOUR INSURANCE POLICY**

### **FOR COMPLETE POLICY TERMS AND CONDITIONS\*\***

## COVERAGE(S) FOR WHICH PREMIUM WAS PAID

**Commercial Property**

## Deductibles

**This policy sets forth certain deductibles that will be applied to claims for damages. When applicable, a deductible will be subtracted from your total claim and you will be paid the balance subject to applicable coverage limits.**

> **You may be able to reduce your premium by increasing your deductible. Contact your producer (agent) or insurer for details.**

**NOTICE: This policy does set forth a separate deductible per building for covered losses caused by hurricanes or *Named Storm* as defined in the policy.**

**This policy does set forth a separate deductible per occurrence for covered losses caused by All Other Wind as defined in the policy.**

SMB 507 2103 LA ALL LOUSIANA DISCLOSURE

## NOTICE TO POLICYHOLDERS

*Separate Deductible Example- Hurricane or  Named Storm Damage.*

**If applicable, the following illustrates how a separate deductible per building applies to hurricane or *Named Storm* damage under your policy:**

**The following example assumes a 2% *Named Storm* deductible per building. The amounts of loss to the damaged property at Building 1 are $450,000 (Coverage A - Building) and $50,000 (Coverage C - Business Personal Property) and at Building 2 are $30,000 (Coverage A - Building) and $10,000 (Coverage C - Business Personal Property)**

| | |
|---|---|
| Limits of Insurance on Building 1 (For Coverage A, B, C and D) | $1,000,000 |
| Total amount of Building and Business Personal Property Damage Loss | $500,000 |
| Less 2% deductible ($1,000,000 X .02) | ($20,000) |
| Net payment to insured for Building loss | $480,000 |

| | |
|---|---|
| Limits of Insurance on Building 2 (For Coverage A, B, C and D) | $2,000,000 |
| Total amount of Building and Business Personal Property Damage Loss | $40,000 |
| Less 2% deductible ($1,000,000 X .02) | ($40,000) |
| Net payment to insured for Building loss | $0 |

| | |
|---|---|
| Net payment to insured for the *Named Storm* Event | $480,000 |

SMB 507 2103 LA ALL LOUSIANA DISCLOSURE

SMB 507 2103 LA ALL LOUSIANA DISCLOSURE

### *Separate Deductible Example- All Other Wind Damage.*

If applicable, the following illustrates how a separate deductible per occurrence applies to All Other Wind Damage under your policy:

The following example assumes a $10,000 All Other Wind deductible. The amounts of loss to the damaged property at Building 1 are $250,000 (Coverage A - Building) and $50,000 (Coverage C - Business Personal Property).

| | |
|---|---|
| Limits of Insurance on Building 1 (For Coverage A, B, C and D) | $1,000,000 |
| Total amount of Building and Business Personal Property Damage Loss | $300,000 |
| Less All Other Wind deductible | ($10,000) |
| Net payment to insured for Building loss | $290,000 |

TO SEE EXACTLY HOW SEPARATE HURRICANE, WIND, or *Named Storm* DEDUCTIBLES WILL APPLY, PLEASE REFER TO YOUR POLICY.

### LIMITATIONS OR EXCLUSIONS UNDER THIS POLICY

**FLOOD:** Flood damage may be covered, regardless of how caused, when flood is the peril that causes the loss. Please check your Commercial Property Declarations to see if Flood Coverage applies to your policy. Flood water includes, but is not limited to, storm surge, waves, tidal water, overflow of a body of water, whether driven by wind or not.

*Flood Insurance* may also be available through the National Flood Insurance Program (NFIP). NFIP flood insurance may provide coverage for damage to your dwelling or building and/or contents subject to the coverage limits and terms of the policy.

SMB 507 2103 LA ALL LOUSIANA DISCLOSURE

*Excess Flood Insurance* may be available under a separate policy, from this or another insurer, if the amount of the primary flood insurance is not enough to cover the value of your property.

- *You may contact your producer (agent) or insurer for more information on the NFIP and excess flood insurance.*

MOLD: - Damage caused solely by mold is not covered under this policy.

**\*\*FOR ALL OTHER LIMITATIONS OR EXCLUSIONS REFER TO YOUR POLICY FOR COMPLETE DETAILS ON TERMS AND PROVISIONS\*\***

EFFECTIVE JANUARY 1, 2010

SMB 507 2103 LA ALL LOUSIANA DISCLOSURE

SMB 517 2102 CW ALL TRIA Rejection Notice

# NOTICE TO POLICYHOLDERS REGARDING THE
## U.S. Terrorism Risk Insurance Act of 2002 As Amended
## Not Purchased Clause

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.**

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

You are hereby notified that under the Terrorism Risk Insurance Act of 2002, as amended ("TRIA"), that you now have a right to purchase insurance coverage for losses arising out of acts of terrorism, **as defined in Section 102(1) of the Act, as amended:** The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.  Any coverage you purchase for "acts of terrorism" shall expire at 12:00 midnight December 31, 2027, the date on which the TRIA Program is scheduled to terminate, or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates.

YOU SHOULD KNOW THAT COVERAGE PROVIDED BY THIS POLICY FOR LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM IS PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THIS FORMULA, THE UNITED STATES PAYS 80% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURER(S) PROVIDING THE COVERAGE.  YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A USD100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS USD100 BILLION.  IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED USD100 BILLION, YOUR COVERAGE MAY BE REDUCED.

It is hereby noted that the Insurer(s) have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

If you have any questions about this or any other insurance matter, please contact your agent or broker representing Independent Specialty Insurance Company and Certain Underwriters at Lloyd's and Other Insurers subscribing to Binding Authority UMR B604510568622021.

SMB 403 1805 CW ALL EQUIPMENT BREAKDOWN

# EQUIPMENT BREAKDOWN ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.**

---

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

---

Words and phrases that appear in *italics* in the remainder of this form have special meaning. Refer to Section I. Definitions of the policy form and / or this endorsement.

**B. Covered Causes of Loss**

In addition to the Covered Causes of Loss in the policy, the following Causes of Loss are included:

1. *Equipment Breakdown*

**C. Additional Coverages**

The following is added to the Additional Coverages section of the policy. Each item with a sublimit of coverage will be a sublimit of the limits provided by the policy and not in addition to the limits provided in the policy.

1. **Equipment Breakdown Pollutant Clean Up and Removal**

   We will pay for the Pollutant Clean Up and Removal for loss resulting from *equipment breakdown*. The most we will pay for the Pollutant Clean Up and Removal is $250,000.

   This Additional Coverage does not apply to costs to test for, monitor, or assess the existence, concentration, or effects of *pollutants*. We will pay for testing which is performed in the course of extracting the *pollutants* from the land or water.

2. **Expediting Expenses**

   We will pay for the expediting expense loss resulting from *equipment breakdown* with respect to your damaged Covered Property. We will pay the *reasonable extra cost* to:

   a. Make temporary repairs;

   b. Expedite permanent repairs; and

   c. Expedite permanent replacement.

   The most we will pay for Expediting Expense is the Limit of Insurance shown on the Declarations.

3. **Refrigerant Contamination**

   We will pay the loss from contamination by refrigerant used in refrigerating, cooling, or humidity control equipment at the described premises as a result of *equipment breakdown*.

   The most we will pay for Refrigerant Contamination is $250,000.

4. **Spoilage**

   We will pay for loss of *perishable goods* due to spoilage resulting from lack of power, light, heat, steam, or refrigeration caused by *equipment breakdown*.

SMB 403 1805 CW
ALL EQUIPMENT
BREAKDOWN

Copyright material from
© Insurance Services Office, Inc., 2011

Page 1 of 5

SMB 403 1805 CW ALL EQUIPMENT BREAKDOWN

However, we will not pay for any loss, damage, cost, or expense directly caused by, contributed to by, resulting from, or arising out of the following causes of loss:

Fire, lightning, combustion explosion, wind-storm or hail, weight of snow, ice or sleet, freezing, falling objects, smoke, aircraft or vehicles, riot or civil commotion, vandalism, sinkhole collapse, volcanic action, leakage from fire extinguishing equipment, water, water damage, earth movement, or flood.

If you are unable to replace the *perishable goods* before their anticipated sale, payment will be determined based on the sales price of the *perishable goods* at the time of the loss, less discounts and expenses that otherwise would have been incurred. Otherwise, payment will be determined in accordance with the Loss Settlement Conditions of the policy, to which this endorsement is attached, up to a maximum limit of $250,000.

5. **Temperature Fluctuation**

We will pay for loss of *perishable goods* only caused by or resulting from any condition or event to Covered Property that can be resolved by calibrating, resetting, tightening, adjusting or cleaning.

However, we will not pay for loss of *perishable goods* as a result of resetting the power supply to the Covered Property containing the *perishable goods*.

If you are unable to replace the *perishable goods* before their anticipated sale, payment will be determined based on the sales price of the *perishable goods* at the time of the loss, less discounts and expenses that otherwise would have been incurred. Otherwise, payment will be determined in accordance with the Loss Settlement Conditions of the policy, to which this endorsement is attached, up to a maximum limit of $5,000.

6. **CFC Refrigerants**

We will pay for the *additional costs* to repair or replace Covered Property because of the use or presence of a refrigerant containing CFC (chlorofluorocarbon) substances caused by *equipment breakdown*.

We also pay for additional loss as described under the Spoilage Coverage provided by this endorsement and the Business Income Coverage as described in the policy to which this endorsement attached, caused by the presence of a refrigerant containing CFC substances.

We pay no more than the least of the following:

a. The cost to repair the damaged property and replace any lost CFC refrigerant;

b. The cost to repair the damaged property, retrofit the system to accept a non-CFC refrigerant, and charge the system with a non-CFC refrigerant; or

c. The cost to replace the system with one using a non-CFC refrigerant.

The most we will pay for CFC Refrigerants is the Limit of Insurance shown on the Ancillary Coverages and Sublimits.

7. **Computer Equipment**

We will pay for loss or damage to your *computer equipment* caused by *equipment breakdown*.

The most we will pay for Computer Equipment is the Limit of Insurance shown on the Declarations.

8. **Data Restoration**

We will pay for your reasonable and necessary cost to research, replace and restore the lost information on electronic media and records as a result of *equipment breakdown*.

The most we will pay for Data Restoration is $100,000.

9. **Computer Virus**

We will pay for loss or damage to your *computer equipment* caused by a *computer virus* which results in *equipment breakdown*.

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 403 1805 CW ALL EQUIPMENT BREAKDOWN

The most we will pay for Computer Virus is the Limit of Insurance shown on the Declarations.

10. **Service Interruption**

Any insurance provided for Service Interruption ,Spoilage, or Data Restoration is extended to apply to your loss, damage or expense caused by *equipment breakdown* to equipment that is owned by a utility, landlord or other supplier with whom you have a contract to supply you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, internet access, telecommunications services, wide area networks, data transmission or *cloud computing*. The equipment must meet the definition of *equipment breakdown* except that it is not Covered Property.

The most we will pay for Service Interruption is the Sublimit of Insurance shown on the Ancillary Coverage and Sublimits Endorsement. The most we will pay for Spoilage or Data Restoration is the sublimit under each Additional Coverage as provided in this endorsement.

11. **Risk Improvement**

If Covered Property suffers direct physical loss or damage due to *equipment breakdown*, we will pay for the insured to improve the *power quality* of the electrical system or equipment at the loss location where the *equipment breakdown* occurred.

We will pay the reasonable extra cost to improve *power quality* for the following electrical systems and/or equipment improvements:

a. Installation of surge protection devices (SPD's) which are installed at the loss location's line disconnect, load disconnect, or on specific pieces of equipment and that are certified by Underwriter Laboratories (UL) or has an equivalent certification. However, SPD's do not include any SPD's which are cord-connected surge strips, direct plug-in SPD's or receptacle SPD's;

b. An upgrade and/or replacement of; electrical panels, switchgear and/or circuit breakers; or

c. Electrical wire and wiring improvements which include installation of; flexible conduit, junction boxes and/or ground wiring.

We will not pay more than 10%, to a maximum limit of $10,000, of the loss amount paid. An invoice for implementation of this Additional Coverage must be sent to us within 180 days after the payment of the loss is received.

12. **Off-Premises Coverage**

We will pay for loss or damage to Covered Property resulting from a covered *equipment breakdown* while temporarily at a *location* that is not a described *location*.

The most we will pay for Off-Premises Coverage is $25,000.

D. **Exclusions and Limitations**

1. With respect to coverage provided by this endorsement only, the following Exclusions do not apply:

   a. **Electrical Surge Exclusion**

   b. ***Equipment Breakdown*** and ***Explosion*** Exclusion

G. **Policy Conditions**

The following is added to the Policy Conditions section of the policy:

1. **Suspension**

Whenever Covered Property is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss to that Covered Property for the perils covered by this endorsement. Coverage can be suspended and possibly reinstated by delivering or mailing a written notice of suspension / coverage reinstatement to:

a. Your last known address; or

Copyright material from
© Insurance Services Office, Inc., 2011

      b.  The address where the property is located.

If we suspend your insurance, you will get a pro rata refund of premium. The suspension will be effective even if we have not yet made or offered a refund.

2.  **Jurisdictional Inspections**

If any Covered Property under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

3.  **Environmental, Safety, and Efficiency Improvements**

If Covered Property requires replacement due to equipment breakdown, we will pay your additional cost to replace with equipment that is better for the environment, safer, or more energy efficient than the equipment being replaced.

However, we will not pay more than 150% of what the cost would have been to repair or replace with like kind and quality. This Condition does not apply to any property to which actual cash value applies.

4.  *Green* **Environmental and Efficiency Improvements**

If Covered Property requires repair or replacement due to equipment breakdown, we will pay:

    a.  The lesser of the reasonable and necessary additional cost incurred by the insured to repair or replace physically damaged Covered Property with equipment of like kind and quality which qualifies as *green*. Like kind and quality includes similar size and capacity.

    b.  The additional reasonable and necessary fees incurred by the insured for an accredited professional certified by a *green authority* to participate in the repair or replacement of physically damaged Covered Property as *green*.

    c.  The additional reasonable and necessary cost incurred by the insured for certification or recertification of the repaired or replaced Covered Property as *green*.

    d.  The additional reasonable and necessary cost incurred by the insured for *green* in the removal, disposal or recycling of damaged Covered Property.

    e.  The Business Income Coverage, if covered within the Policy to which this *Equipment Breakdown* Endorsement is attached, loss during the additional time required for repair or replacement of Covered Property, consistent with *green*, in the coverages above.

We will not pay more than 150% of what the cost would have been to repair or replace with equipment of like kind and quality inclusive of fees, costs, subject to a maximum limit of $100,000 per *occurrence*, in addition to any Business Income Coverage loss incurred as stated above.

*Green* Environmental and Efficiency Improvements does not cover any of the following:

    a.  Covered Property does not include *stock*, raw materials, finished goods, *production machinery*, merchandise, electronic data processing equipment not used in the functional support of the real property, process water, molds and dies, property in the open, property of others for which the insured is legally liable, or personal property of others.

    b.  Any loss adjusted on any valuation basis other than a repair or replacement basis as per the Loss Settlement Conditions section of this policy.

    c.  Any loss covered under any other section of this policy.

    d.  Any cost incurred due to any law or ordinance with which the insured was legally obligated to comply prior to the time of the *equipment breakdown*.

**I.**  **Definitions**

With respect to this endorsement only, the following Definitions are added:

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 403 1805 CW ALL EQUIPMENT BREAKDOWN

1. *Green* means products, materials, methods and processes certified by a *green authority* that conserve natural resources, reduce energy or water consumption, avoid toxic or other polluting emissions or otherwise minimize environmental impact.

2. *Green Authority* means an authority on *green* buildings, products, materials, methods or processes certified and accepted by Leadership in Energy and Environmental Design (LEED®), Green Building Initiative Green Globes®, Energy Star Rating System or any other recognized *green* rating system.

3. *Power quality* means the conditions that allow electrical systems or equipment to operate as intended by limiting voltage fluctuations and other power influences that would adversely affect the operational performance and/or reduce the reliability, or the life-span of the electrical system.

4. *Additional costs* mean those in excess of what would have been required to repair or replace Covered Property, had no CFC refrigerant been involved.

All other terms and conditions, insured coverage, and exclusions of this insurance policy remain unchanged, including applicable limits, sublimits, and deductibles, and apply in full force and effect to the coverage provided by this policy.

Copyright material from
© Insurance Services Office, Inc., 2011

SMB 412 1712 CW ALL PROTECTIVE SAFEGUARDS

# PROTECTIVE SAFEGUARDS ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY

**This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.**

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

Words and phrases that appear in *italics* in the remainder of this form have special meaning. Refer to Section I. Definitions of the policy form and / or this endorsement.

**D. Exclusions and Limitations**

The following is added to the Exclusions and Limitations section of the policy:

1. **Lack of Maintenance to Protective Safeguard Exclusion**

   We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you failed to maintain any protective safeguard represented as present at a building and listed in the Schedule below, and over which you had control, in complete working order.

**H. Property Loss Conditions**

The following Property Loss Condition is added to the policy Property Loss Conditions:

1. In consideration of the premium charged and based on the protection of the premises by the protective safeguard systems described in the submission / application, it is a condition of this policy that you shall exercise due diligence in maintaining in complete working order all equipment and services, affirmed to be part of the Covered Property, and pertaining to the system(s) which are under your control, including maintenance and service requirements.

2. The protective safeguards to which this endorsement applies are identified as:

   a. *Automatic Fire Protection Sprinkler System*, including related supervisory services.

      1) If part of an *Automatic Fire Protection Sprinkler System* is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

   b. *Automatic Central Monitored Fire Alarm*

   c. *Central Monitored Burglar Alarm*

3. You shall give us immediate notice of any impairment in or suspension of any equipment or service pertaining to the system within your knowledge. If part of an *Automatic Fire Protection Sprinkler System* is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

SMB 412 1712 CW ALL PROTECTIVE SAFEGUARDS

SMB 412 1712 CW ALL PROTECTIVE SAFEGUARDS

## I. Definitions

The following definitions are added to the policy definitions:

1. ***Automatic Fire Protection Sprinkler System*** means

   a. any automatic fire protective or extinguishing system, including connected:

      1) Sprinklers and discharge nozzles;

      2) Ducts, pipes, valves and fittings;

      3) Tanks, their component parts and supports; and

      4) Pumps and private fire protection mains.

   b. When supplied from an automatic fire protective system:

      1) Non-automatic fire protective systems; and

      2) Hydrants, standpipes and outlets.

2. ***Automatic Central Monitored Fire Alarm*** means an automatic fire alarm protecting the entire building that is:

   a. Connected to a central station, or

   b. Reporting to a public or private fire alarm station.

3. ***Central Monitored Burglar Alarm*** means a *central monitored burglar alarm* that is protecting all entryways and windows that is:

   a. Activated and operational

   b. Reporting to a public or private burglar alarm station; and

   c. In the "on" position during all non-working hours or when the insured premises are unoccupied.

All other terms and conditions, insured coverage and exclusions of this insurance policy remain unchanged, including applicable limits, sublimits, and deductibles, and apply in full force and effect to the coverage provided by this Policy.

SMB 411 1712 CW ALL MULTIPLE BUILDING VALUATION

# MULTIPLE BUILDING VALUATION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY

**This endorsement provides the terms of coverage if coverage is selected on the Declarations Page.**

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

Words and phrases that appear in *italics* in the remainder of this form have special meaning. Refer to Section I. Definitions of the policy form and / or this endorsement.

**H. Property Loss Conditions**

The following Property Loss Condition is added to the policy Property Loss Conditions:

If the property involved consists of multiple buildings, and the latest Locations & Building Detail on the Declarations does not report values by individual building, in no case shall the loss for the building, including all Additional Coverages other than Debris Removal, exceed that building's respective proportional value of the total building value for that location.

The building's respective proportional value shall be calculated by:

1. Dividing the building values reported for the *location* by the square footage reported to arrive at a dollar per square foot for the *location*; then

2. multiply the dollar per square foot calculated above by the square footage of the specific building(s) damaged.

All other terms and conditions, insured coverage and exclusions of this insurance policy remain unchanged, including applicable limits, sublimits, and deductibles, and apply in full force and effect to the coverage provided by this policy.

SMB 503 1712 CW ALL PHN PRIVACY

# POLICYHOLDER NOTICE

## PRIVACY NOTICE

For commercial business customers with policies administered by us and insured by a non-admitted insurer, our privacy policy is as follows:

1. We do not collect or require personal private information from our customers.
2. We do not share any policyholder information for marketing purposes with any third party.
3. We do share policy information as necessary with third party service providers for purposes of evaluating, processing, or servicing our business, inclusive but not restricted to information gathered in the application, inspection, or claims process.
4. We require a non-disclosure with all third-party service providers as respects information shared from us to our third party service providers which restricts use of information to functions required to perform the contracted services.
5. Exception to all restrictions above will be as required by applicable law or regulatory agency.

SMB 504 1712 CW ALL PHN OFAC

# NOTICE TO POLICYHOLDERS REGARDING THE U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL

### THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy to which it is affixed. This endorsement is a part of this insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

No coverage is provided by this notice nor can it be construed to replace any provisions of your policy. You should read your policy and review the declarations page for complete information on the coverages you are provided.

This notice provides information concerning your rights as a policyholder and payments to the Insured, additional insured, loss payee, or claimant, for loss under this policy may be affected by the administration and enforcement of U.S. economic embargoes, trade sanctions, or other directives issued by the Office of Foreign Assets Control ("OFAC") and possibly the U.S. Department of State.

OFAC is an office of the Department of the Treasury that administers and enforces sanctions policy under presidential wartime and national emergency powers, as well as authority granted by specific legislation, in order to impose controls on transactions and freeze foreign assets under U.S. jurisdiction. OFAC has identified and listed numerous foreign countries, foreign organizations, foreign agents, terrorist organizations, terrorists, international narcotics traffickers, and other named individuals, groups and entities as "Specially Designated Nationals and Blocked Persons." This list and more in-depth information on OFAC is available at the following website: http://www.treas.gov/ofac.

In accordance with OFAC regulations, or any other applicable regulation promulgated by the U.S. Department of State, if it is determined that the Insured, additional insured, loss payee, or claimant has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, we must block or "freeze" property and payment of any funds transfers or transactions and report all blocks to OFAC with ten (10) days. We will not pay a claim, accept premium, or exchange monies or assets of any kind to, from or with individuals, groups or entities, including but not limited to financial institutions, on the Specially Designated National and Blocked Person list. Additionally, we will not defend or provide any other benefits under your policy to individuals, groups or entities on the Specially Designated National and Blocked Person list. Other limitations on premiums and payments may also apply.

SMB 504 1712 CW ALL PHN OFAC

SMB 501 1712 CW ALL PHN CLAIMS

# POLICYHOLDER NOTICE
# CLAIMS REPORTING INFORMATION

All claims shall be reported to Velocity Risk Underwriters Claims via

1. E-mail: **business.claims@velocityrisk.com**
   (email is preferable for quickest response); or
2. Phone: 1-844-VRU-CLMS (1-844-878-2567)

and/or its adjusters assigned to the respective claim(s).   The costs of such adjustments shall be borne by us in proportion to its pro-rata participation in this policy.

Many occurrences result in damages which require immediate attention in order to prevent further loss. Please contact Velocity Risk Underwriters Claims at the e-mail address listed above as soon as possible to report the claim. Please try to have the following information available:

1. Insured name and policy number
2. Exact location of the occurrence
3. Detailed description of the occurrence
4. Type of loss
5. A contact number for someone at the location of the occurrence

SMB 501 1712 CW ALL PHN CLAIMS

SMB 502 1805 CW ALL FRAUD NOTICE

# FRAUD NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **Arkansas** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Colorado** | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| **District of Columbia** | WARNING: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| **Florida** | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| **Kansas** | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| **Kentucky** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| **Louisiana** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Maine** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| **Maryland** | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **New Jersey** | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |
| **New Mexico** | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |

SMB 502 1805 CW ALL FRAUD NOTICE

## FRAUD NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **New York** | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.<br><br>**All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.<br><br>**Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.<br><br>The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| **Ohio** | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| **Oklahoma** | WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony. |
| **Pennsylvania** | **All Commercial Insurance, Except As Provided for Automobile Insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.<br><br>**Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| **Puerto Rico** | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |

SMB 502 1805 CW ALL FRAUD NOTICE

| Rhode Island | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
|---|---|
| Tennessee | **All Commercial Insurance, Except As Provided for Workers' Compensation** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers' Compensation:** It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| Utah | **Workers' Compensation:** Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| Virginia | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| Washington | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| West Virginia | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| All Other States | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison. (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

FILED FOR RECORD 08/30/2023 12:22:14
Brittany H. Vitrano, DY C LERK
JEFFERSON PARISH, LA

RECEIVED VIA COUNTER

**Filed by: FAX**
Date: _8/29/23_
Time: _3:42 PM_
Deputy Clerk: _Brittany Vitrano_

04/26/2021   10:47                                    (FAX)                      P.003/007

---

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

Gary Loftin, Caddo Parish Clerk of Court

**09-1268007**
06/02/2015 03:41 PM

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone: (800) 331-3282 Fax: (818) 662-4141

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

CELTIC BANK

CT Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071               LOUI

File with: Caddo, LA

DEPUTY CLERK

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Mai Ti, Inc. | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 6505 Westbank Expressway | Marrero | | LA | 70072 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Baymont Inn & Suites | | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 6505 Westbank Expressway | Marrero | | LA | 70072 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Celtic Bank Corporation | | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 268 S. State St., Ste 300 | Salt Lake City | | UT | 84111 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All Inventory, Chattel Paper, Accounts, Equipment, and General Intangibles; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)
Prepared by CT Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

PAGE 3/7 * RCVD AT 4/26/2021 10:46:28 AM [Central Daylight Time] * SVR:RIGHTFAX2014/4 * DNIS:56550 * CSID:* ANI:TA:172.27.0.10:1720:NAME:CADDO * DURATION (mm-ss):03-38

EXHIBIT
tabbies  B

04/25/2021  10:48                    (FAX)                  P. 004/007

Mike Spence, Caddo Clerk of Court

**09-1417801**

Recorded On: 02/03/2020  11:02 AM

SHERRY BARRY
DEPUTY CLERK

**UCC FINANCING STATEMENT AMENDMENT**
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

CELTIC BANK

⌐  Lien Solutions
   P.O. Box 29071
   Glendale, CA 91209-9071                              LOUI

              File with: Caddo, LA                      THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
| 09-1266007  6/2/2016  CC LA Caddo | (or recorded) in the REAL ESTATE RECORDS |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
   For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**
   Check one of these two boxes:                    AND Check one of these three boxes to:
   This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address   ☐ ADD name   ☐ DELETE name

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b)

| 7a. ORGANIZATION'S NAME | | | |
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE  COUNTRY |

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
   Indicate collateral:

9. **NAME OF SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
   If this is an Amendment authorized by a DEBTOR, check here ☐  and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME  Celtic Bank Corporation | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:  Debtor Name: Mai Ti, Inc.

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)                International Association of
                                                                                                  Commercial Administrators (IACA)

PAGE 4/7 * RCVD AT 4/26/2021 10:49:20 AM [Central Daylight Time] * SVR:RIGHTFAX2014/4 * DNIS:266550 * CSID: * ANI:TA:173.27.0.10:1720,NAME:CADDO * DURATION (mm-ss):03-38

06/02/2015 01:40:29 PM JEFF PAR 4429453 clm $52.00
26846483  BOOK    PAGE

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone: (800) 331-3282 Fax (818) 662-4141

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

┌─────────────────────────────────┐
│  CT Lien Solutions              │   CELTIC BANK
│  P.O. Box 29071                 │
│  Glendale, CA  91209-9071       │   LOUI
│                                 │   FIXTURE
└─────────────────────────────────┘
File with: Jefferson, LA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name), if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Mai Ti, Inc. | | | | | |
| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 5500 Westbank Expressway | Marrero | | LA | 70072 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name), if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Baymont Inn & Suites | | | | | |
| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 5500 Westbank Expressway | Marrero | | LA | 70072 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Celtic Bank Corporation | | | | | |
| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 268 S. State St., Ste 300. | Salt Lake City | | UT | 84111 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All Fixtures; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and accounts proceeds)

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:   6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility    ☐ Agricultural Lien    ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor   ☐ Consignee/Consignor    ☐ Seller/Buyer     ☐ Bailee/Bailor      ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by CT Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

**UCC FINANCING STATEMENT ADDENDUM**
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
Mal Ti, Inc.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only **one** additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                SUFFIX

10c. MAILING ADDRESS                CITY                STATE  POSTAL CODE        COUNTRY

11. ☐ ADDITIONAL SECURED PARTY'S NAME **or** ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only **one** name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

11b. INDIVIDUAL'S SURNAME          FIRST PERSONAL NAME    ADDITIONAL NAME(S)/INITIAL(S)  SUFFIX

11c. MAILING ADDRESS              CITY              STATE  POSTAL CODE      COUNTRY

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral)

13. ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☒ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest)

16. Description of real estate:
Exhibit A

17. MISCELLANEOUS: 10703064-LA-5*    15231 - CELTIC BANK        Corelogic Data Corporation      Franklin Jefferson, LA   V3843449

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Prepared by CT Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

LEGAL DESCRIPTION

A CERTAIN PLOT OF GROUND, together with all the buildings and improvements thereon and all attachments thereto, and all of the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the Parish of Jefferson, State of Louisiana, in that part thereof known as PATERNOSTRO SUBDIVISION EXTENSION, and according to a plan by J. J. Krebs & Sons, Inc., dated December 3, 1969, approved by Ordinance No. 9507, adopted January 8, 1970, registered in COB 710, folio 178, said Plot is designated and described as follows:

Plot 2, Square 9, which square is bounded by West Bank Expressway, Cholly Street, Garden Road and the East boundary line of the subdivision, Said Plot 2 commences at a distance of 194 feet from the corner of the West Bank Expressway and Garden Road and measures thence 150.84 feet front feet front on the West Bank Expressway, by a width in the rear on Cholly Street of 167.88 feet, by a depth on Plot 1 of 301.97 feet, and a depth on its eastern boundary line of 300.23 feet.

And further in accordance with survey no. T3803-L by Dufrene Surveying & Engineering, Inc., Tilden J. Dufrene, Jr., Registered Land Surveyor, dated May 26, 2006, revised July 20, 2006, print recorded in COB 3172 page 727, the property has the same designation and location as hereinabove set forth and measures 150.84 feet front on the West Bank Expressway, by a width in the rear on Cholly Street of 167.89 feet, by a depth on Plot 1 of 301.97 feet, and a depth on its eastern boundary line of 300.32 feet.

Improvements thereon bear the Municipal No. 6589 Westbank Expressway, Marrero, LA 70072

Debtors

02/19/2020 02:30:36 PM JEFF PAR 6223846 mjb $32.00
UCC 26392048 BOOK    PAGE

## UCC FINANCING STATEMENT AMENDMENT
*FOLLOW INSTRUCTIONS*

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

CELTIC BANK

Lien Solutions,
P.O. Box 29071
Glendale, CA 91209-9071

LOUI
FIXTURE

File with: Jefferson, LA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
26346483  6/2/2015 CC LA Jefferson

1b. ☒ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☒ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE
Check only one of these two boxes
This Change affects ☐ Debtor or ☐ Secured Party of record
AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)
6a. ORGANIZATION'S NAME
Mai Ti, Inc.

6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)
7a. ORGANIZATION'S NAME

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
9a. ORGANIZATION'S NAME
Celtic Bank Corporation

9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10. OPTIONAL FILER REFERENCE DATA: Debtor Name: Mai Ti, Inc.

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

International Association of
Commercial Administrators (IACA)

**UCC FINANCING STATEMENT AMENDMENT ADDENDUM**

FOLLOW INSTRUCTIONS

| 11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as Item 1a on Amendment form |
|---|
| 26346483   6/2/2015 CC LA Jefferson |

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 9 on Amendment form

12a. ORGANIZATION'S NAME

Celtic Bank Corporation

OR   12b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)   SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13) Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions. If same does not fit.

13a. ORGANIZATION'S NAME

Mai Tii, Inc.

OR   13b. INDIVIDUAL'S SURNAME   FIRST PERSONAL NAME   ADDITIONAL NAME(S)/INITIAL(S)   SUFFIX

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

Debtor Name and Address:
Mai Tii, Inc. - 6589 Westbank Expressway , Marrero, LA 70072
Baymont Inn & Suites - 6580 Westbank Expressway , Marrero, LA 70072

Secured Party Name and Address:
Celtic Bank Corporation - 268 S. State St., Ste 300 , Salt Lake City, UT 84111

| 15. This FINANCING STATEMENT AMENDMENT: | 17. Description of real estate |
|---|---|
| ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☒ is filed as a fixture filing | Exhibit A |
| 16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest) | |

| 18. MISCELLANEOUS: 7368766-LA-51 | Celtic Bank Corporation | Kenner/Jefferson, LA   1563541 & 0049421 |
|---|---|---|

*FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)*

International Association of
Commercial Administrators (IACA)

**LEGAL DESCRIPTION**

A CERTAIN PLOT OF GROUND, together with all the buildings and improvements thereon and all attachments thereto, and all of the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the Parish of Jefferson, State of Louisiana, in that part thereof known as PATERNOSTRO SUBDIVISION EXTENSION, and according to a plan by J. J. Krebs & Sons, Inc., dated December 9, 1969, approved by Ordinance No. 9507, adopted January 8, 1970, registered in COB 710, folio 178, said Plot is designated and described as follows:

Plot 2, Square 8, which square is bounded by West Bank Expressway, Choly Street, Garden Road and the East boundary line of the subdivision. Said Plot 2 commences at a distance of 194 feet from the corner of the West Bank Expressway and Garden Road and measures thence 150.84 feet front feet front on the West Bank Expressway, by a width in the rear on Choly Street of 167.88 feet, by a depth on Plot 1 of 301.97 feet, and a depth on its eastern boundary line of 300.23 feet.

And further in accordance with survey no. T3803-L by Dutrene Surveying & Engineering, Inc., Tilden J. Dutrene, Jr., Registered Land Surveyor, dated May 26, 2005, revised July 20, 2005, print recorded in COB 3173 page 727, the property has the same designation and location as hereinabove set forth and measures 150.84 feet front on the West Bank Expressway, by a width in the rear on Choly Street of 167.89 feet, by a depth on Plot 1 of 301.97 feet, and a depth on its eastern boundary line of 300.32 feet.

Improvements thereon bear the Municipal No. 6589 Westbank Expressway, Marrero, LA 70072



**Filed by: FAX**

Date: 8/29/23

Time: 3:42 PM

Deputy Clerk: *Brittany Vitrano*

 **ACCESS RESTORATION SERVICES**
WATER FIRE STORM BUILD

**Access Restoration Services U.S. Inc.**

27657 Commerce Oaks Drive Conroe TX 77385 Phone: (832) 840 6590

## EMERGENCY WORK AUTHORIZATION AGREEMENT     RECEIVED VIA COUNTER

Job #: US-00004-EME                                                     Policy No. _____

Owner/Client: Mai TI Inc o/a Baymont Inn and Suites                     FILED FOR RECORD 08/30/2023 12:29:07
                                                                        Brittany H. Vitrano, DY CLERK
Main Contact #:                                                         JEFFERSON PARISH, LA

Job Loss Location: 6589 West Bank Expressway Marrero, LA 70072

Insurance Company: _____     Broker: _____

**As Outlined Below:** x

| |
|---|
| Emergency Services and Mitigation<br>Building Assessment<br>Structural Drying<br>Selective Demolition<br>Management and other services as required |

1. I/We (the "OWNER") or our appointed representative(s) authorize Access Restoration Services US, Inc. ("ARS") or their representative(s) to perform all necessary actions or services as outlined in the "Scope of Work" (the "WORK") above, whether or not that WORK is covered by the OWNER's insurance policy provided by the insurance company (the "INSURER") identified above.

2. The OWNER acknowledges that in the case of emergency services, it is often not possible or reasonable to provide an estimate and/or details of the WORK before commencing the WORK. In cases such as this, ARS will use an industry approved pricing guide to provide a final invoice. Should any of the required emergency services not be covered by the INSURER, the OWNER will be responsible for the payment of said services. The charges for all other repairs will be in accordance with the estimates of the WORK prepared by ARS and approved by the INSURER.

3. The OWNER acknowledges that the payment of a deductible prescribed in the OWNER's insurance policy is the responsibility of the OWNER. The OWNER agrees to pay the deductible upon signing the actual Work Authorization that is specifically associated with the WORK. The following statement is required by TX HB2102 to be included in this Agreement: Texas law requires a person insured under a property insurance policy to pay any deductible applicable to a claim made under the policy. It is a violation of Texas law for a seller of goods or services who reasonably expects to be paid wholly or partly from the proceeds of a property insurance claim to knowingly allow the insured person to fail to pay, or assist the insured person's failure to pay, the applicable insurance deductible.

4. The OWNER understands that ARS is neither an employee nor a representative of the INSURER, and this contract is between the OWNER and ARS. ARS will attempt to expediently resolve any disputes directly with the OWNER. The OWNER irrevocably assigns to ARS that portion of proceeds of any insurance coverage which relates to the WORK performed by ARS and agrees to promptly authorize and/or endorse all payments to ARS. OWNER further agrees to notify ARS within five (5) days after receipt of insurance proceeds, related in whole or in part, to the WORK.

5. Unless otherwise notified by the OWNER in writing, the OWNER authorizes ARS to dispose of any non-restorable contents that may be in ARS's possession 30 days after the OWNER receives the final "Non-restorable Listing" (and, if applicable any associated photo documentation) from ARS.

6. Wherein the WORK completed is an insurable and compensable loss, the OWNER will authorize and direct the INSURER to pay all applicable proceeds directly to ARS from the initial proceeds of the insurance settlement. Notwithstanding the same, OWNER is responsible for collection of all funds held by the INSURER, and acknowledges that the OWNER is responsible for all payments due under this Agreement and that ARS has the right to collect any such payments directly from the OWNER in the event the INSURER delays or does not tender payment in a timely manner.

7. Should the cost of the WORK exceed the proceeds of any insurance settlement or payment, the difference of such costs will be immediately due and payable by the OWNER upon receipt of an invoice from ARS. Payments not timely made shall accrue interest on a daily basis at the rate of one and a half percent (1.5%) per month or eighteen percent (18%) per annum, not to exceed the maximum amount of interest allowed by law. In addition, ARS shall be entitled to reasonable attorney's fees and all other related costs in the event that legal actions or arbitration proceedings are necessary to enforce the terms of this Agreement.

8. EACH PARTY AGREES THAT AS A MATERIAL PART OF THE CONSIDERATION HEREUNDER AND AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT, EACH PARTY HEREBY WAIVES THE RIGHT TO A JURY TRIAL.

I have read and understood the above points as well as the "Terms and Conditions" outlined on page 2 of this Agreement and agree to pay (if applicable) a deposit of $_____ or the applicable insurance deductible. I understand that as a representative I have the authority to bind this contract on behalf of the Policy Holder/Owner and accept any and all legal responsibility that may arise with regards to this claim.

_____                         _____
OWNER/CLIENT/AUTHORIZED REPRESENTATIVE'S SIGNATURE                              August 31st, 2021

*Kathy nguyen* (Aug 31, 2021 12:25 CDT)                          *Nathan Normoyle* (Aug 31, 2021 12:29 CDT)
_ Kathy Nguy                                                     Nathan Normoyle

                                                                ARS EME V4_2021 (TX) ...........1 | P a g e

(Please Print)

## ARS Work Authorization
### Terms & Conditions

1. ARS shall not be responsible for any concealed or unknown conditions at the Job Loss Locations, and ARS shall be entitled to equitable compensation for any increased cost of performing the WORK and an equitable extension of the time required to perform the Work arising out of or related to any such differing site conditions encountered, or any other cause beyond ARS's reasonable control. Due to the nature of the WORK, a completion date cannot be specified.

2. IF THERE HAS BEEN AN OCCURRENCE OF WIDESPREAD OR SEVERE DAMAGE, INJURY, OR LOSS OF LIFE OR PROPERTY RELATED TO ANY NATURAL CAUSE, INCLUDING FIRE, FLOOD, EARTHQUAKE, WIND, STORM OR WAVE ACTION, THAT RESULTED IN A CURRENT DISASTER DECLARATION BY THE GOVERNOR OR A LOCAL DISASTER DECLARATION BY A COUNTY JUDGE UNDER CHAPTER 418 OF THE TEXAS GOVERNMENT CODE, FOR THE STATE OR THE COUNTY WHERE THE PROPERTY IS LOCATED: THIS AGREEMENT IS SUBJECT TO CHAPTER 58, TEXAS BUSINESS & COMMERCE CODE. A CONTRACTOR MAY NOT REQUIRE A FULL OR PARTIAL PAYMENT BEFORE THE CONTRACTOR BEGINS WORK AND MAY NOT REQUIRE PARTIAL PAYMENTS IN AN AMOUNT THAT EXCEEDS AN AMOUNT REASONABLY PROPORTIONATE TO THE WORK PERFORMED, INCLUDING ANY MATERIALS DELIVERED.

3. The OWNER acknowledges that the reasonable use of certain disinfectants, natural sanitizers, and/or similar household chemicals may occur during the general execution of the WORK. OWNER shall remove from the property any hazardous materials or other valuables prior to commencement of any WORK. ARS is not responsible for damage to or caused in whole or in part by, or theft or loss of, any such articles left on the property when WORK commences. OWNER's electricity, water are to be made available to ARS personnel during the course of the WORK, at no charge.

4. If the WORK has commenced and/or material(s) have been ordered, any cancellation of all or part of the WORK will result in a charge of $300.00, plus all charges or costs, Overhead, and Profit for the portion of WORK already performed. Both Parties agree that such charge is not a penalty, but a reasonable estimate of the uncertain damages suffered by ARS.

5. If the OWNER terminates ARS prior to commencement of the WORK, the OWNER agrees that ARS is harmed to the extent that ARS has provided pre-WORK services to OWNER. OWNER further agrees that exact damages caused are not reasonably ascertainable and therefore, OWNER shall owe ARS ten percent (10%) of the value of this Agreement upon demand. OWNER agrees that said amount is not a penalty.

6. The OWNER acknowledges that ARS cannot anticipate all dangers that may be present at a job site and, hereby, waives, releases and discharges ARS, its directors, officers, employees, agents, and sub-trades from any liability resulting from the escape, disposal, and/or disposal of any pollutants, irritants, mold, fungi, spores, and/or contaminant waste that existed at the job site prior to the commencement of the WORK. The OWNER further waives and discharges ARS from any and all claims for loss, damage, or injury caused by fungi, mold, or other contaminants. ARS disclaims all liability for all claims, disputes, rights, losses, damages, causes of action or controversies (" Claims" ) pertaining to PreExisting Conditions, whether those Claims arise in law, equity, contract, warranty, tort, or federal or state statutory claims. The Customer is solely liable and responsible for all damages, whether actual or consequential, arising out of or relating to Pre-Existing Conditions. ARS disclaims all liability for all claims, disputes, rights, losses, damages, causes of action or controversies pertaining to Mold, whether those claims arise in law, equity, contract, warranty, tort, or federal or state statutory claims, and whether those claims are based on the acts or omissions of ARS or individuals or entities under ARS' control. The Customer is solely liable and responsible for all damages, whether actual or consequential, caused by mold and incurred by Owner, ARS or third parties.

7. OWNER agrees to provide ARS with access and right of entry to the Job Loss Location and adequate access to electricity and other utilities as needed on site necessary to perform the WORK. ARS shall not be held responsible for delays as a result of decisions or indecisions by an INSURER, their appointed representatives, or OWNER, which may create a slow down or stoppage of the WORK.

8. In no event, whether based on the Agreement, warranty (express or implied), tort, federal or state statute or otherwise arising from or relating to the work and services performed under the Agreement, shall ARS be liable for and OWNER covenants not to bring any action or claims for special, consequential, punitive or indirect damages of any kind or nature whether foreseeable or not, including but not limited to the loss of use or loss of profits. ARS and OWNER agree to allocate certain of the risks so that, to the fullest extent permitted by law, ARS' total aggregate liability to OWNER is limited to $100,000.00 for any and all injuries, damages, claims, expenses or claim expenses including attorneys' fees arising out of or relating to this Agreement regardless of whether it is based in warranty, tort, contract, strict liability, negligence, errors, omissions, or from any other cause or causes. ARS shall not be liable for any damage, whether actual or consequential, or claim arising out of or relating to Acts of God, accidents, civil disturbances, delays in obtaining materials, fires, hurricanes and other weather conditions, strikes, war or other any other causes beyond ARS' reasonable control. The OWNER agrees that it will not bring any claim or other proceedings against any of ARS's officers, directors, employees, agents or consultants in their personal capacity. ARS shall be entitled to reasonable attorney's fees and all other related costs in the event that legal actions or arbitration proceedings are necessary to enforce the terms of this Section 6.

9. In the event of an alleged breach of this agreement, OWNER shall provide ARS a minimum of seven (7) days to cure the alleged breach, before declaring ARS in default of this Agreement. It is OWNER' S responsibility to notify ARS in writing within seven (7) days of the occurrence of any claim, defect, or deficiency arising out of work performed or services supplied by ARS under this Agreement (" Occurrence" ). Failure of the OWNER to provide written notice of the Occurrence shall result in the OWNER waiving all claims that may be brought against ARS because of or relating to the Occurrence, including claims arising in law, equity, contract, warranty, tort, or federal or state statutory claims.

10. The OWNER shall be in default of this Agreements upon violating any material provision in this Agreement, including failing to make timely payment. ARS shall provide seven (7) days written notice and opportunity to cure (required only if the default is of an ongoing nature capable of being cured), after which ARS may terminate the Agreement and/or pursue all available remedies. In the case of a failure to make payment, ARS may immediately stop all work until payment is received and/or terminate the Agreement.

11. This Agreement and exhibits attached hereto, including modifications issued thereafter, represent the entire agreement of both parties, and supersede any prior oral or written agreement. No modification, written or verbal, shall be binding upon either party unless agreed to in writing signed by both parties. Each provision of this Agreement and/or the Contract Documents are severable from every other provision, and if any provision is unenforceable, the remainder of the Agreement and/or Contract Documents will remain valid and enforceable.

12. If a dispute shall arise between ARS and OWNER with respect to any matters or questions arising out of or relating to this Agreement or the breach thereof, such dispute, other than collection matters, shall be decided by arbitration administered by and in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. This Agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in any Court having jurisdiction thereof. In the event there is litigation, the parties KNOWINGLY, VOLUNTARILY, IRREVOCABLY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION ARISING OUT OF OR PERTAINING TO THE AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PERSON OR PARTY RELATED TO THIS AGREEMENT; THIS IRREVOCABLE WAIVER OF THE RIGHT TO A JURY TRIAL BEING A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT. This Agreement shall be governed by the laws of the State of Texas, and the venue of any action brought to enforce the provisions of this Agreement, or otherwise arising out of or relating to the Agreement, shall be Dallas County, Texas. The losing party in any legal or equitable action to enforce this Section 10 or arising out of or relating to this Agreement including appellate and/or bankruptcy proceedings shall reimburse the prevailing party on demand for all attorney' s fees, costs, and expenses incurred by the prevailing party in connection with the action.

13. THERE ARE NO EXPRESS OR IMPLIED WARRANTIES WHATSOEVER INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

14. TO THE FURTHEST EXTENT PERMITTED B Y LAW, OWNER SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS ARS, ITS OFFICERS, DIRECTORS, AGENTS AND EMPLOYEES, AGAINST LIABILITY, LOSS, DAMAGE, OR EXPENSE, INCLUDING BUT NOT LIMITED TO ATTORNEYS' FEES ARISING BY REASON OF ANY CLAIMS, DEMANDS, SUITS OR JUDGMENTS ARISING OUT OF OR RELATED TO THE CONDITION OR ALLEGED CONDITION OF THE PROPERTY OR ANY EXISTING IMPROVEMENTS, FIXTURES OR APPURTENANCES THEREON, INCLUDING BUT NOT LIMITED TO: THE PRESENCE OF ANY LATENT DEFECTS OR TOXIC OR HAZARDOUS MATERIALS.

15. Each provision of this Agreement and/or the Contract Documents are severable from every other provision, and if any provision is unenforceable, the remainder of the Agreement and/or Contract Documents will remain valid and enforceable. Each provision of the Agreement and the Contract Documents shall be construed as if both parties mutually drafted it. In the event of a conflict between this Agreement and any other Contract Document, the Agreement controls, governs and takes precedence.

16. IN THE EVENT THE JOB LOSS LOCATION IS A RESIDENTIAL PROPERTY, THE ARS RESIDENTIAL RIDER SHALL BE ATTACHED HERETO, SIGNED BY ALL OWNERS OF THE PROPERTY AND APPLY TO THIS AGREEMENT.

CUSTOMER(S) SIGNATURE: _Kathy nguyen (Aug 31, 2021 12:25 CDT)_ _____

DATE: _____

# US-00004-EME Work Auth

**Final Audit Report** 2021-08-31

| | |
|---|---|
| Created: | 2021-08-31 |
| By: | Tana Brandsma (tanab@arsresponds.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAApTy4o1-PCpzENBYTCGtfnVINX-XJjxZy |

## "US-00004-EME Work Auth" History

🖻 Document created by Tana Brandsma (tanab@arsresponds.com)
    2021-08-31 - 5:21:00 PM GMT- IP address: 216.208.32.66

🖾 Document emailed to kathy nguyen (kathynguy3n@yahoo.com) for signature
    2021-08-31 - 5:21:48 PM GMT

🖻 Email viewed by kathy nguyen (kathynguy3n@yahoo.com)
    2021-08-31 - 5:23:29 PM GMT- IP address: 174.203.74.144

🖎 Document e-signed by kathy nguyen (kathynguy3n@yahoo.com)
    Signature Date: 2021-08-31 - 5:25:59 PM GMT - Time Source: server- IP address: 174.203.74.144

🖾 Document emailed to Nathan Normoyle (nathann@arsresponds.com) for signature
    2021-08-31 - 5:26:01 PM GMT

🖻 Email viewed by Nathan Normoyle (nathann@arsresponds.com)
    2021-08-31 - 5:28:41 PM GMT- IP address: 174.248.146.85

🖎 Document e-signed by Nathan Normoyle (nathann@arsresponds.com)
    Signature Date: 2021-08-31 - 5:29:12 PM GMT - Time Source: server- IP address: 174.203.47.177

⊘ Agreement completed.
    2021-08-31 - 5:29:12 PM GMT



ACCESS RESTORATION SERVICES

POWERED BY
Adobe Sign

Filed by: FAX

Date: 8/29/23

Time: 3:42 PM

Deputy Clerk: Brittany Vitrano

EXHIBIT

E

RECEIVED VIA COUNTER FILED FOR RECORD 08/30/2023 12:29:31
Brittany H. Vitrano, DY CLERK
JEFFERSON PARISH, LA

Robin Cheatham

**From:** Robin Cheatham
**Sent:** Friday, October 28, 2022 6:03 AM
**To:** 'Fitch, Kristin'; Claude Reynaud; 'lbarker@wshblaw.com'
**Cc:** cosuna@celticbank.com
**Subject:** RE: |SDA21017210| Baymont

Dear Ms. Fitch: Thank you for your email response. I do not understand the distinction you have made in using proceeds from a policy which is subject to a security interest in favor of our client. You cannot parse out a portion of the insurance policy which serves as a security interest and say that this amount is not secured and the remainder is secured. Moreover, the insurer acknowledged the existence of that security interest when it issued the original check for proceeds including my client as an additional loss payee. Please be advised that Celtic Bank Corporation reserves any and all rights against any and all parties including but not limited to the mitigation company, Mai TL, the guarantors of the loan to our client and the insurer. I am also herewith making a demand for the immediate return of any such proceeds that may have been remitted to the mitigation company. Failure to provide such proceeds within ten(10) days from date of this email correspondence will result in actions being taken to protect our client's interest without further notice. Please be guided accordingly.

**From:** Fitch, Kristin <Kristin.Fitch@sedgwick.com>
**Sent:** Thursday, October 20, 2022 8:46 AM
**To:** Robin Cheatham <Robin.Cheatham@arlaw.com>; Claude Reynaud <claude@mma-pllc.com>; 'lbarker@wshblaw.com' <LBarker@wshblaw.com>
**Subject:** |SDA21017210| Baymont

Good Morning Ms. Cheatham,

Thank you for your email and my apologies for the delay in response.

To answer your question, while mitigation is paid as a part of the building coverage, it is not a part of the building repairs.

The insurance company has a duty to include the mortgage interested parties on all payments in regards to the repairs of the building, not the water extraction or demo portion. This makes sense so that so that the insured can prevent further damage to the building.

Since the mitigation has been completed, the company who performed the work should be paid for their services without restriction. With the permission of the insured, the insurance can include the insured on these payment, but it is not required as it was a service performed for the insured.

Therefore, we have paid what is due and owing to the mitigation contractor, but will continue to include the mortgage company on any proceeds that involves the actual repairs of the building.

Thank you,

Kristin Fitch | Account Manager
Sedgwick |Delegated Authority
DIRECT 407.840.5471 | OFFICE 407.849.0044
12650 Ingenuity Drive Suite 200
Orlando, FL 32826
FREE 800.779.4259 | EMAIL Kristin.Fitch@sedgwick.com
www.sedgwick.com/solutions/property | Caring counts®
(sp) sedgwick | delegated authority

Sedgwick is the Third-Party Claims Administrator for

**Velocity Risk** [logo]

f ⊚ ◎ 𝕏

Please send all claim related documents to Kristin.Fitch@sedgwick.com. Please add the claim number to the subject line of your email.

**From:** Robin Cheatham <Robin.Cheatham@arlaw.com>
**Sent:** Thursday, October 20, 2022 7:15 AM
**To:** Claude Reynaud <claude@mma-pllc.com>; Fitch, Kristin <Kristin.Fitch@sedgwick.com>; 'lbarker@wshblaw.com' <LBarker@wshblaw.com>
**Subject:** RE: Baymont

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

All: I am still waiting for a response to my last email as to the source of the proposed settlement with ARS and the actual status of that proposed settlement particularly considering our client's security interest in certain insurance proceeds? Robin Cheatham

**Robin Cheatham** | ADAMS AND REESE LLP
Of Counsel
701 Poydras Street, Suite 4500 | New Orleans LA 70139
P: 504.585.0411 | M: 504.621.4047
robin.cheatham@arlaw.com | Bio | vCard | Twitter | LinkedIn

**From:** Claude Reynaud <claude@mma-pllc.com>
**Sent:** Wednesday, October 19, 2022 3:24 PM
**To:** Fitch, Kristin <Kristin.Fitch@sedgwick.com>; 'lbarker@wshblaw.com' <LBarker@wshblaw.com>
**Cc:** Robin Cheatham <Robin.Cheatham@arlaw.com>
**Subject:** Baymont

Hey guys, just following up.

Now that the ARS deal is behind us, any idea when we can expect the reissuance of the previously issued checks/payments (in the revised amounts, accounting for the ARS payment) and, perhaps more importantly at this point, the supplemental loss of income payments based on our latest documentation?

Please advise.

Thanks!

**Claude F. Reynaud III**
*Partner*

[logo] MCCLENNY | MOSELEY
& ASSOCIATES

Claude@mma-pllc.com

1820 St. Charles Avenue, Suite 110
New Orleans, LA 70130
Office Direct: (504) 702-0770
Main Office: (713) 334-6121
Toll Free: (844) 662-7552
Fax: (713) 322-5953
www.mma-pllc.com

**From:** Claude Reynaud
**Sent:** Thursday, October 6, 2022 8:29 PM
**To:** Fitch, Kristin <Kristin.Fitch@sedgwick.com>; 'Lori D. Barker' <LBarker@wshblaw.com>
**Cc:** Robin Cheatham <Robin.Cheatham@arlaw.com>
**Subject:** Baymont

Lori/Kristin,

I'm told that the ARS deal was signed and approved yesterday!  Fantastic news!!

Thanks so much for your help with this!! I really do sincerely appreciate it.

Now that that's out of the way, any idea when we can expect the reissuance of the previously issued
checks/payments and the supplemental loss of income payments based on our latest documentation?

As you know, our client is in dire need of the funds and looks forward to rebuilding and resuming business as soon as
possible!

Anyway, just let me know.

Looking forward to working together going forward!

**Claude F. Reynaud III**
*Partner*

MCCLENNY | MOSELEY
& ASSOCIATES

Claude@mma-pllc.com
1820 St. Charles Avenue, Suite 110
New Orleans, LA 70130
Office Direct: (504) 702-0770
Main Office: (713) 334-6121
Toll Free: (844) 662-7552
Fax: (713) 322-5953
www.mma-pllc.com

Any personal data acquired, processed or shared by us will be lawfully processed in line with applicable data protection legislation. If you have any questions regarding how we process personal data refer to our Privacy Notice. Any communication including this email and files/attachments transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If this message has been sent to you in error, you must not copy, distribute or disclose of the information it contains and you must notify us immediately (contact is within the privacy policy) and delete the message from your system.

**Robin Cheatham**

| | |
|---|---|
| **From:** | Robin Cheatham |
| **Sent:** | Monday, October 10, 2022 2:53 PM |
| **To:** | 'Fitch, Kristin'; Claude Reynaud; 'Lori D. Barker' |
| **Subject:** | RE: Baymont |

All: In response to Ms. Fitch's email I don't understand how any payment can be made to the mitigation contractor. There were two checks which were previously issued. For $1M each and those checks were issued to various parties including our client Celtic Bank as a result of their having a security interest in the proceeds and policy which is number 2021-800969. So what I would like to know is the following:

1. Is it correct that all that has been done is that the insurance carrier has negotiated a resolution of the claim by the mitigation company to the amount set forth in your email below?
2. There has been no payment of any proceeds from the above policy or any other insurance policy held by Mai TL which serves as potential for recovery of any proceeds or damages as a result of Hurricane Ida except from loss of use?

Please advise. Thank you. Robin Cheatham

**From:** Fitch, Kristin <Kristin.Fitch@sedgwick.com>
**Sent:** Monday, October 10, 2022 2:25 PM
**To:** Robin Cheatham <Robin.Cheatham@arlaw.com>; Claude Reynaud <claude@mma-pllc.com>; 'Lori D. Barker' <LBarker@wshblaw.com>
**Subject:** RE: Baymont

Hi Robin,

No, mitigation is paid under Building Damage.

Thank you,

**Kristin Fitch | Account Manager**
**Sedgwick |Delegated Authority**
DIRECT 407.840.5471 | OFFICE 407.849.0044
12650 Ingenuity Drive Suite 200
Orlando, FL 32826
FREE 800.779.4259 | EMAIL Kristin.Fitch@sedgwick.com
www.sedgwick.com/solutions/property | Caring counts®
sedgwick | delegated authority

Sedgwick is the Third-Party Claims Administrator for

**Velocity Risk**

f  @  O

Please send all claim related documents to Kristin.Fitch@sedgwick.com. Please add the claim number to the subject line of your email.

**From:** Robin Cheatham <Robin.Cheatham@arlaw.com>
**Sent:** Monday, October 10, 2022 10:40 AM
**To:** Fitch, Kristin <Kristin.Fitch@sedgwick.com>; Claude Reynaud <claude@mma-pllc.com>; 'Lori D. Barker'

**Robin Cheatham**

**From:** Robin Cheatham
**Sent:** Monday, October 10, 2022 9:40 AM
**To:** 'Fitch, Kristin'; Claude Reynaud; 'Lori D. Barker'
**Subject:** RE: Baymont

Good morning! Thank you for your email of this past Friday. I want to understand from what source was the mitigation payment made? Was it from the loss of use claim proceeds? Thank you. Robin Cheatham ,

Yes, we have completed the mitigation portion with ARS.

I have also requested for the reissuance of the prior payments as follows:

$1M Advance payment and $68,000.66 , the difference, less the mitigation payment of $931,999.34.

The payments will be send via FedEx and should be received some time early next week.

We will be revisiting the claim and will be in touch to discuss next steps soon.

Please let me know if there are any questions.

Thank you,

Kristin Fitch | Account Manager
**Sedgwick |Delegated Authority**
DIRECT 407.840.5471 | OFFICE 407.849.0044
12650 Ingenuity Drive Suite 200
Orlando, FL 32826
FREE 800.779.4259 | EMAIL Kristin.Fitch@sedgwick.com
www.sedgwick.com/solutions/property | Caring counts®
Sedgwick | delegated authority

Sedgwick is the Third-Party Claims Administrator for

**Velocity Risk**

f ⊕ ◎ 🐦

Please send all claim related documents to Kristin.Fitch@sedgwick.com. Please add the claim number to the subject line of your email.

**From:** Claude Reynaud <claude@mrna-pllc.com>
**Sent:** Thursday, October 6, 2022 9:29 PM
**To:** Fitch, Kristin <Kristin.Fitch@sedgwick.com>; 'Lori D. Barker' <LBarker@wshblaw.com>
**Cc:** Robin Cheatham <Robin.Cheatham@arlaw.com>
**Subject:** Baymont

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

<LBarker@wshblaw.com>
**Subject: RE: Baymont**

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Good morning. Thank you for your email of this past Friday. I want to understand from what source was the mitigation payment made? Was it from the loss of use claim proceeds? Thank you. Robin Cheatham,

Yes, we have completed the mitigation portion with ARS.

I have also requested for the reissuance of the prior payments as follows:

$1M Advance payment and. $68,000.66 , the difference, less the mitigation payment of $931,999.34.

The payments will be send via FedEx and should be received some time early next week.

We will be revisiting the claim and will be in touch to discuss next steps soon.

Please let me know if there are any questions.

Thank you,

Kristin **Fitch** | Account Manager
Sedgwick |**Delegated Authority**
Direct 407.840.5471 | Office 407.849.0044
12650 Ingenuity Drive Suite 200
Orlando, FL 32826
FREE 800.779.4259 | EMAIL Kristin.Fitch@sedgwick.com
www.sedgwick.com/solutions/property | Caring counts®
(®) sedgwick | delegated authority

Sedgwick is the Third-Party Claims Administrator for

**Velocity Risk ▓▓**

f ⊕ ⊚ ⚥

Please send all claim related documents to Kristin.Fitch@sedgwick.com. Please add the claim number to the subject line of your email.

**Robin Cheatham** | ADAMS AND REESE LLP
Of Counsel
701 Poydras Street, Suite 4500 | New Orleans LA 70139
P: 504.585.0411 | M: 504.621.4047
robin.cheatham@arlaw.com | Bio | vCard | Twitter | LinkedIn

From: Claude Reynaud <claude@mma-pllc.com>
Sent: Thursday, October 6, 2022 9:29 PM
To: Fitch, Kristin <Kristin.Fitch@sedgwick.com>; 'Lori D. Barker' <LBarker@wshblaw.com>

Lori/Kristin,

I'm told that the ARS deal was signed and approved yesterday!  Fantastic news!!

Thanks so much for your help with this!! I really do sincerely appreciate it.

Now that that's out of the way, any idea when we can expect the reissuance of the previously issued checks/payments and the supplemental loss of income payments based on our latest documentation?

As you know, our client is in dire need of the funds and looks forward to rebuilding and resuming business as soon as possible!

Anyway, just let me know.

Looking forward to working together going forward!

**Claude F. Reynaud III**
*Partner*

MCCLENNY | MOSELEY
& ASSOCIATES

Claude@mma-pllc.com
1820 St. Charles Avenue, Suite 110
New Orleans, LA 70130
Office Direct: (504) 702-0770
Main Office: (713) 334-6121
Toll Free: (844) 662-7552
Fax: (713) 322-5953
www.mma-pllc.com

Any personal data acquired, processed or shared by us will be lawfully processed in line with applicable data protection legislation. If you have any questions regarding how we process personal data refer to our Privacy Notice. Any communication including this email and files/attachments transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If this message has been sent to you in error, you must not copy, distribute or disclose of the information it contains and you must notify us immediately (contact is within the privacy policy) and delete the message from your system.

Cc: Robin Cheatham <Robin.Cheatham@arlaw.com>
**Subject:** Baymont

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Lori/Kristin,

I'm told that the ARS deal was signed and approved yesterday! Fantastic news!!

Thanks so much for your help with this!! I really do sincerely appreciate it.

Now that that's out of the way, any idea when we can expect the reissuance of the previously issued checks/payments and the supplemental loss of income payments based on our latest documentation?

As you know, our client is in dire need of the funds and looks forward to rebuilding and resuming business as soon as possible!

Anyway, just let me know.

Looking forward to working together going forward!

**Claude F. Reynaud III**
*Partner*

McCLENNY MOSELEY
& ASSOCIATES

Claude@mma-pllc.com
1820 St. Charles Avenue, Suite 110
New Orleans, LA 70130
Office Direct: (504) 702-0770
Main Office: (713) 334-6121
Toll Free: (844) 662-7552
Fax: (713) 322-5953
www.mma-pllc.com

Any personal data acquired, processed or shared by us will be lawfully processed in line with applicable data protection legislation. If you have any questions regarding how we process personal data refer to our Privacy Notice. Any communication including this email and files/attachments transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If this message has been sent to you in error, you must not copy, distribute or disclose of the information it contains and you must notify us immediately (contact is within the privacy policy) and delete the message from your system.

Any personal data acquired, processed or shared by us will be lawfully processed in line with applicable data protection legislation. If you have any questions regarding how we process personal data refer to our Privacy Notice. Any communication including this email and files/attachments transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If this message has been sent to you in error, you must not copy, distribute or disclose of the information it contains and you must notify us immediately (contact is within the privacy policy) and delete the message from your system.